1   Jeffrey T. Sprung, WSBA #23607
     Kristin Beneski, WSBA #45478
2   Paul M. Crisalli, WSBA #40681
     *Assistant Attorneys General*
3   ROBERT W. FERGUSON
     ATTORNEY GENERAL
4   Washington Attorney General's Office
     800 Fifth Avenue, Suite 2000
5   Seattle, WA 98014
     (206) 464-7744

6

7         **UNITED STATES DISTRICT COURT**
        **EASTERN DISTRICT OF WASHINGTON**
8               **AT YAKIMA**

| | |
|---|---|
| 9    STATE OF WASHINGTON, | NO. 1:19-cv-03040-SAB |
| 10         Plaintiff, | STATE OF WASHINGTON'S MOTION FOR PRELIMINARY |
| 11    v. | INJUNCTION |
| 12    ALEX M. AZAR II, et al., | NOTED FOR: April 25, 2019 |
| 13         Defendants. | With Oral Argument at 10:00 a.m. |

14

15   NATIONAL FAMILY PLANNING
     & REPRODUCTIVE HEALTH
     ASSOCIATION, et al.,
16

17        Plaintiffs,

18   v.

19   ALEX M. AZAR II, et al.,

20        Defendants.

21

22

STATE OF WASHINGTON'S
MOTION FOR PRELIMINARY
INJUNCTION
NO. 1:19-CV-03040-SAB
      i

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1

**TABLE OF CONTENTS**

2    I.    INTRODUCTION AND RELIEF REQUESTED ....................................1

3    II.    STATUTORY AND FACTUAL BACKGROUND...............................4

4        A.  Overview of Title X and Washington's Program .................................4

5        B.  Other Controlling Statutes.................................................................6

6        C.  Five Decades of Title X Regulations ................................................7

7        D.  The Final Rule....................................................................................9

8        E.  The Final Rule's Impact on Washington .........................................13

9    III.    ARGUMENT.......................................................................................19

10        A.  Legal Standard .................................................................................19

11        B.  Washington Is Likely To Succeed on the Merits of Its Administrative
12            Procedure Act Claims .......................................................................19

13            1.  The Final Rule is contrary to law ...................................................19

14                a.  The Final Rule violates the Nondirective Mandate ..............20

15                b.  The Final Rule violates section 1554 of the ACA ................22

16                c.  The Final Rule violates Title X's text and purpose ..............25

17            2.  The Final Rule is arbitrary and capricious....................................27

18                a.  Failure to consider medical ethics and patient-focused care .29

19                b.  Disregarding program requirements and standards of care ...32

20                c.  Network destruction and unnecessary burdens.....................34

21                d.  Failing to consider reliance interests....................................38

22

C.  Washington Will Suffer Irreparable Harm Absent Preliminary Relief ................................................................................39

D.  Equity and the Public Interest Strongly Favor an Injunction .............44

E.  Relief Requested ...................................................................45

IV.  CONCLUSION ..........................................................................45

STATE OF WASHINGTON'S
MOTION FOR PRELIMINARY
INJUNCTION
NO. 1:19-CV-03040-SAB

iii

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

1

**TABLE OF AUTHORITIES**

2

<u>Cases</u>

3

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*
   458 U.S. 592 (1982)..................................................................................5

4

5

*Bauer v. DeVos*
   325 F. Supp. 3d 74 (D.D.C. 2018) ................................................45

6

*California v. Azar*
   911 F.3d 558 (9th Cir. 2018).....................................39, 42, 43

7

8

*California v. Health & Human Servs.*
   281 F. Supp. 3d 806 (N.D. Cal. 2017 ...........................................43

9

*California v. Health & Human Servs.*
   351 F. Supp. 3d 1267 (N.D. Cal. 2019) ..................................42

10

11

*Cf. Nat'l Inst. of Family & Life Advocates v. Becerra*
   138 S.Ct. 2361 (2018) ................................................................29

12

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*
   467 U.S. 837 (1984)..........................................................20, 23

13

14

*City of Los Angeles v. Sessions*
   293 F. Supp. 3d 1087 (C.D. Cal. 2018) .......................................45

15

*Diaz v. Brewer*
   656 F.3d 1008 (9th Cir. 2011).......................................................45

16

17

*Drakes Bay Oyster Co. v. Jewell*
   747 F.3d 1073 (9th Cir. 2014)........................................................44

18

*E. Bay Sanctuary Covenant v. Trump*
   354 F. Supp. 3d 1094 (N.D. Cal. 2018) .......................................41

19

20

*E. Bay Sanctuary Covenant v. Trump*
   909 F.3d 1219 (9th Cir. 2018)..........................................22, 23, 25

21

*Encino Motorcars, LLC v. Navarro*
   136 S. Ct. 2117 (2016) ...........................................................28, 39

22

STATE OF WASHINGTON'S
MOTION FOR PRELIMINARY
INJUNCTION
NO. 1:19-CV-03040-SAB

iv

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

*F.E.C. v. Democratic Senatorial Campaign Comm.*
   454 U.S. 27 (1981) ................................................................................25

*Fair Emp't Council of Greater Wash., Inc. v. BMC Mktg. Corp.*
   28 F.3d 1268 (D.C. Cir. 1994) ............................................................40

*FCC v. Fox Television Stations, Inc.*
   556 U.S. 502 (2009) ................................................................28, 34, 38

*Hernandez v. Sessions*
   872 F.3d 976 (9th Cir. 2017) ...............................................................19

*Idaho v. Coeur d'Alene Tribe*
   794 F.3d 1039 (9th Cir. 2015) .............................................................42

*Jackson Women's Health Org. v. Currier*
   940 F. Supp. 2d 416 (S.D. Miss. 2013) ..............................................41

*King v. Burwell*
   135 S. Ct. 2480 (2015) .........................................................................20

*League of Women Voters of U.S. v. Newby*
   838 F.3d 1 (D.C. Cir. 2016) ...........................................................40, 45

*Lone Mountain Processing, Inc. v. Sec'y of Labor*
   709 F.3d 1161 (D.C. Cir. 2013) ...........................................................34

*MCI Telecomms. Corp. v. AT&T*
   512 U.S. 218 (1994) .............................................................................22

*Michigan v. EPA*
   135 S.Ct. 2699 (2015) ..........................................................................29

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*
   463 U.S. 29 (1983) ..........................................................28, 29, 31, 34

*N.Y. State Nat'l Org. for Women v. Terry*
   886 F.2d 1339 (2d Cir. 1989) ..............................................................41

*Nat'l Family Planning & Reprod. Health Ass'n, Inc. v. Sullivan*
   979 F.2d 227 (D.C. Cir. 1992) ...............................................................5

STATE OF WASHINGTON'S      v      ATTORNEY GENERAL OF WASHINGTON
MOTION FOR PRELIMINARY             800 Fifth Avenue, Suite 2000
INJUNCTION                              Seattle, WA 98104-3188
NO. 1:19-CV-03040-SAB                 (206) 464-7744

*Nat'l Fed'n of Fed. Emps. v. McDonald*
   128 F. Supp. 3d 159 (D.D.C. 2015) ................................................................26

*Nw. Envtl. Advocates v. E.P.A.*
   537 F.3d 1006 (9th Cir. 2008).......................................................................20

*Pennsylvania v. Trump*
   351 F. Supp. 3d 791 (E.D. Pa. 2019) ..............................................41, 42, 43

*Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't Health*
   699 F.3d 962 (7th Cir. 2012).........................................................................41

*Price v. Stevedoring Serv. of Am., Inc.*
   697 F.3d 820 (9th Cir. 2012).........................................................................20

*Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*
   908 F.3d 476 (9th Cir. 2018).........................................................................45

*Rust v. Sullivan*
   500 U.S. 173 (1991) ........................................................................................8

*Saravia for A.H. v. Sessions*
   905 F.3d 1137 (9th Cir. 2018).......................................................................19

*Texas v. United States*
   809 F.3d 134 (5th Cir. 2015).........................................................................42

*Trump v. Int'l Refugee Assistance Project*
   137 S. Ct. 2080 (2017) ..................................................................................44

*Valle del Sol Inc. v. Whiting*
   732 F.3d 1006 (9th Cir. 2013)................................................................40, 41

*W. Ala. Women's Ctr. v. Williamson*
   120 F. Supp. 3d 1296 (M.D. Ala. 2015) .......................................................41

*Waterkeeper Alliance v. E.P.A.*
   853 F.3d 527 (D.C. Cir. 2017) ......................................................................22

*Winter v. Nat. Res. Def. Council, Inc.*
   555 U.S. 7 (2008) ...................................................................................19, 44

STATE OF WASHINGTON'S
MOTION FOR PRELIMINARY
INJUNCTION
NO. 1:19-CV-03040-SAB

vi

1

<u>Statutes</u>

2    RCW 43.70.040(5) ........................................................................................6

3    5 U.S.C. § 705 ...........................................................................................45

4    5 U.S.C. § 706 .............................................................................19, 20, 28

5    42 U.S.C. § 300 ..................................................................................4, 5, 35

6    42 U.S.C. § 300(a) ......................................................................4, 26, 27, 31

7    42 U.S.C. § 300a-3(a) ...............................................................................27

8    42 U.S.C. § 300a-4 .......................................................................................6

9    42 U.S.C. § 300a-5 .................................................................................4, 26

10    42 U.S.C. § 300a-6 .................................................................................4, 33

11    42 U.S.C. § 300(b) ....................................................................................37

12    42 U.S.C. § 300jj-11 .................................................................................33

13    42 U.S.C. § 18114 ..........................................................................7, 23, 29

<u>Regulations</u>

15    42 C.F.R. Part 59 .........................................................................................8

16    42 C.F.R. § 59.5 ...........................................................................................9

17    42 C.F.R. § 59.5(a) ......................................................................................4

18    42 C.F.R. § 59.5(a)(1) ...............................................................................12

19    42 C.F.R. § 59.5(a)(5) ...............................................................................10

20    42 C.F.R. § 59.5(b)(1) ...............................................................................10

14

21

22

STATE OF WASHINGTON'S
MOTION FOR PRELIMINARY
INJUNCTION
NO. 1:19-CV-03040-SAB

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

1    **I.    INTRODUCTION AND RELIEF REQUESTED**

2    On March 4, 2019, Defendants (collectively, "HHS") issued a Final Rule

3    that will destroy almost 90% of Washington's statewide family planning

4    network. Contrary to Congress's directive that HHS use grant funds under Title X

5    of the Public Health Service Act to establish projects that make "comprehensive

6    voluntary family planning services readily available to all persons desiring such

7    services," under the Final Rule the number of Washington counties *without* a

8    Title X provider will jump from five to 21. This will leave low-income patients

9    in more than half of Washington's counties without ready access to Title X family

10   planning services.

11   The State of Washington moves for a preliminary injunction prohibiting

12   HHS from implementing the Final Rule, which is scheduled to go into effect on

13   May 3, 2019. The Final Rule makes drastic and unlawful changes to five decades

14   of regulations implementing Title X, the nation's family planning program for

15   low-income individuals. The Final Rule violates *three* controlling statutes, and is

16   arbitrary and capricious for a host of reasons. It must be enjoined to prevent

17   devastating harm to the State of Washington's family planning network, and the

18   tens of thousands of patients who depend on it.

19   First, the Final Rule violates Congress's mandate that all pregnancy

20   counseling in a Title X program "shall be nondirective" (the "Nondirective

21   Mandate"), which is included in the appropriations act that funds HHS through

22

STATE OF WASHINGTON'S
MOTION FOR PRELIMINARY
INJUNCTION
NO. 1:19-CV-03040-SAB

1

1    September 2019 (and every annual appropriations act since 1996). Contrary to

2    the Nondirective Mandate, the Final Rule requires that *all* pregnant patients

3    receive directive referrals for prenatal care, prohibits referrals for abortion

4    (including at the patient's request or when medically indicated), and permits

5    clinic staff at their discretion to give only directive counseling that pushes

6    patients toward carrying the pregnancy to term.

7        Second, the Final Rule violates section 1554 of the Patient Protection and

8    Affordable Care Act (ACA) in a number of different respects. It mandates strict

9    and costly separation of abortion-related speech and services from Title X-funded

10   services—not just financially, but physically—which, along with the coercive

11   pregnancy counseling requirements and other new provisions, will force out the

12   Title X clinics comprising 89% of Washington's statewide network, leaving

13   low-income patients without access to services. The few clinics able and willing

14   to stay in the program will have to provide substandard care that omits accurate

15   medical information needed for informed decisionmaking and steers patients

16   toward the government's preferred treatment option. Both outcomes violate

17   section 1554, which prohibits the Secretary from promulgating "any" regulation

18   that delays or creates barriers to medical care, interferes with patient–provider

19   communications, or violates principles of informed consent and medical ethics.

20       Third, the Final Rule violates Title X, as its effect fundamentally betrays

21   the statute's central purpose: equalizing access to modern, high-quality, effective

22

STATE OF WASHINGTON'S                    2        ATTORNEY GENERAL OF WASHINGTON
MOTION FOR PRELIMINARY                                    800 Fifth Avenue. Suite 2000
INJUNCTION                                               Seattle, WA  98104-3188
NO. 1:19-CV-03040-SAB                                        (206) 464-7744

1    contraception and other family planning services, regardless of a person's

2    economic condition. Forcing highly qualified and demonstrably successful

3    providers out of Washington's Title X program (based on care they provide

4    *independent* of the program) will inevitably reduce access to care, worsen health

5    outcomes, and hurt the very people the statute was intended to help. In addition,

6    the coercive counseling requirements violate the statutory command that receipt

7    of Title X services and information be strictly "voluntary." Furthermore, the Final

8    Rule exceeds HHS's authority and is arbitrary and capricious. In its single-

9    minded pursuit of policy goals unrelated to Title X, HHS ignored extensive

10    evidence in the record and failed to meaningfully respond to a host of public

11    comments, including unanimous opposition from leading medical associations.

12         The Final Rule is an executive overreach aimed at implementing policy

13    objectives disconnected from Title X. An agency cannot enact new policies

14    through a rulemaking that ignores or unrecognizably twists the meaning of

15    controlling statutes, or that brushes aside extensive evidence of the harm it will

16    cause. Agencies are strictly bound by laws duly enacted by Congress—and here,

17    Congress has spoken clearly, consistently, and repeatedly.[1]

18    ———————————————

19        [1] In addition to these consolidated cases, five other cases challenging the

20    Final Rule have been filed: Nos. 19-cv-217, 19-cv-318 (D. Or.);

21    Nos. 19-cv-1184, 19-cv-1195 (N.D. Cal.); No. 19-cv-100 (D. Me.).

22

STATE OF WASHINGTON'S
MOTION FOR PRELIMINARY
INJUNCTION
NO. 1:19-CV-03040-SAB

3

1               **II.     STATUTORY AND FACTUAL BACKGROUND**

2   **A.    Overview of Title X and Washington's Program**

3           Title X[2] is the nation's safety-net family planning program for low-income

4 individuals. Through grants to states like Washington and other qualifying

5 entities, Title X funds "projects" or "programs" nationwide that offer a "broad

6 range of acceptable and effective family planning methods and services[.]"[3] Title

7 X programs offer patients a wide selection of contraceptive methods and services;

8 testing for sexually transmitted infections (STIs) and human immunodeficiency

9 virus (HIV); cancer screenings; pregnancy testing and counseling; and referrals

10 for out-of-program care.[4] Per section 1007 of the statute, the acceptance of all

11 Title X services and information must be strictly "voluntary."[5] Per section 1008,

12 Title X funds may not be used for "abortion as a method of family planning."[6]

13           Title X's primary purpose is to equalize access to modern, effective

14

15 _____

16      [2] 42 U.S.C. § 300 *et seq.*

17      [3] *Id.* § 300(a).

18      [4] *Id.*; 42 C.F.R. § 59.5(a).

19      [5] 42 U.S.C. § 300a-5.

20      [6] *Id.* § 300a-6. Congress has made clear that section 1008 is consistent with

21 requiring that Title X pregnancy counseling be nondirective. *See infra* at 6–7.

22

STATE OF WASHINGTON'S
MOTION FOR PRELIMINARY
INJUNCTION
NO. 1:19-CV-03040-SAB

4

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

1   contraception to help women avoid unplanned and unwanted pregnancies.[7] The

2   statute was passed with strong bipartisan support in 1970 in response to a growing

3   body of evidence that, due to low-income women's lack of access to effective

4   contraception, they had less control over their reproduction than more affluent

5   women, creating adverse health and economic outcomes.[8] First among Title X's

6   stated purposes is "to assist in making comprehensive voluntary family planning

7   services readily available to all persons desiring such services"; a related goal

8   was to "improve the effectiveness of family planning service programs" in

9   helping people determine freely the number and spacing of their children.[9]

10          The Washington State Department of Health (DOH) is the sole grantee[10]

11  of Title X funds in Washington and runs a statewide program pursuant to state

12  law, overseeing a network of 16 subrecipient organizations operating 85 clinic

13

14  _____

15          [7] *See id.* § 300; ECF No. 1 (Compl.) ¶¶ 22–26.

16          [8] *Id.* ¶¶ 19–21.

17          [9] Pub. L. No. 91-572, § 2, 84 Stat. 1504 (1970).

18          [10] Washington has standing to sue as a grantee, *see, Nat'l Family Planning*

19  *& Reprod. Health Ass'n, Inc. v. Sullivan*, 979 F.2d 227, 239 (D.C. Cir. 1992),

20  and to vindicate its sovereign, quasi-sovereign, and proprietary interests, *Alfred*

21  *L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 600–07 (1982).

22

STATE OF WASHINGTON'S          5
MOTION FOR PRELIMINARY
INJUNCTION
NO. 1:19-CV-03040-SAB

1   sites.[11] Approximately one third of the program is funded through Title X grants,

2   while the remainder is State-funded.[12] This integrated, jointly funded program

3   served over 91,000 low-income patients in 2017 (57% of whom were at or below

4   the federal poverty level), saving over $113 million in health care costs and

5   helping women avoid over 18,000 unintended pregnancies that year alone.[13]

6   **B.    Other Controlling Statutes**

7   HHS is authorized to issue regulations implementing Title X, subject to

8   statutory limitations on its rulemaking authority found in Title X and elsewhere.[14]

9   One such limitation is the Nondirective Mandate included in decades' worth of

10  annual appropriations acts.[15] The Department of Health and Human Services

11  Appropriations Act, 2019, which funds HHS through September 2019, provides

12  that all Title X pregnancy counseling "shall be nondirective[.]"[16]

13  _____

14  [11] Harris Decl. ¶ 14; WA cmt. at 4; RCW 43.70.040(5). For the Court's

15  convenience, citations to public comments in the rulemaking record are both

16  hyperlinked and attached to the Beneski Declaration as Exhibit 1.

17  [12] Harris Decl. ¶ 24.

18  [13] Harris Decl. ¶¶ 26, 33; WA cmt. at 5.

19  [14] *See* 42 U.S.C. §§ 300–300a-4.

20  [15] Compl. ¶ 49 n.15 (citing appropriations acts 1996–2018).

21  [16] Pub. L. No. 115-245.

22

STATE OF WASHINGTON'S
MOTION FOR PRELIMINARY
INJUNCTION
NO. 1:19-CV-03040-SAB

6

1     Another limitation on HHS's authority is section 1554 of the ACA, which

2  provides that the Secretary "shall not promulgate any regulation" that—

3       (1)    creates any unreasonable barriers to the ability of individuals
               to obtain appropriate medical care;
4       (2)    impedes timely access to health care services;
        (3)    interferes with communications regarding a full range of
5              treatment options between the patient and the provider;
        (4)    restricts the ability of health care providers to provide full
6              disclosure of all relevant information to patients making
               health care decisions; [or]
7       (5)    violates the principles of informed consent and the ethical
               standards of health care professionals . . . .[17]
8

**C.    Five Decades of Title X Regulations**

9
        Since the 1970s, Title X regulations and guidance have governed grantees'
10
provision of a broad range of effective, medically approved contraception and
11
other family planning services, including nondirective pregnancy counseling and
12
referrals for out-of-program care, while ensuring compliance with section 1008.[18]
13
The sole exception was an anomalous 1988 "gag rule" that was swiftly enjoined
14
and never implemented in fact: it prohibited nondirective pregnancy counseling,
15
including referral for abortion, and for the first time required physical separation
16
of abortion care.[19] The gag rule was upheld as a permissible construction of
17

18  _____

19      [17] 42 U.S.C. § 18114.

20      [18] *See* Compl. ¶¶ 29–47.

21      [19] *Id.* ¶¶ 33–36; 53 Fed. Reg. 2922 (former 42 C.F.R. §§ 59.8, 59.9).

22

STATE OF WASHINGTON'S
MOTION FOR PRELIMINARY
INJUNCTION
NO. 1:19-CV-03040-SAB                    7          ATTORNEY GENERAL OF WASHINGTON
                                                    800 Fifth Avenue. Suite 2000
                                                    Seattle, WA  98104-3188
                                                    (206) 464-7744

Title X in the pre-Nondirective Mandate case of *Rust v. Sullivan*, 500 U.S. 173 (1991), but was rescinded in early 1993 amidst a public outcry and continued litigation.[20] Congress has since shut the door on regulations like the gag rule.

The Current Regulations reinstated the pre-*Rust* status quo.[21] In 1996, Congress began including the Nondirective Mandate in its annual appropriations acts,[22] prompting the HHS Secretary to observe in 2000 that "Congress has repeatedly indicated that it considers this requirement to be an important one[.]"[23] The Secretary further noted that "the requirement for nondirective options counseling has existed in the Title X program for many years, and, with the exception of the period 1988–1992, it has always been considered to be a necessary and basic health service of Title X projects"; moreover, nondirective counseling is "consistent with the prevailing medical standards" recommended by national medical groups.[24] Accordingly, the Current Regulations require Title X projects to offer "neutral, factual information" about all pregnancy options—"prenatal care and delivery"; "infant care, foster care, and adoption";

---

[20] *Id.* ¶¶ 37–39.

[21] 65 Fed. Reg. 41270 (Jul. 3, 2000), 42 C.F.R. Part 59; Compl. ¶¶ 40–47.

[22] Compl. ¶ 49 n.15.

[23] 65 Fed. Reg. 41273.

[24] *Id.*

STATE OF WASHINGTON'S
MOTION FOR PRELIMINARY
INJUNCTION
NO. 1:19-CV-03040-SAB

8

1  and "termination of pregnancy"—and referral upon request, unless the patient
2  does not wish to receive such information about a particular option.[25]

3       In addition, HHS's Program Requirements require Title X projects to
4  provide nondirective pregnancy counseling, and incorporate the "QFP" and its
5  updates.[26] The QFP reflects evidence-based best practices for "Providing Quality
6  Family Planning Services" in the United States, and requires that "[o]ptions
7  counseling should be provided" to pregnant patients as recommended by the
8  American College of Obstetricians and Gynecologists (ACOG) and others.[27]

9  **D.    The Final Rule**

10      The Final Rule[28] reverses longstanding policies reflected in the Current
11  Regulations and Program Requirements. It will disrupt Title X programs like
12  Washington's that are currently functioning smoothly. If the Final Rule goes into

13  _____

14      [25] 42 C.F.R. § 59.5.

15      [26] Beneski Decl. Ex. 2 (Program Requirements), 3 (QFP), 4 (QFP update).

16      [27] QFP at 14; Coleman Decl. ¶¶ 63–64; Kost Decl. ¶¶ 22–25; AAP &
17  ACOG, *Guidelines for Perinatal Care* at 127 (7th ed. 2016) (patient with
18  unwanted pregnancy should be "fully informed in a balanced manner about all
19  options, including raising the child herself, placing the child for adoption, and
20  abortion"); ACOG cmt. at 6; Compl. ¶ 46.

21      [28] 84 Fed. Reg. 7714, ECF No. 1-4 (Compl. Ex. A).

22

STATE OF WASHINGTON'S                    9            ATTORNEY GENERAL OF WASHINGTON
MOTION FOR PRELIMINARY                                        800 Fifth Avenue. Suite 2000
INJUNCTION                                                      Seattle, WA  98104-3188
NO. 1:19-CV-03040-SAB                                               (206) 464-7744

1  effect, it will impede patients' access to complete and accurate information and

2  medical care, whether funded by Title X or otherwise—violating multiple

3  controlling statutes, irrationally overturning five decades of precedent, and

4  exceeding the scope of the Secretary's rulemaking authority.

5      First, the Final Rule imposes coercive and misleading pregnancy

6  counseling requirements that brazenly violate the Nondirective Mandate and

7  other post-*Rust* laws. It broadly prohibits referrals for abortion, striking

8  requirements that patients be referred for out-of-program care upon request and

9  for "medically indicated" care.[29] It requires that all pregnant patients receive

10  directive referrals for prenatal care absent an "emergency," regardless of the

11  patient's wishes (or the provider's medical judgment).[30] At the same time, the

12  Final Rule purports to permit "nondirective" pregnancy counseling (if provided

13  by physicians or "advanced practice providers"),[31] but alternatively allows any

14  clinic staff to give only biased, one-sided information about carrying to term.[32]

15

16  _____

17      [29] Final Rule §§ 59.5(a)(5), 59.5(b)(1), 59.14(a); *compare* current

18  42 C.F.R. §§ 59.5(a)(5), 59.5(b)(1); Compl. ¶¶ 71, 78.

19      [30] Final Rule § 59.14(b); Compl. ¶ 72.

20      [31] Final Rule §§ 59.14(b)(1)(i), 59.2; Compl. ¶¶ 74–75.

21      [32] 84 Fed. Reg. 7714 (revised 42 C.F.R. § 59.14(b)); Compl. ¶ 72.

22

STATE OF WASHINGTON'S
MOTION FOR PRELIMINARY
INJUNCTION
NO. 1:19-CV-03040-SAB

10

1    Second, the Final Rule imposes onerous and unworkable physical

2   separation requirements in addition to the statute's financial separation

3   requirement, without sufficient justification. If a grantee or subgrantee provides

4   abortion care or referral, or engages in expressive or associational activities such

5   as supporting access to safe and legal abortion, those activities must be physically

6   separated from Title X services.[33] "Factors relevant to" adequate separation

7   include the existence of separate treatment, consultation, examination and

8   waiting rooms; separate office entrances and exits; separate phone numbers and

9   email addresses; separate websites; separate educational services; separate

10  personnel; separate workstations; separate electronic health records; and the

11  presence or absence of signage "referencing" abortion.[34] HHS emphasized that

12  employing separate Title X and non-Title X staff is insufficient separation, that

13  co-locating Title X activities and abortion-related activities within a single space

14  is impermissible, and that separate electronic health records systems are

15  mandatory.[35] Many clinics cannot bear the financial costs—which commenters

16  anticipate will be over twenty times HHS's unsupported estimate of $30,000 per

17

18  _____

19      [33] Final Rule § 59.15; *see id.* §§ 59.13, .14, .16; Compl. ¶ 90.

20      [34] Final Rule § 59.15; Compl. ¶ 91.

21      [35] Supp. Info., 84 Fed. Reg. at 7764–67, 7769.

22

STATE OF WASHINGTON'S                              11                    ATTORNEY GENERAL OF WASHINGTON
MOTION FOR PRELIMINARY                                                          800 Fifth Avenue, Suite 2000
INJUNCTION                                                                        Seattle, WA  98104-3188
NO. 1:19-CV-03040-SAB                                                                (206) 464-7744

1    clinic—or cannot meet the one-year deadline.[36] Those that try to scramble to

2    comply will have to provide unethical and substandard care, divert limited

3    resources away from caring for patients, and reduce their hours or close their

4    doors during construction, further reducing access to care for no good reason.[37]

5        Third, the Final Rule makes a number of other changes that will unlawfully

6    and arbitrarily reduce access to care, impose needless costs, and undermine the

7    purpose of Title X: removing the requirement that Title X services be "medically

8    approved";[38] requiring that Title X clinics offer or be in close proximity to

9    "comprehensive primary health care services" (which are outside Title X's

10    scope);[39] jeopardizing the right to apply for a grant by vesting HHS with broad

11    discretion to arbitrarily determine eligibility;[40] and limiting the uses of Title X

12    funds (even uses expressly contemplated by the statute).[41]

13    _____

14        [36] *See* PPFA cmt. at 32, 73–74; NFPRHA cmt. at 37; Eastlund Decl. ¶¶ 14-

15    20 (estimating compliance costs of $6.5 million in first year); 84 Fed. Reg. 7782.

16        [37] Compl. ¶¶ 102–108; *see infra* at 15–16, 23–24, 34–35.

17        [38] *Compare* Final Rule § 59.5(a)(1) *with* current 42 C.F.R. § 59.5(a)(1);

18    Compl. ¶¶ 109–113.

19        [39] Final Rule § 59.5(a)(12); Compl. ¶¶ 114–120.

20        [40] Final Rule § 59.7(b); Compl. ¶¶ 126–132; NFPRHA cmt. at 31.

21        [41] Final Rule § 59.18(a); Compl. ¶¶ 133–134.

22

STATE OF WASHINGTON'S                    12                    ATTORNEY GENERAL OF WASHINGTON
MOTION FOR PRELIMINARY                                          800 Fifth Avenue. Suite 2000
INJUNCTION                                                      Seattle, WA  98104-3188
NO. 1:19-CV-03040-SAB                                              (206) 464-7744

1    **E.    The Final Rule's Impact on Washington**

2    As Washington explained in its public comments, the unlawful Final Rule

3    will disqualify critical Title X providers and dismantle the State's successful

4    family planning program.[42] This will leave many patients with diminished or no

5    access to needed care, exacerbating the negative health and economic outcomes

6    Title X was meant to address.[43] The consequences for the State and its residents

7    cannot be fully remedied if the Final Rule goes into effect.

8    Five current subrecipients of Title X grant funds operating 35 clinics in

9    Washington have informed DOH that they cannot meet the Final Rule's new

10    requirements.[44] In 2017, these clinics served 89% of the Title X patients in

11    Washington.[45] Their departure will leave 21 of Washington's 39 counties without

12    *any* Title X provider: 11 in Eastern Washington and 10 in Western Washington

13

14    _____

15    [42] WA cmt. at 4–5, 24–25.

16    [43] *Id.* at 26.

17    [44] Harris Decl. ¶ 60. Other subrecipients, clinics, and individual providers

18    are likely to leave as well, due to the Final Rule's costly required separation and

19    imposition of unethical and contraindicated medical care. *Id*. ¶ 64; *cf.* Eastlund

20    Decl. ¶ 8; Kruse Decl. ¶ 40; Maisen Decl. ¶ 42; Adams Decl. ¶¶ 34–40, 43–51.

21    [45] Harris Decl. ¶ 60.

22

STATE OF WASHINGTON'S
MOTION FOR PRELIMINARY
INJUNCTION
NO. 1:19-CV-03040-SAB

13

1    (including six of the 10 most populous counties in the State).[46] Patients in those

2    counties will have to travel hundreds of miles to the nearest Title X clinic,

3    overburdening clinics that remain, while patients who cannot make the long trip

4    or get into an overloaded clinic will lose access to services.[47] Patients in rural

5    areas will suffer disproportionately, as they are more likely to be uninsured and

6    underserved by health care providers generally.[48] Rural clinics are more likely to

7    close entirely absent federal funding, exacerbating public health disparities

8    among already underserved patients.[49] Students, too, will be especially impacted

9    by the loss of Title X clinics near Washington colleges and universities,

10    jeopardizing student health and educational attainment.[50] In the unlikely event

11    that the remaining 11% of the network stays in place with no staff losses,[51] these

12    clinics cannot come close to filling the massive gap left by the departing

13    ───────────────

14        [46] Harris Decl. ¶ 61.

15        [47] Harris Decl. ¶ 62.

16        [48] Harris Decl. ¶¶ 65–66; WA cmt. at 23, 25; *see also* AMA cmt. at 4;

17    ACOG cmt. at 11–12; CA cmt. at 13–14.

18        [49] Harris Decl. ¶ 66; Eastlund Decl. ¶ 11; WA cmt. at 25.

19        [50] Harris Decl. ¶¶ 67, 91; Eastlund Decl. ¶¶ 6–7; *see* WA cmt. at 3 & n.9;

20    NWLC cmt. at 7 & n.22; PPFA cmt. at 95.

21        [51] *See supra* n.44.

22

STATE OF WASHINGTON'S                          14              ATTORNEY GENERAL OF WASHINGTON
MOTION FOR PRELIMINARY                                                800 Fifth Avenue. Suite 2000
INJUNCTION                                                            Seattle, WA  98104-3188
NO. 1:19-CV-03040-SAB                                                      (206) 464-7744

subrecipients.[52] For instance, Federally Qualified Health Centers (FQHCs) in Washington are structurally and financially unable to handle a massive influx of patients,[53] leaving many without care. HHS offered no evidence to support its "belie[f]" that new clinics able and willing to comply with the Final Rule will somehow rush in to immediately fill the massive gaps in the network.[54]

The Final Rule's drastic and harmful new requirements are not limited to clinics and their patients—they will also impact Washington's ability to continue administering a Title X program at all. For instance, the separation provisions extend so far as to require DOH to *physically* separate its Olympia-based administration of Washington's statewide Title X program from any State

---

[52] Harris Decl. ¶ 68. Studies show that when specialized family planning clinics such as Planned Parenthood are excluded from statewide networks, patients lose access to care, and clinics that remain in the network are unable to fill the gaps even when the program is adequately funded. *See* ACOG cmt. at 12-13; APHA cmt. at 4; NFPRHA cmt. at 34; PPFA cmt. at 16, 20; GW Fac. cmt. at 2–3; Beneski Decl. Ex. 5.

[53] Marsalli Decl. ¶¶ 8–11; *see also* ACOG cmt. at 12; Guttmacher cmt. at 14 & Table 2; PPFA cmt. at 16, 78.

[54] Supp. Info., 84 Fed. Reg. 7766.

STATE OF WASHINGTON'S
MOTION FOR PRELIMINARY
INJUNCTION
NO. 1:19-CV-03040-SAB

15

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1   activities related to abortion.[55] Even if Washington could continue its Title X

2   program despite this crippling burden, that program would receive less federal

3   funding due to network shrinkage as discussed above, and would offer

4   substandard care that would harm patients and increase costs in Washington.[56]

5      If its Title X funds disappear entirely because of the Final Rule,

6   Washington's program will lose one third of its current funding. DOH would

7   suddenly have far less funding to allocate to family planning providers, resulting

8   in fewer patients receiving services and a more limited scope of services.[57] DOH

9   estimates that up to 72,000 Washingtonians would lose access to subsidized

10  family planning if this occurred.[58] The 16,000 Title X patients in Washington

11  who pay on a sliding scale may no longer be able to afford needed care if they

12  lose access to a Title X clinic and have to pay full price.[59] With fewer patients

13  being able to access the most effective forms of contraception, STI testing, cancer

14  screening, and other reproductive health care, the inevitable consequences will

15

16  _____

17     [55] Harris Decl. ¶ 82; Maisen Decl. ¶¶ 26–37.

18     [56] Harris Decl. ¶¶ 70–71, 84; *see infra* at 23–24, 32–34.

19     [57] Harris Decl. ¶¶ 88–89, 94.

20     [58] Harris Decl. ¶ 89.

21     [59] Zerzan-Thul Decl. ¶ 18.

22

STATE OF WASHINGTON'S
MOTION FOR PRELIMINARY
INJUNCTION
NO. 1:19-CV-03040-SAB

16

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

1    include more unintended pregnancies,[60] more maternal deaths,[61] adverse

2    maternal and pediatric health outcomes, undetected cancers, and other public

3    health problems.[62] Analyses show that nationally, every $1 spent on family

4    planning services results in over $7 of cost savings[63]—savings that will be

5    slashed when the Final Rule impedes access to these services.

6        The State of Washington will bear increased public health costs. In 2017,

7    Title X services saved the State multiple millions of dollars that otherwise would

8    have been spent addressing preventable health issues; the costs imposed by the

9    Final Rule will be well over $100 million, and are projected at $28 million in the

10   first year alone if the rule is not enjoined.[64] The State's Health Care Authority,

11   _____

12       [60] *See* WA cmt. at 26; AAN cmt. at 3; ACOG cmt.at 2; ACP cmt. at 4;

13   APHA cmt. at 5; CA cmt. at 4, 14, 16; JIWH cmt. at 1, 4–5; NFPRHA cmt. at 4,

14   31–35; PPFA cmt. at 18, 80; GW Fac. cmt. at 7.

15       [61] Maternal mortality has been rising in the United States. CA cmt. at 13 &

16   n.21; Beneski Decl. Ex. 6; Compl. ¶ 78 n.28.

17       [62] Harris Decl. ¶ 96; WA cmt. at 26; PPFA cmt. at 15–22, 33, 70, 80–81;

18   NFPRHA cmt. at 31–35; CA cmt. at 4, 14; Compl. ¶¶ 159, 167–168.

19       [63] Beneski Decl. Ex. 7; WA cmt. at 26; ACOG cmt. at 2; Guttmacher cmt.

20   at 19; NFPRHA cmt. at 32; PPFA cmt. at 80.

21       [64] WA cmt. at 5; Harris Decl. ¶ 95.

22

STATE OF WASHINGTON'S
MOTION FOR PRELIMINARY
INJUNCTION
NO. 1:19-CV-03040-SAB

17

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

1  which administers its Medicaid program (Apple Health) and other public health

2  programs, currently funds nearly 50% of all births in Washington State, a figure

3  likely to increase if unintended pregnancies rise due to the Final Rule.[65] Apple

4  Health will pay for the care of many women who experience an unintended

5  pregnancy after losing access to Title X services: currently, 81% of Title X clients

6  are eligible for Apple Health or would become eligible in the event of a

7  pregnancy; others may become eligible if a pregnancy affects their income by

8  forcing them to stop working or reduce their hours, or by changing their family

9  size.[66] Patients who are ineligible for Apple Health and who lose access to Title

10 X services would turn to other parts of the safety net, or fall through the cracks.

11      Washington raised its serious concerns about network destruction in public

12 comments on the proposed rule that preceded the Final Rule,[67] but HHS failed to

13 address or even acknowledge Washington's unique concerns. Indeed, network

14 destruction is part and parcel of the Trump Administration's goal in promulgating

15 the Final Rule, which is to penalize clinics that provide abortion care *independent*

16 of Title X.[68] HHS fundamentally fails to grapple with the real-world

17

18      [65] Zerzan-Thul Decl. ¶ 15.

19      [66] Zerzan-Thul Decl. ¶¶ 7, 13, 15, 19.

20      [67] WA cmt. at 24 & Att. 1.

21      [68] *See* Compl. ¶¶ 135–138.

22

STATE OF WASHINGTON'S                    18        ATTORNEY GENERAL OF WASHINGTON
MOTION FOR PRELIMINARY                                      800 Fifth Avenue. Suite 2000
INJUNCTION                                                     Seattle, WA  98104-3188
NO. 1:19-CV-03040-SAB                                              (206) 464-7744

1    consequences of the Final Rule's drastic and politically motivated changes.

2    ### III.    ARGUMENT

3    ### A.    Legal Standard

4    "The familiar *Winter* standard provides that 'a plaintiff seeking a

5    preliminary injunction must establish that he is likely to succeed on the merits,

6    that he is likely to suffer irreparable harm in the absence of preliminary relief,

7    that the balance of equities tips in his favor, and that an injunction is in the public

8    interest.' " *Saravia for A.H. v. Sessions*, 905 F.3d 1137, 1142 (9th Cir. 2018)

9    (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). Under the

10    Ninth Circuit's "sliding scale" approach, these elements are "balanced, so that a

11    stronger showing of one element may offset a weaker showing of another."

12    *Hernandez v. Sessions*, 872 F.3d 976, 990 (9th Cir. 2017).

13    ### B.    Washington Is Likely To Succeed on the Merits of Its Administrative Procedure Act Claims

14

15    Washington is likely to succeed on the merits of its claims under the

16    Administrative Procedure Act (APA). The Final Rule should be "[held] unlawful

and set aside" because it is contrary to multiple controlling statutes, exceeds the

17    agency's rulemaking authority, and is arbitrary and capricious. 5 U.S.C. § 706.

18    #### 1.    The Final Rule is contrary to law

19    Under the APA, courts must set aside agency action "in excess of statutory

20    jurisdiction, authority, or limitations" or otherwise "not in accordance with law."

21

22

STATE OF WASHINGTON'S
MOTION FOR PRELIMINARY
INJUNCTION
NO. 1:19-CV-03040-SAB

19

1    5 U.S.C. §§ 706(2)(A), (C). Where, as here, a plaintiff alleges that agency action

2    is contrary to law, courts apply the framework established in *Chevron, U.S.A.,*

3    *Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984). *See Nw. Envtl.*

4    *Advocates v. E.P.A.*, 537 F.3d 1006, 1014 (9th Cir. 2008). Under *Chevron*, the

5    court "must give effect to the unambiguously expressed intent of Congress."

6    467 U.S. at 843. If "Congress has directly spoken to the precise question at issue"

7    and "the intent of Congress is clear, that is the end of the matter." *Id.* at 842.

8    "If the statutory language is plain, [the court] must enforce it according to its

9    terms." *King v. Burwell*, 135 S. Ct. 2480, 2489 (2015). Even where a statute

10    contains an ambiguity, no deference is owed to a *post hoc* agency interpretation

11    advanced for the first time in litigation, absent a formal rulemaking process.

12    *Price v. Stevedoring Serv. of Am., Inc.*, 697 F.3d 820, 830 (9th Cir. 2012).

13        The Final Rule violates *multiple* statutes plainly mandating (1) that Title X

14    pregnancy counseling be nondirective; (2) that HHS is forbidden to promulgate

15    any rule that creates barriers or impedes timely access to medical care, interferes

16    with patient–provider communications, or violates medical ethics or principles

17    of informed consent; and (3) that receipt of Title X services and information be

18    strictly "voluntary," among other requirements of Title X's text and purpose.

19        **a.    The Final Rule violates the Nondirective Mandate**

20        Every year since 1996, Congress has included the Nondirective Mandate

21    in its appropriations acts. As to the amounts allocated for Fiscal Year 2019 "for

22

STATE OF WASHINGTON'S                    20              ATTORNEY GENERAL OF WASHINGTON
MOTION FOR PRELIMINARY                                      800 Fifth Avenue. Suite 2000
INJUNCTION                                                  Seattle, WA  98104-3188
NO. 1:19-CV-03040-SAB                                           (206) 464-7744

1 carrying out the program under title X of the PHS Act to provide for voluntary

2 family planning projects, . . . all pregnancy counseling shall be nondirective[.]"[69]

3       The Final Rule defies Congress's mandate by requiring that *all* pregnant

4 patients receive directive referrals for prenatal care—regardless of whether the

5 patient intends to continue the pregnancy, or whether the medical care provider

6 believes the referral is appropriate in light of the patient's individual needs and

7 choices. Although section 59.14(b) pays lip service to the Nondirective Mandate

8 by purporting to permit "nondirective" counseling if a provider chooses to offer

9 it, the prenatal care referral requirement renders *any* counseling directive and

10 coercive because it pushes patients toward one option (carrying to term) and away

11 from another (abortion). Directing patients to the government's preferred type of

12 medical care in response to a pregnancy cannot be reconciled with the

13 Nondirective Mandate. Even if pregnancy counseling that includes a mandatory

14 prenatal care referral could somehow be genuinely nondirective, the Final Rule

15 makes such counseling optional, as opposed to making it available to all patients

16 as required by the Nondirective Mandate. As alternatives to "nondirective"

17 counseling, the Final Rule lets providers instead choose to give pregnant patients

18 only politically biased "[i]nformation about maintaining the health of the mother

19

20 _____

21     [69] Pub. L. No. 115-245; Compl. ¶ 49.

22

STATE OF WASHINGTON'S
MOTION FOR PRELIMINARY
INJUNCTION
NO. 1:19-CV-03040-SAB

21

1    and unborn child during pregnancy,"[70] and permits referrals to "social services

2    or adoption agencies" but not to abortion clinics. Final Rule § 59.14(b)(1).

3        These clear violations of the Nondirective Mandate render the Final Rule

4    invalid. *See E. Bay Sanctuary Covenant v. Trump*, 909 F.3d 1219, 1247 (9th Cir.

5    2018) ("an agency's authority to promulgate categorical rules is limited by clear

6    congressional intent to the contrary"). HHS lacks the power to adopt regulations

7    that contradict the means (i.e., nondirective counseling) by which Congress

8    directed it to implement Title X. *See Waterkeeper Alliance v. E.P.A.*, 853 F.3d

9    527, 535 (D.C. Cir. 2017) (agencies and reviewing courts are "bound, not only

10   by the ultimate purposes Congress has selected, but by the means it has deemed

11   appropriate, and prescribed, for the pursuit of those purposes") (quoting

12   *MCI Telecomms. Corp. v. AT&T*, 512 U.S. 218, 231 n.4 (1994)). The coercive

13   counseling provisions (§§ 59.5), and the required separation of nondirective

14   counseling from Title X activities (§ 59.15), are unlawful statutory violations.

15       **b.    The Final Rule violates section 1554 of the ACA**

16       Section 1554 of the ACA preserves the sanctity and integrity of the

17   patient–provider relationship by prohibiting interference by federal regulators. It

18   bars HHS from adopting "any" regulations, under Title X or otherwise, that

19   _____

20       [70] "Unborn child" is a non-medical term signaling an ideological view of

21   reproductive health care. *See* ACOG cmt. at 4; Guttmacher cmt. at 7.

22

STATE OF WASHINGTON'S                    22                ATTORNEY GENERAL OF WASHINGTON
MOTION FOR PRELIMINARY                                          800 Fifth Avenue. Suite 2000
INJUNCTION                                                        Seattle, WA  98104-3188
NO. 1:19-CV-03040-SAB                                               (206) 464-7744

1    impede patients' access to medical information and quality care. 42 U.S.C. §

2    18114. HHS failed to even mention or consider these "clear" and "unambiguous"

3    limitations on its authority, which cannot be reconciled with the Final Rule.

4    *Chevron*, 467 U.S. at 842–43; *E. Bay Sanctuary Covenant*, 909 F.3d at 1247.

5          The Final Rule "impedes timely access to care" and

6    "creates . . . unreasonable barriers to the ability of individuals to obtain

7    appropriate medical care" (§§ 18114(1), (2)) in a number of ways, including by

8    imposing onerous, unworkable, and unnecessary physical separation

9    requirements and mandating unethical practices that will disqualify and drive out

10   the vast majority of current Title X providers in Washington, thereby reducing

11   patients' access to family planning services—especially in rural areas.[71]

12   Requiring total physical separation of abortion care (and other newly prohibited

13   activities like nondirective pregnancy counseling) is cost-prohibitive for many

14   clinics and burdensome for patients.[72] Those who live in one of the 21

15   Washington counties that will lack a Title X provider because of the Final Rule

16   will have to travel long distances to reach the nearest clinic, which may be

17   impossible for some. Even for patients who are able to make the trip, the Final

18   Rule impedes timely access by broadly prohibiting them from receiving referrals

19   _____

20      [71] *Supra* at 13–14.

21      [72] *Supra* at 12, 14; ACP cmt. at 6; CBD cmt. at 2.

22

STATE OF WASHINGTON'S
MOTION FOR PRELIMINARY
INJUNCTION
NO. 1:19-CV-03040-SAB

23

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    for abortion care (subject to an illusory exception that is meaningless in

2    Washington),[73] leaving most patients to attempt to find a provider of the desired

3    care on their own. Timely access is important because, while abortion is always

4    safe (and "markedly safer than childbirth"), it is safest when performed early in

5    a pregnancy.[74] The Final Rule further impedes access by artificially separating

6    the provision of related health services,[75] and needlessly requiring clinics to

7    divert resources from caring for patients to achieve separation.[76]

8        The Final Rule "violates the principles of informed consent and the ethical

9    standards of health care professionals" (§ 18114(5)) by requiring providers to

10   withhold medically relevant information from their patients, coerce them into

11   treatment that may be unwanted and unneeded, and knowingly depart from

12   medical standards of care and fiduciary obligations to disclose information.[77] It

13   _____

14       [73] There are no known primary care providers in Washington that offer

15   abortion care. Harris Decl. ¶ 54; *see* Final Rule § 59.14(c)(2).

16       [74] Compl. ¶ 77 & n.26; Dr. Steinauer cmt. at 2 & n.6.

17       [75] PPFA cmt. at 33–34.

18       [76] *Supra* at 12; Compl. ¶ 99; PPFA cmt. at 31–34.

19       [77] HHS ignored numerous comments detailing the ethical standards for

20   health care providers, including the central principle of informed consent. *See,*

21   *e.g.*, WA cmt. at 11 & nn.41–42; AMA cmt. at 3; ACOG cmt. at 1, 3–6; NFPRHA

22

STATE OF WASHINGTON'S
MOTION FOR PRELIMINARY
INJUNCTION
NO. 1:19-CV-03040-SAB

24

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

1    also "interferes with communications regarding a full range of treatment options

2    between the patient and the provider" and "restricts the ability of health care

3    providers to provide full disclosure of all relevant information to patients making

4    health care decisions" (§§ 18114(3), (4)) by requiring coercive counseling in

5    violation of the Nondirective Mandate as described above.

6         **c.    The Final Rule violates Title X's text and purpose**

7              "'In order to be valid regulations must be consistent with the statute under

8    which they are promulgated.'" *E. Bay Sanctuary Covenant*, 909 F.3d at 1248

9    (brackets omitted) (quoting *United States v. Larionoff*, 413 U.S. 864, 873 (1977)).

10   Regulations "inconsistent with the statutory mandate or that frustrate the policy

11   that Congress sought to implement" are invalid. *F.E.C. v. Democratic Senatorial*

12   *Campaign Comm.*, 454 U.S. 27, 32 (1981).

13             Title X's central purpose is to equalize access to comprehensive,

14   evidence-based, voluntary family planning services. The combined effect of the

15   unlawful aspects of the Final Rule—the separation requirements, coercive

16   _____

17   cmt. at 6, 8–11, 21 & nn.43, 87–89; Guttmacher cmt. at 7–8 & nn.15–20; *id.* at

18   12, 16; PPFA cmt. at 10–15 & nn.38–55; ACP cmt. at 5 & nn.3, 5, 9, 11; ACNM

19   cmt. at 3 & n.6; APHA cmt. at 2–3; CA cmt. at 5–7; JIWH cmt. at 3; Dr. Steinauer

20   cmt.; NIRH cmt. at 3–4; *see* Compl. ¶¶ 81–84. *See also* Prager Decl. ¶¶ 16–25,

21   32–33, 36, 42, 48; Madden Decl. ¶¶ 20–22, 35; Kruse Decl. ¶¶ 11–19, 30–31, 40.

22

STATE OF WASHINGTON'S                    25         ATTORNEY GENERAL OF WASHINGTON
MOTION FOR PRELIMINARY                                      800 Fifth Avenue. Suite 2000
INJUNCTION                                                     Seattle, WA  98104-3188
NO. 1:19-CV-03040-SAB                                              (206) 464-7744

1   counseling provisions, and others—will significantly *reduce* access to these

2   services, frustrating the statute as a whole in service of HHS's broad new

3   interpretation of section 1008. This outcome "allow[s] the exception to swallow

4   the rule, thereby undermining the purpose of the statute itself." *Nat'l Fed'n of*

5   *Fed. Emps. v. McDonald*, 128 F. Supp. 3d 159, 172 (D.D.C. 2015). These

6   unethical and onerous provisions will drive out the vast majority (if not all) of

7   Washington's existing network of Title X clinics, and it will no longer be feasible

8   for DOH to administer a Title X program while also performing other public

9   health-related duties. As a result, Washington patients in need will lose access to

10  family planning and related preventive health services, and others will receive a

11  diminished level of care inconsistent with medical standards from clinics that

12  may offer a sharply limited range of non-medically approved options.[78]

13      The Final Rule violates individual statutory requirements as well,

14  including Title X's directive that the acceptance of family planning "services"

15  and "information" "shall be voluntary[.]"[79] The "voluntary" requirement—

16  referenced several times in the statute and in its title—forbids clinicians from

17  providing patients with unwanted information or coercing them into unwanted

18  medical treatment, but the Final Rule requires exactly that. In addition, the Final

19  _____

20      [78] *See infra* at 29–31.

21      [79] 42 U.S.C. § 300a-5; *see also id.* § 300(a).

22

STATE OF WASHINGTON'S                           26          ATTORNEY GENERAL OF WASHINGTON
MOTION FOR PRELIMINARY                                              800 Fifth Avenue. Suite 2000
INJUNCTION                                                          Seattle, WA  98104-3188
NO. 1:19-CV-03040-SAB                                                    (206) 464-7744

1    Rule inexplicably limits the use of Title X funds for core functions such as "bulk

2    purchasing of contraceptives," "clinical training for staff," and "community

3    outreach," including development and distribution of "educational materials."[80]

4    Title X expressly contemplates that funds should be used to "offer . . . effective

5    family planning methods" and "develop[] and mak[e] available family planning

6    . . . information (including educational materials)."[81]

7           These numerous statutory violations on their own are more than enough to

8    establish Washington's likelihood of success on the merits at this stage.

9           **2.    The Final Rule is arbitrary and capricious**

10          In addition to violating multiple statutes, the Final Rule is arbitrary and

11   capricious. Its harmful new requirements further an improper goal: to shift TitleX

12   away from its original bipartisan vision of equalizing access to modern, effective

13   contraception, and toward policy preferences ungrounded in law or public health.

14   In pursuit of this goal, HHS overhauled decades of Title X regulations while

15   ignoring and brushing aside its own precedent, its evidence-backed Program

16   Requirements, and the extensive public comments opposing the rule. HHS made

17   no serious effort to balance these real-world problems against the speculative and

18   baseless "risks" of improper commingling and public misperception it used to

19   _____

20          [80] Final Rule § 59.18; Supp. Info., 84 Fed. Reg. 7774.

21          [81] 42 U.S.C. §§ 300(a), 300a-3(a).

22

STATE OF WASHINGTON'S                        27              ATTORNEY GENERAL OF WASHINGTON
MOTION FOR PRELIMINARY                                              800 Fifth Avenue. Suite 2000
INJUNCTION                                                          Seattle, WA  98104-3188
NO. 1:19-CV-03040-SAB                                                    (206) 464-7744

1    justify the sweeping changes. Its rationales for various aspects of the Final Rule

2    are illogical, unsupported, and contrary to the evidence in the "whole"

3    administrative record. *See* 5 U.S.C § 706.

4          Courts must set aside agency action that is "arbitrary, capricious, an abuse

5    of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). To

6    survive judicial review, the agency action must be based on a "reasoned analysis"

7    that indicates the agency "examine[d] the relevant data and articulate[d] a

8    satisfactory explanation for its action including a rational connection between the

9    facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S. v. State*

10   *Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42–43 (1983) (citation and internal

11   quotation marks omitted). When an agency reverses position, it must "supply a

12   reasoned analysis for the change," *id.* at 42, and may not "depart from a prior

13   policy *sub silentio* or simply disregard rules that are still on the books,"

14   *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Further, any

15   "serious reliance interests must be taken into account," *id.*, particularly where

16   "decades of . . . reliance on the Department's prior policy" demand a fulsome

17   explanation for the reversal. *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117,

18   2126 (2016). In general, a rule is arbitrary and capricious where the agency

19   "relied on factors which Congress has not intended it to consider, entirely failed

20   to consider an important aspect of the problem, offered an explanation for its

21   decision that runs counter to the evidence before the agency, or is so implausible

22

STATE OF WASHINGTON'S
MOTION FOR PRELIMINARY
INJUNCTION
NO. 1:19-CV-03040-SAB

28

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

1    that it could not be ascribed to a difference in view or the product of agency

2    expertise." *State Farm*, 463 U.S. at 43. "[A]gency action is lawful only if it rests

3    'on a consideration of the relevant factors,' " *Michigan v. EPA*, 135 S.Ct. 2699,

4    2707 (2015) (quoting *State Farm*, 463 U.S. at 43), and the agency must consider

5    "the advantages *and* the disadvantages" of the proposal before taking action, *id.*

6    HHS's Final Rule is arbitrary and capricious for a host of reasons.

7              **a.    Failure to consider medical ethics and patient-focused care**

8          HHS failed to justify the Final Rule's interference in the patient–provider

9    relationship, which needlessly endangers patients' health and undermines their

10   trust in the health care system. *Cf. Nat'l Inst. of Family & Life Advocates v.*

11   *Becerra*, 138 S.Ct. 2361, 2374 (2018) ("[T]his Court has stressed the danger of

12   content-based regulations in the fields of medicine and public health, where

13   information can save lives.") (citation and internal quotation marks omitted).

14   "High-quality health care is founded on complete, accurate, and unbiased

15   information and relies on a relationship of trust between a patient and their health

16   care professional."[82] Impacts on the "ethical standards of health care

17   professionals" and "principles of informed consent" are important factors that

18   Congress directed HHS to consider as part of *any* rulemaking. 42 U.S.C.

19   § 18114(5). Yet the agency completely disregarded extensive and unanimous

20   _____

21        [82] AAN cmt. at 4; *see also supra* n.77.

22

STATE OF WASHINGTON'S                    29
MOTION FOR PRELIMINARY
INJUNCTION
NO. 1:19-CV-03040-SAB

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

1    public comments from leading medical associations, public health policy

2    organizations, medical and infrastructure experts, and states (including

3    Washington) pointing out that the coercive and misleading counseling provisions

4    create serious ethical and legal problems for physicians, nurses, and other

5    clinicians.[83] HHS barely acknowledged these concerns, and failed to respond

6    directly to a single one of the specific ethical problems raised by commenters.[84]

7        A primary justification for the unethical counseling requirements is that

8    HHS wanted to expand eligibility for Title X funds to "diverse" providers who

9    are no longer obligated to offer "medically approved" contraceptive methods and

10   who object to nondirective counseling, including referral for abortion.[85] This

11   justification is irrationally overbroad,[86] and there is no indication that Congress

12   wanted HHS to prioritize the interests of an unknown minority of health care

13   providers over the needs of the patients whom Title X was intended to help (and

14

15   _____

16       [83] *See supra* n.77.

17       [84] *See* Supp. Info., 84 Fed. Reg. 7748 (HHS "does not believe" the Final

18   Rule violates ethical requirements, offering no supporting analysis or evidence).

19       [85] *Id.* at 7716–17, 7719, 7746–47; *see supra* n.38.

20       [86] *See* Compl. ¶ 86; *see also, e.g.*, PPFA cmt. at 8 (conscience laws are not

21   "a sword to be wielded against all *other* providers").

22

STATE OF WASHINGTON'S                    30                ATTORNEY GENERAL OF WASHINGTON
MOTION FOR PRELIMINARY                                              800 Fifth Avenue. Suite 2000
INJUNCTION                                                          Seattle, WA  98104-3188
NO. 1:19-CV-03040-SAB                                                      (206) 464-7744

1   the ethical obligations of all medical care providers).[87] Prioritizing "conscience"

2   objectors, while simultaneously excluding experienced clinics with a

3   demonstrated ability to provide a full range of FDA-approved options,

4   undermines Title X's requirement that projects offer a "broad range" of

5   "effective" family planning methods and services.[88] Even if HHS's "conscience"

6   rationale had some legitimacy (which it does not), the agency cannot rely on it

7   exclusively while disregarding several "important aspect[s] of the problem"

8   Congress expressly identified. *State Farm*, 463 U.S. at 42–43, 55.

9        HHS fails to offer any rational justification whatsoever for the Final Rule's

10   other intrusions into the patient–provider relationship. It fails to explain why

11   "medically indicated" abortion referrals are no longer permitted (*see*

12   § 59.5(b)(1)), or to justify putting patients in danger by withholding referrals and

13   delaying access to care (§§ 59.5(a)(5), .14);[89] fails to explain why the Final Rule

14   does not permit qualified nurses and trained staff to provide "nondirective"

15   pregnancy counseling (although any Title X staff are permitted to provide

16

17   ————————————

18       [87] *See* Compl. ¶ 86.

19       [88] 42 U.S.C. § 300(a).

20       [89] *Supra* n.29; *see* Compl. ¶¶ 77–80; PPFA cmt. at 92; ACOG cmt. at 5–6;

21   AMA cmt. at 3; CA cmt. at 16; Guttmacher cmt. at 8; Dr. Steinauer cmt. at 2.

22

STATE OF WASHINGTON'S MOTION FOR PRELIMINARY INJUNCTION NO. 1:19-CV-03040-SAB

31

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1   directive counseling) (§§ 59.2, .14(b)(1));[90] and tries to rationalize the coercive,

2   directive, and demeaning requirement that all pregnant patients be given prenatal

3   care referrals (§ 59.14(b)(1)) on the irrelevant grounds that prenatal care is

4   deemed "medically necessary" for purposes of Medicaid reimbursement—which

5   has no bearing on whether such care is appropriate for all patients.[91]

6           **b.    Disregarding program requirements and standards of care**

7           In its drive to remake the Title X program as a vehicle for the

8   Administration's unrelated policy goals, HHS also ignored its own Program

9   Requirements—including the QFP, which was prepared by HHS's sub-agencies

10  in 2014, backed by extensive research, and fully reaffirmed in December 2017.

11          The Final Rule contradicts standards of care, including those reflected in

12  the QFP, in a number of ways: by mandating coercive and directive pregnancy

13  counseling (§ 59.5, .14); permitting providers to offer limited, non-medically-

14  approved family planning options (*see* § 59.5(a)(1)); prohibiting referrals for

15  abortion absent a medical "emergency" (§ 59.14(b));[92] and requiring separate sets

16  _____

17          [90] Compl. ¶ 75.

18          [91] Zerzan-Thul Decl. ¶ 11 (prenatal care is not appropriate if a pregnancy

19  will be terminated); Kimelman Decl. ¶¶ 9–10 (same); *see* 84 Fed. Reg. 7762.

20          [92] This restriction also exceeds HHS's rulemaking authority to the extent

21  it regulates referrals for abortion that are needed to protect the patient's life,

22

STATE OF WASHINGTON'S                     32

1    of medical records for any patients who receive abortion care or counseling

2    (§ 59.15). Contrary to these provisions, the QFP requires "client-centered" care,

3    which for pregnant patients includes nondirective "[o]ptions counseling" with

4    "appropriate referrals," consistent with ACOG standards; if "pregnancy

5    abnormalities or problems are suspected," the QFP requires treatment or

6    appropriate referral, *regardless* of whether there is an "emergency."[93] The QFP

7    emphasizes that clinics should offer a "full range of FDA-approved contraceptive

8    methods,"[94] and stresses the importance of consistent electronic health records to

9    ensure accuracy and improve patients' health.[95]

10        The Final Rule's heedless departures from these prevailing standards put

11    patients' lives and health at risk. Requiring separate records is not only extremely

12    costly[96]—it increases the likelihood of medical error, posing a "considerable

13    _____

14    health, or safety, including in cases of rape or incest, which are outside Title X's

15    scope. *See* 42 U.S.C. § 300a-6; *see* Compl. ¶ 78 & n.27.

16        [93] QFP (Beneski Decl. Ex. 3) at 2, 4, 13–14.

17        [94] *Id.* at 2, 7, 10 (Fig. 3), 11, 24, 39.

18        [95] *Id.* at 22, 24; *see also* 42 U.S.C. § 300jj-11 (emphasizing importance of

19    integrated electronic health records and establishing federal standards re same).

20        [96] NFPRHA cmt. at 36–37 (changing *one* electronic template could cost

21    $30,000 per clinic—a fraction of the cost of creating a separate new system).

22

STATE OF WASHINGTON'S                          33            ATTORNEY GENERAL OF WASHINGTON
MOTION FOR PRELIMINARY                                              800 Fifth Avenue. Suite 2000
INJUNCTION                                                          Seattle, WA  98104-3188
NO. 1:19-CV-03040-SAB                                                   (206) 464-7744

1   health risk to patients."[97] Failing to refer patients for needed care and impeding

2   their ability to choose effective, FDA-approved contraceptives predictably harms

3   their health and well-being,[98] and in the long run, will undermine trust in the

4   medical care system, worsening health outcomes overall.[99] HHS fails to "supply

5   a reasoned analysis" for departing from the QFP. *State Farm*, 463 U.S. at 42.

6   Indeed, it fails to even *acknowledge* the QFP, reversing it *sub silentio*. *See Fox*

7   *Television Stations*, 556 U.S. at 515; *see also Lone Mountain Processing, Inc. v.*

8   *Sec'y of Labor*, 709 F.3d 1161, 1164 (D.C. Cir. 2013) (agency must show that

9   prior policies are not being "casually ignored"). HHS quietly ignored the QFP for

10  good reason: it cannot rationally justify requirements that fly in the face of

11  evidence-backed medical standards and principles of patient-centered care.

12              c.    **Network destruction and unnecessary burdens**

13          The Final Rule's unworkable and unnecessary physical separation

14  requirements, along with its invasion of the patient–provider relationship to

15  mandate unethical medical care, will force out the subrecipients and clinics

16

17  _____

18      [97] PPFA cmt. at 34 & n.135; WA cmt. at 24; Compl. ¶ 104.

19      [98] *Supra* at 16–17.

20      [99] *See* AMA cmt. at 2; ACOG cmt. at 3; PPFA cmt. at 11 & n.42; NFPRHA

21  cmt. at 4, 10, 21–24; ACNM cmt. at 3.

22

STATE OF WASHINGTON'S                    34        ATTORNEY GENERAL OF WASHINGTON
MOTION FOR PRELIMINARY                                      800 Fifth Avenue. Suite 2000
INJUNCTION                                                    Seattle, WA 98104-3188
NO. 1:19-CV-03040-SAB                                              (206) 464-7744

1   comprising the vast majority of Washington's Title X network.[100] Any remaining

2   clinics will be excessively burdened by the *ultra vires* "comprehensive primary

3   health care" requirement (§ 59.5(a)(12));[101] the new limitations on the use of

4   grant funds (§ 59.18);[102] and the vagueness of the separation "factors," which

5   increase uncertainty and the cost of compliance—particularly since the Final

6   Rule establishes an initial grant eligibility hurdle (§ 59.7(b)) that gives HHS

7   considerable discretion to arbitrarily reject applications prior to merits review.[103]

8        Washington explained in its public comments that these burdensome

9   requirements will leave over half its counties without a Title X provider, with the

10  devastating effects falling "particularly hard on uninsured patients and those in

11  rural areas, who in some cases will have no other reasonable option for obtaining

12  _____

13        [100] *Supra* at 13–14, 23–24.

14        [101] Requiring family planning clinics to provide primary care or be in

15  "close proximity" to a referral source is costly and will disqualify clinics located

16  in already-underserved areas. Compl. ¶¶ 119–120; WA cmt. at 20; AMA cmt. at

17  4; ACOG cmt. at 13; ACP cmt. at 8–9; PPFA cmt. at 70. Moreover, it exceeds

18  HHS's rulemaking authority, since Title X pertains exclusively to "family

19  planning" services, not primary care. *See generally* 42 U.S.C. § 300 *et seq.*

20        [102] *See supra* at 26–27 & n.80.

21        [103] Compl. ¶¶ 126–129; NFPRHA cmt. at 14; PPFA cmt. at 31.

22

STATE OF WASHINGTON'S                    35        ATTORNEY GENERAL OF WASHINGTON
MOTION FOR PRELIMINARY                                      800 Fifth Avenue. Suite 2000
INJUNCTION                                                        Seattle, WA  98104-3188
NO. 1:19-CV-03040-SAB                                                    (206) 464-7744

1  family planning services."[104] Lack of access to Title X services will worsen

2  public health outcomes—and increase costs to the State—because the number of

3  unintended pregnancies will rise, more STIs and cancers will go undetected and

4  untreated, and more people will become eligible for (and in need of) safety-net

5  care.[105] Title X preventive care saves millions of dollars a year in health care

6  costs.[106] Yet in promulgating the Final Rule, HHS turned a deaf ear to the

7  concerns of Washington and other grantees; the agency simply asserted, with no

8  evidence, that it "does not believe" the Final Rule will have *any* impact on

9  patients' access to care.[107] In baselessly claiming that patients will be unaffected,

10  _____

11  [104] WA cmt. at 23–26 & Att. 1; *see also* Guttmacher cmt. at 9 (separation

12  requirements will "effectively exclude" clinics that offer abortion or are affiliated

13  with clinics that do so); Compl. ¶¶ 87–89, 93, 99, 139–153.

14  [105] *See* WA cmt. at 23–27 (rule will "reduce access to essential preventive

15  health services" and "impose tens of millions of dollars of costs" on state

16  treasuries); NFPRHA cmt. at 31–35 (lack of access due to Final Rule is "likely

17  to lead to a significant public health crisis"); PPFA cmt. at 15–22 (extensively

18  discussing "gaps in access to care, harm [to] population health," and "significant,

19  unnecessary costs" the rule will cause); *see supra* at 16–18.

20  [106] Beneski Decl. Ex. 7.

21  [107] Supp. Info., 84 Fed. Reg. 7725; *see also id.* at 7766, 7775, 7785.

22

STATE OF WASHINGTON'S
MOTION FOR PRELIMINARY
INJUNCTION
NO. 1:19-CV-03040-SAB

36

1    HHS also implied that complete physical separation would somehow be simple

2    and cheap: it wildly underestimated the costs and burdens without backing up its

3    lowball "estimate"[108] or justifying its rejection of substantiated cost assessments

4    submitted in public comments.[109]

5         The Final Rule's destruction of existing, effective family planning

6    networks, and the resulting loss of access to much-needed care, is another

7    "important aspect of the problem" that HHS failed to confront or address. Title

8    X's concerns with serving high numbers of patients and adequately addressing

9    local needs, *see* 42 U.S.C. § 300(b), and its stated purpose of making

10   "comprehensive" services "readily available to all," Pub. L. No. 91-572, § 2,

11   _____

12        [108] *See id.* at 7718, 7782 (estimating costs at $30,000 per clinic and $36

13   million nationwide, citing no evidence); *id.* at 7781 (asserting that moving

14   abortion care and referral to "distinct facilities" "likely entails only minor costs").

15        [109] *See* PPFA cmt. at 31–33 (cost estimates of $.5 to $1.5 million;

16   duplicating operations would further increase costs by 50–100%); Prof. Brown

17   cmt. (HHS's cost estimate is "completely unrealistic"); NFPRHA cmt. at 36–37

18   (costs will be "orders of magnitude more" than HHS's estimate); MO FHC cmt.

19   at 8 (locating and opening health facilities "costs hundreds of thousands, or even

20   millions, of dollars"); WA cmt. at 23; ACP cmt. at 6; APHA cmt. at 6; CBD cmt.

21   at 2; Compl. ¶¶ 87–89 & n.32, 97–100; *see also* Eastlund Decl. ¶¶ 14–20.

22

STATE OF WASHINGTON'S
MOTION FOR PRELIMINARY
INJUNCTION
NO. 1:19-CV-03040-SAB

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

1  show that network adequacy and access to care are critical, central issues.

2  Congress also expressly identified "timely access" and "barriers" to medical care

3  as issues HHS must account for as part of *any* rulemaking. 42 U.S.C.

4  §§ 18114(1), (2). HHS offered no evidence that its concerns about "potential"

5  commingling or a "risk" of confusion are anything more than speculative[110] and

6  failed to respond to comments regarding the adequate and "thorough" monitoring

7  and compliance systems already in place.[111] Even assuming HHS's unfounded

8  concerns have *some* relevance, the agency cannot rely on them exclusively while

9  completely ignoring factors that Congress actually deemed important.

10  **d.    Failing to consider reliance interests**

11  The Final Rule ignores and undermines reliance interests developed during

12  five decades of Title X regulation. *See Fox Television Stations*, 556 U.S. at 515

13  (2009). Washington has for decades relied on being able to administer its family

14  planning program without having to physically separate its work on other State

15  _____

16  [110] In fact, HHS admits that "demonstrated abuses of Medicaid funds do

17  not necessarily mean that Title X grants are being abused . . ." Supp. Info.,

18  84 Fed. Reg. 7725. And HHS fails to explain why these "risks" justify physical

19  separation of abortion care, but not other out-of-program care that a Title X clinic

20  may provide (such as prenatal care). *See* Compl. ¶ 102.

21  [111] WA cmt. at 16–18; CA cmt. at 19–20; *see* Harris Decl. ¶¶ 41–49.

22

STATE OF WASHINGTON'S
MOTION FOR PRELIMINARY
INJUNCTION
NO. 1:19-CV-03040-SAB                38                ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

1   business.[112] Providers and clinics rely on being able to provide Title X services

2   without violating their professional responsibilities, and patients expect providers

3   to act ethically and fulfill their fiduciary duties regardless of who funds their

4   services.[113] Patients also rely on being able to obtain comprehensive reproductive

5   health services from specialized clinics,[114] whether federally funded or not—but

6   an abrupt loss of funding will force at least some current Title X clinics to close

7   or reduce their services, leaving vulnerable patients without access to what may

8   be their only source of care.[115] Simply brushing aside these "decades

9   of . . . reliance on the Department's prior policy" without adequate justification,

10  as HHS has done, is unacceptable under the APA. *Encino Motorcars*, 136 S. Ct.

11  at 2126.

12  **C.    Washington Will Suffer Irreparable Harm Absent Preliminary Relief**

13          The harm analysis "focuses on irreparability, irrespective of the magnitude

14  of the injury." *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018) (internal

15  quotation marks omitted). Washington is irreparably harmed in at least three

16  _____

17          [112] Harris Decl. ¶ 11; *see* Compl. ¶¶ 107, 141; *supra* at 15–16.

18          [113]   Maisen Decl. ¶¶ 20, 40–42; Kruse Decl, ¶¶ 2, 17–32, 38–39;

19  Eastlund Decl. ¶ 8; *see* Compl. ¶¶ 81, 141.

20          [114] Compl. ¶ 56 & n.22.

21          [115] *Supra* at 13–15.

22

STATE OF WASHINGTON'S                    39          ATTORNEY GENERAL OF WASHINGTON
MOTION FOR PRELIMINARY                               800 Fifth Avenue. Suite 2000
INJUNCTION                                               Seattle, WA  98104-3188
NO. 1:19-CV-03040-SAB                                        (206) 464-7744

1   ways. The Final Rule is likely to (1) seriously disrupt or destroy Washington's

2   existing Title X network, (2) impose uncompensable financial costs on the State,

3   and (3) harm the health and well-being of Washington patients and providers.[116]

4        First, Washington will be harmed because the Final Rule will destroy its

5   family planning network, forcing out subrecipients and clinics that served almost

6   90% of Title X patients in 2017.[117] Federal action that undermines a state program

7   and impedes its purpose constitutes irreparable harm. "An organization is harmed

8   if the actions taken by [the defendant] have 'perceptibly impaired' the

9   [organization's] programs." *League of Women Voters of U.S. v. Newby*, 838 F.3d

10  1, 8 (D.C. Cir. 2016) (internal quotation marks and citation omitted); *see also*

11  *Fair Emp't Council of Greater Wash., Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268,

12  1276 (D.C. Cir. 1994) (anti-discrimination organization was injured because

13  defendant's "discriminatory actions . . . interfered with [plaintiff's] efforts and

14  programs and . . . also required [it] to expend resources to counteract" the

15  discrimination); *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013)

16  ("ongoing harms to [plaintiffs'] organizational missions" established likelihood

17  of irreparable harm); *E. Bay Sanctuary Covenant v. Trump*, 354 F. Supp. 3d 1094,

18  _____

19        [116] "That [Washington] promptly filed an action following the issuance of

20  the [Final Rule] also weighs in [its] favor" for the irreparable harm analysis. *Id.*

21        [117] *Supra* at 13–16.

22

STATE OF WASHINGTON'S
MOTION FOR PRELIMINARY
INJUNCTION
NO. 1:19-CV-03040-SAB

40

1116 (N.D. Cal. 2018) ("the Organizations 'have established a likelihood of irreparable harm' based on their showing of serious 'ongoing harms to their organizational missions,' including diversion of resources and the non-speculative loss of substantial funding from other sources") (quoting *Whiting*, 732 F.3d at 1029).[118] Based on the extensive evidence of network destruction discussed above, Washington satisfies this standard. Given the imminent loss of almost 90% of Washington's Title X network because of the Final Rule, "the only serious disagreement is not whether [Washington] will be harmed, but *how much*." *Pennsylvania v. Trump*, 351 F. Supp. 3d 791, 828 (E.D. Pa. 2019).

Second, the Final Rule will harm Washington economically, and there is no mechanism by which Washington could recover damages from the United

------

[118] Courts routinely find a likelihood of irreparable harm in similar scenarios involving likely clinic closures, staff layoffs, and loss of access to health care services. *See, e.g.*, *Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't Health*, 699 F.3d 962, 980–81 (7th Cir. 2012); *W. Ala. Women's Ctr. v. Williamson*, 120 F. Supp. 3d 1296, 1317–20 (M.D. Ala. 2015); *Jackson Women's Health Org. v. Currier*, 940 F. Supp. 2d 416, 423–24 (S.D. Miss. 2013); *N.Y. State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1362 (2d Cir. 1989) ("Those women denied access cannot be compensated by money damages; injunctive relief alone can assure them the clinics' availability.").

1    States. Uncompensable economic harm, such as that caused by unlawful federal

2    agency action, satisfies the irreparable harm standard. *Azar*, 911 F.3d at 581.[119]

3    The first component of Washington's economic harm is the loss of granted Title

4    X funds—up to $4 million—that would follow the dramatic contraction of its

5    network.[120] The second component is increased costs to the State of providing

6    family planning services to patients who lose access to Title X clinics, since the

7    income eligibility criteria for state-funded family planning services overlap with

8    the Title X criteria.[121] *See Azar*, 911 F.3d at 572 (economic injury to states was

9    "reasonably probable" where agency rule would increase reliance on state-funded

10   programs). The third component is increased costs to Apple Health and other

11   state programs due to a rise in unintended pregnancies and other health

12   consequences caused by the Final Rule. *See Pennsylvania*, 351 F. Supp. 3d at

13   827 (finding irreparable harm where states would "become obligated to shoulder

14   _____

15       [119] *See also Idaho v. Coeur d'Alene Tribe*, 794 F.3d 1039, 1046 (9th Cir.

16   2015); *Texas v. United States*, 809 F.3d 134, 186 (5th Cir. 2015); *Pennsylvania*,

17   351 F. Supp. 3d at 828; *California v. Health & Human Servs.*, 351 F. Supp. 3d

18   1267, 1297 (N.D. Cal. 2019).

19       [120] *Supra* at 16; Harris Decl. ¶ 70 (if it lost most of its network, DOH

20   "would not continue to receive the roughly $4 million current award from HHS").

21       [121] Harris Decl. ¶ 12; Zerzan-Thul Decl. ¶¶ 7, 10, 19.

22

STATE OF WASHINGTON'S                    42

1    much of the burden of providing contraceptive services to women who lose

2    contraceptive care" as a result of agency rules). Here, "[a]s a direct result of

3    HHS's new rule, millions of unnecessary dollars will be spent in Washington to

4    pay for unintended pregnancies, unplanned births, abortions, treatment of

5    sexually transmitted infections, cervical and breast cancer treatment, and other

6    public health risks that the Title X program is designed to prevent."[122]

7        Third, thousands of Washington residents will be seriously harmed by the

8    Final Rule. Injury to residents' health and well-being irreparably harms the State

9    itself. *See Pennsylvania*, 351 F. Supp. 3d at 828 ("the States also stand to suffer

10   injury to their interest in protecting the safety and well-being of their citizens");

11   *California v. Health & Human Servs.*, 281 F. Supp. 3d 806, 830 (N.D. Cal. 2017),

12   *aff'd in pertinent part sub nom. California v. Azar*, 911 F.3d 558 (9th Cir. 2018)

13   (finding irreparable injury based in part on "what is at stake: the health of

14   Plaintiffs' citizens and Plaintiffs' fiscal interests"). The Final Rule will harm

15   Washington residents' health by reducing both access to services and quality of

16   services. Some current Title X patients will lose access to family planning

17   services entirely,[123] especially in rural areas, putting their lives and health at

18   _____

19      [122] Zerzan-Thul Decl. ¶ 22; *see also id*. ¶¶ 13, 15, 19; *supra* nn.60–62.

20      [123] Harris Decl. ¶¶ 59 ("thousands of people in Washington" will lose

21   access), 62, 65–67, 83, 86, 88–89 ("reduction is guaranteed"), 90 (quantifying

22

STATE OF WASHINGTON'S                    43          ATTORNEY GENERAL OF WASHINGTON
MOTION FOR PRELIMINARY                                       800 Fifth Avenue. Suite 2000
INJUNCTION                                                    Seattle, WA  98104-3188
NO. 1:19-CV-03040-SAB                                              (206) 464-7744

1   risk.[124] Patients who can still access Title X services will be harmed because the

2   Final Rule's unethical and misleading counseling requirements, combined with

3   total physical separation from counseling and care to which patients cannot be

4   referred, will impede patients' ability to obtain the care they want and need and

5   coerce them into receiving unwanted or medically inappropriate treatment.

6   **D.    Equity and the Public Interest Strongly Favor an Injunction**

7           When the government is a party, the final two *Winter* factors merge.

8   *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). The

9   balance of the equities and public interest strongly favor an injunction. "[T]he

10  purpose of such interim equitable relief is not to conclusively determine the rights

11  of the parties, but to balance the equities as the litigation moves forward." *Trump*

12  *v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017). "There is

13  generally no public interest in the perpetuation of unlawful agency action. To the

14  contrary, there is a substantial public interest in having governmental agencies

15  abide by the federal laws that govern their existence and operations." *League of*

16  _____

17  residents who would lose services), 91–94; Zerzan-Thul Decl. ¶¶ 10, 21.

18          [124] Harris Decl. ¶ 97 ("As a result of the Final Rule, more unplanned

19  pregnancies and unwanted childbearing will occur, cervical cancers will not be

20  diagnosed in early stages when they are treatable, and poor health outcomes will

21  result from undiagnosed and untreated STIs"); Zerzan-Thul Decl. ¶¶ 12–13.

22

STATE OF WASHINGTON'S                    44                    ATTORNEY GENERAL OF WASHINGTON
MOTION FOR PRELIMINARY                                         800 Fifth Avenue. Suite 2000
INJUNCTION                                                     Seattle, WA  98104-3188
NO. 1:19-CV-03040-SAB                                         (206) 464-7744

1     *Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (citations and

2     internal quotation marks omitted). As discussed above, the Final Rule is unlawful

3     for numerous reasons and will wreak havoc on a successful and beneficial

4     program. Preserving the status quo will not harm Defendants, and refraining from

5     enforcing the Final Rule will cost them nothing. *See Diaz v. Brewer*, 656 F.3d

6     1008, 1015 (9th Cir. 2011) (court may waive Rule 65(c) bond requirement).

7     **E.    Relief Requested**

8           For all the reasons above, the State of Washington requests that the Final

9     Rule be preliminarily enjoined in full. *See, e.g.*, *Regents of the Univ. of Cal. v.*

10     *U.S. Dep't of Homeland Sec.*, 908 F.3d 476, 511–12 (9th Cir. 2018); *City of Los*

11     *Angeles v. Sessions*, 293 F. Supp. 3d 1087, 1100–01 (C.D. Cal. 2018) (enjoining

12     rule nationwide to ensure "even playing field" in competition for federal grants).

13     Alternatively, and pursuant to the same standard, the State requests that the Court

14     stay the rule's effective date during the pendency of this litigation pursuant to

15     5 U.S.C. § 705. *Cf. Bauer v. DeVos*, 325 F. Supp. 3d 74, 104–05 (D.D.C. 2018).

16     The State requests a ruling prior to the effective date of 12:00 a.m. on

17     May 3, 2019.

18                  **IV.    CONCLUSION**

19           For all the reasons above, the State of Washington requests that the Court

20     preliminarily enjoin Defendants from implementing or enforcing the Final Rule.

21

22

STATE OF WASHINGTON'S        45        ATTORNEY GENERAL OF WASHINGTON
MOTION FOR PRELIMINARY             800 Fifth Avenue. Suite 2000
INJUNCTION                          Seattle, WA  98104-3188
NO. 1:19-CV-03040-SAB                   (206) 464-7744

1    DATED this 22nd day of March, 2019.

2                                ROBERT W. FERGUSON
                                 Attorney General
3

4
                                 /s/ Jeffrey T. Sprung
5                                JEFFREY T. SPRUNG, WSBA #23607
                                 KRISTIN BENESKI, WSBA #45478
6                                PAUL M. CRISALLI, WSBA #40681
                                 Assistant Attorneys General
7                                800 Fifth Avenue, Suite 2000
                                 Seattle, WA 98014
8                                (206) 464-7744
                                 JeffS2@atg.wa.gov
9                                KristinB1@atg.wa.gov
                                 PaulC1@atg.wa.gov
10                               *Attorneys for Plaintiff State of Washington*

11

12

13

14

15

16

17

18

19

20

21

22

STATE OF WASHINGTON'S                    46          ATTORNEY GENERAL OF WASHINGTON
MOTION FOR PRELIMINARY                                   800 Fifth Avenue. Suite 2000
INJUNCTION                                                Seattle, WA  98104-3188
NO. 1:19-CV-03040-SAB                                         (206) 464-7744

1

## <u>**DECLARATION OF SERVICE**</u>

2          I hereby declare that on this day I caused the foregoing document to be

3     electronically filed with the Clerk of the Court using the Court's CM/ECF

4     System which will serve a copy of this document upon all counsel of record.

5          DATED this 22nd day of March, 2019, at Seattle, Washington.

6

7                                         */s/ Jeffrey T. Sprung*
                                          JEFFREY T. SPRUNG, WSBA #23607
8                                         Assistant Attorney General

9

10

11

12

13

14

15

16

17

18

19

20

21

22

STATE OF WASHINGTON'S                      47                    ATTORNEY GENERAL OF WASHINGTON
MOTION FOR PRELIMINARY                                                 800 Fifth Avenue. Suite 2000
INJUNCTION                                                              Seattle, WA  98104-3188
NO. 1:19-CV-03040-SAB                                                      (206) 464-7744