JOSEPH H. HUNT
Assistant Attorney General
JOSEPH H. HARRINGTON
United States Attorney
MICHELLE R. BENNETT
Assistant Branch Director
BRADLEY P. HUMPHREYS
ANDREW M. BERNIE
Trial Attorneys
Federal Programs Branch
U.S. Department of Justice, Civil Division
1100 L Street, N.W.
Washington, DC 20005
(202) 305-0878
Bradley.Humphreys@usdoj.gov
*Counsel for Defendants*

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WASHINGTON
### AT YAKIMA

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>Plaintiff,<br><br>v.<br><br>ALEX M. AZAR II, in his official capacity as Secretary of the United States Department of Health and Human Services; and UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES,<br><br>Defendants. | NO. 1:19-cv-3040-SAB<br><br>CONSOLIDATED OPPOSITION TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION<br><br>NOTED FOR:  April 25, 2019<br>With Oral Argument at 10:00 a.m. |

CONSOLIDATED OPPOSITION
TO PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION
NO. 1:19-CV-3040-SAB

U.S. DEPARTMENT OF JUSTICE
1100 L Street, N.W.
Washington, DC  20005
(202) 305-0878

| | |
|---|---|
| 1 | |
| 2 | NATIONAL FAMILY PLANNING & REPRODUCTIVE HEALTH |
| 3 | ASSOCIATION, FEMINIST WOMEN'S HEALTH CENTER, |
| 4 | DEBORAH OYER, M.D., and TERESA GALL, F.N.P., |
| 5 | |
| 6 | Plaintiffs, |
| 7 | v. |
| 8 | ALEX M. AZAR II, in his official |
| 9 | capacity as United States Secretary of Health and Human Services, UNITED |
| 10 | STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, |
| 11 | DIANE FOLEY, M.D., in her official capacity as Deputy Assistant Secretary |
| 12 | for Population Affairs, and OFFICE OF POPULATION AFFAIRS, |
| 13 | |
| 14 | Defendants. |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |

CONSOLIDATED OPPOSITION
TO PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION
NO. 1:19-CV-3040-SAB

# **TABLE OF CONTENTS**

INTRODUCTION ................................................................................ 1

LEGAL AND FACTUAL BACKGROUND .................................... 4

    I.   PRIOR REGULATORY INTERPRETATIONS AND
        *RUST* ................................................................................... 5

    II.  THE FINAL RULE ............................................................. 8

    III. THIS LITIGATION ............................................................. 9

ARGUMENT ................................................................................... 10

    I.     PLAINTIFFS ARE UNLIKELY TO SUCCEED ON
         THE MERITS ................................................................. 10

       A.  Plaintiffs' Claims Are Indistinguishable From Those
           *Rust* Rejected ......................................................... 11

       B.  Neither The Nondirective Provision Nor The ACA Silently
           Overruled *Rust* ...................................................... 17

           1.  The Nondirective Provision Does Not Supplant *Rust*. ............ 19

           2.  Section 1554 of the ACA Does Not Supplant *Rust*. ............... 28

       C.  *Rust* Forecloses Plaintiffs' Claim that the Rule
           Violates Title X ...................................................... 34

       D.  The Final Rule Is Not Arbitrary and Capricious .......................... 35

           1.  *Rust* Establishes That It is Not Arbitrary and Capricious for
               HHS to Place Conditions on Title X Funds that Require
               Physical Separation and Restrict Activities that Promote
               Abortion as a Method of Family Planning. ........................... 36

           2.  HHS Adequately Justified the Separation and Referral
               Requirements ......................................................... 38

           3.  Plaintiffs' Contrary Arguments Lack Merit ............................ 41

CONSOLIDATED OPPOSITION
TO PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION
NO. 1:19-CV-3040-SAB

i

U.S. DEPARTMENT OF JUSTICE
1100 L Street, N.W.
Washington, DC 20005
(202) 305-0878

II.  PLAINTIFFS WILL SUFFER NO IRREPARABLE HARM ............ 53

    A.  Washington ...................................................................... 54

    B.  NFPRHA ........................................................................... 55

        1.  Impact on Title X Services ..................................... 55

        2.  Harm to Provider-Patient Relationships ................. 56

        3.  Harm to Patients and Public Health ....................... 57

III. THE BALANCE OF EQUITIES AND THE PUBLIC
INTEREST WEIGH IN FAVOR OF DENYING
PLAINTIFFS' MOTIONS ................................................................ 58

IV. ANY INJUNCTIVE RELIEF SHOULD BE LIMITED .................... 60

    A.  Any Injunctive Relief Should Be Limited To The Plaintiffs. ....... 60

    B.  Any Injunctive Relief Should Be Limited To
Particular Provisions. ...................................................... 65

CONCLUSION ................................................................................. 67

| | |
|---|---|
| 1 | **TABLE OF AUTHORITIES** |
| 2 | Cases |
| 3 | *Abbott Labs. v. Gardner,* |
| 4 | 387 U.S. 136 (1967) ....................................................................... 62 |
| 5 | *Alaska Oil & Gas Ass'n v. Jewell,*<br>815 F.3d 544 (9th Cir. 2016) .......................................................... 36 |
| 6 | *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez,* |
| 7 | 458 U.S. 592 (1982) ....................................................................... 54 |
| 8 | *Arent v. Shalala,*<br>70 F.3d 610 (D.C. Cir. 1995) .......................................................... 41 |
| 9 | *Branch v. Smith,* |
| 10 | 538 U.S. 254 (2003) ....................................................................... 30 |
| 11 | *California v. Azar,*<br>911 F.3d 558 (9th Cir. 2018) .............................................. 61, 63, 64 |
| 12 | *Calloway v. Dist. of Columbia,* |
| 13 | 216 F.3d 1 (D.C. Cir. 2000) ....................................................... 2, 21 |
| 14 | *Citizens to Pres. Overton Park, Inc. v. Volpe,*<br>401 U.S. 402 (1971) ....................................................................... 32 |
| 15 | *Consumer Elecs. Ass'n v. FCC,* |
| 16 | 347 F.2d 291, 303 (D.C. Cir. 2003) ............................................... 49 |
| 17 | *Ctr. for Food Safety v. Vilsack,*<br>636 F.3d 1166 (9th Cir. 2011) ........................................................ 53 |
| 18 | *Encino Motorcars, LLC v. Navarro,* |
| 19 | 136 S. Ct. 2117 (2016) ................................................................... 42 |
| 20 | *Exeltis USA Inc. v. First Databank, Inc.,*<br>No. 17-cv-04810-HSG, 2017 WL 6539909 (N.D. Cal. Dec. 21, 2017) .......... 57 |
| 21 | *FCC v. Fox Television Stations, Inc.,*<br>556 U.S. 502 (2009) ............................................................ 36, 42, 43 |
| 22 | |

CONSOLIDATED OPPOSITION
TO PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION
NO. 1:19-CV-3040-SAB

iii

U.S. DEPARTMENT OF JUSTICE
1100 L Street, N.W.
Washington, DC  20005
(202) 305-0878

*Forest Grove Sch. Dist. v. T.A.*,
   557 U.S. 230 (2009) ............................................................................ 20

*Freedom Holdings, Inc. v. Spitzer*,
   408 F.3d 112 (2d Cir. 2005) .............................................................. 56

*Gill v. Whitford*,
   138 S. Ct. 1916 (2018) ................................................................. 60, 63

*Hecht Co. v. Bowles*,
   321 U.S. 321 (1944) ............................................................................ 62

*Janus v. Am. Fed'n of State, Cty., & Mun. Emps., Council 31*,
   138 S. Ct. 2448 (2018) ....................................................................... 42

*Lopez v. Brewer*,
   680 F.3d 1068 (9th Cir. 2012) .......................................................... 10

*Los Angeles Haven Hospice, Inc. v. Sebelius*,
   638 F.3d 644 (9th Cir. 2011) ............................................................ 61

*Madsen v. Women's Health Ctr., Inc.*,
   512 U.S. 753 (1994) ............................................................................ 61

*Marina Mercy Hosp. v. Harris*,
   633 F.2d 1301 (9th Cir. 1980) .......................................................... 39

*Maryland v. King*,
   567 U.S. 1301 (2012) ......................................................................... 58

*Massachusetts v. Bowen*,
   679 F. Supp. 137 (D. Mass. 1988) ................................................... 61

*MD/DC/DE Broads. Ass'n v. FCC*,
   236 F.3d 13 (D.C. Cir.  2001) ........................................................... 66

*Morales v. Trans World Airlines, Inc.*,
   504 U.S. 374 (1992) ............................................................................ 33

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) .............................................................................. 35

CONSOLIDATED OPPOSITION
TO PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION
NO. 1:19-CV-3040-SAB

iv

U.S. DEPARTMENT OF JUSTICE
1100 L Street, N.W.
Washington, DC  20005
(202) 305-0878

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*,
   551 U.S. 644 (2007) ................................................................. 18, 20

*Nat'l Inst. of Family & Life Advocates v. Becerra*,
   138 S. Ct. 2361 (2018) .................................................................... 45

*Nuclear Energy Inst., Inc. v. EPA*,
   373 F.3d 1251 (D.C. Cir. 2004) ....................................................... 29

*Nutraceutical Corp. v. Von Eschenbach*,
   459 F.3d 1033 (10th Cir. 2006).......................................................... 28

*Oregon v. Legal Servs. Corp.*,
   552 F.3d 965 (9th Cir. 2009)............................................................. 54

*Planned Parenthood Fed'n of Am. v. Bowen*,
   687 F. Supp. 540 (D. Colo. 1988) .................................................... 61

*Planned Parenthood of Greater Ohio v. Hodges*,
   917 F.3d 908 (6th Cir. 2019)............................................................. 65

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
   566 U.S. 639 (2012) ........................................................................ 33

*Roe v. Wade*,
   410 U.S. 113 (1973) ........................................................................ 45

*Rust v. Sullivan*,
   500 U.S. 173 (1991) ..............................................................*passim*

*Sierra Forest Legacy v. Sherman*,
   646 F.3d 1161 (9th Cir. 2011)........................................................... 54

*Stilwell v. Office of Thrift Supervision*,
   569 F.3d 514 (D.C. Cir. 2009) ......................................................... 42

*TC Heartland LLC v. Kraft Foods Grp. Brands LLC*,
   137 S. Ct. 1514 (2017) .................................................................... 20

*Trump v. Hawaii*,
   138 S. Ct. 2392 (2018) .............................................................. 61, 62

CONSOLIDATED OPPOSITION
TO PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION
NO. 1:19-CV-3040-SAB

v

U.S. DEPARTMENT OF JUSTICE
1100 L Street, N.W.
Washington, DC 20005
(202) 305-0878

*TVA v. Hill,*
  437 U.S. 153 (1978) ............................................................................ 2, 21

*United States v. City of Los Angeles,*
  595 F.2d 1386 (9th Cir. 1979) ............................................................ 56

*Univ. Health Servs., Inc. v. Thompson,*
  363 F.3d 1013 (9th Cir. 2004) ............................................................ 29

*Univ. of Tex. v. Camenisch,*
  451 U.S. 390 (1981) ............................................................................ 61

*W. Va. Ass'n of Cmty. Health Centers, Inc. v. Sullivan,*
  737 F. Supp. 929 (S.D.W. Va. 1990) .................................................. 61

*Washington v. Chimei Innolux Corp.,*
  659 F.3d 842 (9th Cir. 2011) .............................................................. 54

*Weinberger v. Romero-Barcelo,*
  456 U.S. 305 (1982) ............................................................................ 62

*Whitman v. Am. Trucking Ass'ns,*
  531 U.S. 457 (2001) ............................................................................ 29

*Winter v. NRDC,*
  555 U.S. 7 (2008) .................................................................... 10, 53, 54

*Zepeda v. INS,*
  753 F.2d 719 (9th Cir. 1983) .............................................................. 54

<u>Statutes</u>

5 U.S.C. § 702 .................................................................................................... 62

5 U.S.C. § 703 .................................................................................................... 62

5 U.S.C. § 706 .................................................................................................... 62

42 U.S.C. § 300 .................................................................................. 5, 34, 51, 53

42 U.S.C. § 300a-4 .................................................................................... 5, 52

42 U.S.C. § 300a-5 .................................................................................... 34

CONSOLIDATED OPPOSITION
TO PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION
NO. 1:19-CV-3040-SAB

vi

U.S. DEPARTMENT OF JUSTICE
1100 L Street, N.W.
Washington, DC 20005
(202) 305-0878

42 U.S.C. § 300a-6 ................................................................................ 1, 5, 11

42 U.S.C. § 18114 ....................................................................................... *passim*

42 U.S.C. § 18032 .............................................................................................. 32

Pub. L. No. 91-572, 84 Stat. 1504 (1970) ............................................................ 5

Pub. L. No. 115-245, 132 Stat. 2981 (2018) ...................................................... 19

### Regulations

42 C.F.R. § 59.5 .................................................................................................. 6

42 C.F.R. § 59.8 ......................................................................................... 15, 42

42 C.F.R. § 59.14 ............................................................................................. 13

42 C.F.R. § 59.14 ......................................................................... 14, 15, 18, 19

42 C.F.R. § 59.15 ............................................................................................. 18

36 Fed. Reg. 18,465 (Sept. 15, 1971) ................................................................ 6

52 Fed. Reg. 33,210 (Sept. 1, 1987) .................................................................. 7

53 Fed. Reg. 2922 (Feb. 2, 1988) ............................................................ *passim*

58 Fed. Reg. 7455 (Jan. 22, 1993) .................................................................... 8

58 Fed. Reg. 7464 (Feb. 5, 1993) ..................................................................... 8

65 Fed. Reg. 41,270 (July 3, 2000) ................................................................ 8, 9

83 Fed. Reg. 25,502 (June 1, 2018) ......................................................... *passim*

84 Fed. Reg. 7714 (Mar. 4, 2019) ........................................................... *passim*

### Legislative Materials

116 Cong. Rec. 37,375 (1970) ........................................................................... 6

H.R. Rep. No. 102-204 (1991) ......................................................................... 24

CONSOLIDATED OPPOSITION
TO PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION
NO. 1:19-CV-3040-SAB

vii

U.S. DEPARTMENT OF JUSTICE
1100 L Street, N.W.
Washington, DC 20005
(202) 305-0878

S. 323, 102nd Cong. (1991) ................................................................... 24

S. Doc. No. 102-28 (1992) ................................................................. 25

<u>Other Authorities</u>

Antonin Scalia & Brian A. Garner, Reading Law 331 (2012) ............................ 21

Black's Law Dictionary (10th ed. 2014) ............................................. 24


HHS, *Announcement of Anticipated Availability of Funds for Family Planning Services Grants* 13-14 (Feb. 23, 2018),

    https://www.hhs.gov/opa/sites/default/files/FY18-Title-X-Services-FOA-Final-Signed.pdf ............................................................. 56

CONSOLIDATED OPPOSITION
TO PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION
NO. 1:19-CV-3040-SAB

viii

U.S. DEPARTMENT OF JUSTICE
1100 L Street, N.W.
Washington, DC 20005
(202) 305-0878

# **INTRODUCTION**

Boiled down to its essence, this lawsuit seeks to overrule the Supreme

Court's decision in *Rust v. Sullivan*, 500 U.S. 173 (1991). Then, as now, section

1008 of the Public Health Service Act (PHSA) provides that "[n]one of the funds

appropriated under [the Title X program] shall be used in programs where abortion

is a method of family planning." 42 U.S.C. § 300a-6. In 1988, the Department of

Health and Human Services (HHS) promulgated regulations extremely similar to

the rule Plaintiffs challenge here. Those regulations "require[d] a ban on . . .

referral. . . and advocacy [of abortion] within the Title X project" and "mandate[d]

that Title X programs be organized so that they are physically and financially

separate from [abortion-related] activities." *Rust*, 500 U.S. at 184, 188. The

Supreme Court upheld those regulations in *Rust*, concluding that their

requirements were a lawful construction of the Title X statute, were not arbitrary

and capricious, and did not violate the First or Fifth Amendments. *Id.* at 184, 192-

203.

Plaintiffs nevertheless seek to preliminarily enjoin a March 4, 2019 HHS

Final Rule, the major components of which are materially indistinguishable from

the requirements the Supreme Court upheld in *Rust*. *See* Compliance with

Statutory Program Integrity Requirements, 84 Fed. Reg. 7714 (Mar. 4, 2019)

(Final Rule or Rule). Plaintiffs make no serious effort to distinguish the Rule from

the regulations upheld in *Rust*, and Congress has not amended the statute *Rust*

interpreted. Notably, Congress *attempted* to enact legislation that would have

CONSOLIDATED OPPOSITION
TO PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION
NO. 1:19-CV-3040-SAB

1

U.S. DEPARTMENT OF JUSTICE
1100 L Street, N.W.
Washington, DC 20005
(202) 305-0878

1    partially overruled *Rust* by permitting abortion referrals within the Title X

2    program, but its efforts were vetoed. *Rust* thus squarely controls.

3         Plaintiffs' attempts to avoid this binding precedent are unpersuasive.

4    Plaintiffs principally argue that Congress silently superseded section 1008 as

5    interpreted in *Rust* in two provisions: (1) a one-line rider Congress began adding

6    to appropriations bills in 1996, which provides that "all pregnancy counseling

7    shall be nondirective" (the nondirective provision); and (2) a section of the

8    Affordable Care Act (ACA), codified at 42 U.S.C. § 18114 (section 1554), that

9    says nothing about abortion or abortion-related services.  This argument—an

10   implied repeal on steroids—is implausible.  Neither the nondirective provision nor

11   section 1554 even mentions abortion, section 1008, or *Rust*, much less creates a

12   previously undiscovered statutory conflict.  And Plaintiffs cite no legislative

13   history (or anything else) suggesting that Congress sought to smuggle such a

14   major change on a highly controversial subject into these subsequent provisions.

15        The problems with Plaintiffs' case do not end there.  If anything, the

16   nondirective provision *supports* the Rule, which allows pregnancy counseling,

17   including about abortion, if it is nondirective.  In addition, the presumption against

18   implied repeals "applies with even *greater* force when the claimed repeal rests

19   solely on an Appropriations Act," *TVA v. Hill*, 437 U.S. 153, 190 (1978), and there

20   is a "very strong presumption that [appropriations bills] do not" substantively

21   change existing law, *Calloway v. Dist. of Columbia*, 216 F.3d 1, 9 (D.C. Cir.

22   2000).  Plaintiffs come nowhere close to rebutting that "very strong presumption":

the nondirective provision they invoke nowhere mentions abortion, *Rust*, or (unlike the legislation that Congress unsuccessfully tried to enact following *Rust*) referrals.

Plaintiffs have also waived any challenge based on section 1554 because they never allege that they (or anyone else) raised this provision during the notice-and-comment process. That omission is understandable. Section 1554 concerns the *denial* of information and services. As the Supreme Court held in *Rust*, restrictions such as those in the Rule *deny* nothing; they are merely limitations on what the government chooses to fund. And even if section 1554 and section 1008 did somehow conflict, section 1554 only supersedes contrary requirements in the Affordable Care Act—not preexisting requirements elsewhere in the U.S. Code, such as section 1008. *See* 42 U.S.C. § 18114 (applies only "[n]otwithstanding any provision of [the Affordable Care] Act").

Plaintiffs' remaining challenges similarly fail. Far from being an unreasonable interpretation of the PHSA, the Rule follows directly from section 1008 and includes requirements *Rust* expressly affirmed. And the charge that the Rule is arbitrary and capricious withers under scrutiny. HHS thoroughly explained its reasoning and offered a rational justification for the choices it made—choices the Supreme Court has already upheld in substantial part.

Given Plaintiffs' failure to establish a likelihood of success on the merits, they cannot obtain the extraordinary relief they seek. But even setting the merits aside, Plaintiffs fail to meet the equitable criteria for a preliminary injunction.

CONSOLIDATED OPPOSITION
TO PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION
NO. 1:19-CV-3040-SAB

3

U.S. DEPARTMENT OF JUSTICE
1100 L Street, N.W.
Washington, DC 20005
(202) 305-0878

Plaintiffs' speculative predictions of injury likewise fail to establish that they will suffer any irreparable injury in the absence of preliminary relief. The remaining two factors favor the government, which suffers irreparable injury whenever its laws are set aside by a court and which has a compelling interest in following longstanding federal law prohibiting the use of Title X funds for programs where abortion is a method of family planning.

Finally, at a minimum, any relief should be limited in at least two respects. First, it should be confined to Plaintiffs and not extended nationwide. Indeed, in the lead-up to *Rust*, every court that enjoined the 1988 regulations limited that relief to the parties before it, and Plaintiffs provide no good reason for a broader remedy here. In addition, a nationwide injunction would render the proceedings in three other district courts academic and effectively allow Plaintiffs' views to govern the entire country. Second, any relief should be limited to particular provisions found unlawful. The Rule contains an express severability clause and, as a practical matter, the Rule's major components can operate independently. Thus, whatever else this Court decides, there is no basis for enjoining the entire Rule throughout the country.

## LEGAL AND FACTUAL BACKGROUND

Congress enacted Title X of the PHSA in 1970 to provide federal subsidies for certain types of family planning services. *See* Pub. L. No. 91-572, 84 Stat. 1504 (1970). Nothing material in the statutory language of Title X has changed since the 1970s, or, for that matter, since the Supreme Court decided *Rust* in 1991.

CONSOLIDATED OPPOSITION
TO PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION
NO. 1:19-CV-3040-SAB

4

U.S. DEPARTMENT OF JUSTICE
1100 L Street, N.W.
Washington, DC 20005
(202) 305-0878

Section 1001(a) authorizes the Secretary of HHS to make grants and enter into contracts with public or private nonprofit entities "to assist in the establishment and operation of voluntary family planning projects which shall offer a broad range of acceptable and effective family planning methods and services (including natural family planning methods, infertility services, and services for adolescents)." 42 U.S.C. § 300(a). Section 1006(a) states that "[g]rants and contracts made under this subchapter shall be made in accordance with such regulations as the Secretary may promulgate." *Id.* § 300a-4(a). And section 1008 requires that "[n]one of the funds appropriated under this subchapter shall be used in programs where abortion is a method of family planning." *Id.* § 300a-6. As a sponsor explained, "the committee members clearly intend that abortion is not to be encouraged or promoted in any way through this legislation." 116 Cong. Rec. 37,375 (1970) (Rep. Dingell).

## I.  PRIOR REGULATORY INTERPRETATIONS AND *RUST*

HHS's initial regulations for the Title X program required only that a grantee's application state that the Title X "project will not provide abortions as a method of family planning." 36 Fed. Reg. 18,465, 18,466 (Sept. 15 1971); 42 C.F.R. § 59.5(a)(9) (1971). Between the time of those regulations and 1988, however, HHS interpreted Title X both to prohibit projects from engaging in activities that "in any way promot[e] or encourag[e] abortion as a method of family planning," and to "requir[e] that the Title X program be 'separate and distinct' from any abortion activities of a grantee." 53 Fed. Reg. 2922, 2923-25

CONSOLIDATED OPPOSITION
TO PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION
NO. 1:19-CV-3040-SAB

5

U.S. DEPARTMENT OF JUSTICE
1100 L Street, N.W.
Washington, DC 20005
(202) 305-0878

1   (Feb. 2, 1988).  In 1981, HHS also issued guidelines that required Title X projects

2   to offer "nondirective" counseling about pregnancy termination, followed by

3   referral for abortions if requested.  *Id.*  At the time, HHS "took the view that

4   activity which did not have the . . . principal purpose or effect of promoting

5   abortion was permitted." *Id.*

6          The agency modified its approach in 1988.  The Secretary adopted final

7   regulations to address uncertainty and confusion concerning the use of Title X

8   funds and to effectuate more faithfully the underlying policy embodied in section

9   1008 against the use of Title X funds in any way to encourage or promote abortion.

10  *See* 53 Fed. Reg. at 2923-2925; Proposed Rules, 52 Fed. Reg. 33,210, 33,211-22

11  (Sept. 1, 1987).  Those 1988 regulations bear a striking resemblance to the ones

12  Plaintiffs challenge here.  The 1988 regulations:

13       • Prohibited Title X projects from engaging in abortion counseling
           and referrals, even upon specific request.  *See* 53 Fed. Reg. at 2945
14         (section 59.8(a)(1)).

15       • Required referrals "for appropriate prenatal and/or social services by
           furnishing a list of available providers that promote the welfare of
16         mother and unborn child" to every patient client.  *Id.* (section
           59.8(a)(2)).
17
         • Prohibited Title X projects from "encourag[ing], promot[ing] or
18         advocat[ing] abortion as a method of family planning." *Id.* (section
           59.10).
19
         • Prohibited providers from using a list of prenatal and/or social
20         services to indirectly encourage or promote abortion.  *Id.* (section
           59.8(a)(3)).
21

22

- Prohibited providers from "including on the list of referral providers health care providers whose principal business is the provision of abortions[.]" *Id.* (section 59.8(a)(3)).

- Required all abortion services to be separate and distinct from a Title X funded project, including by requiring a Title X grantee to structure its Title X project "so that it is physically and financially separate" from other parts of a grantee's organization that might provide abortion services. *Id.* (section 59.9).

These requirements were challenged as unauthorized by Title X, arbitrary and capricious, and impermissible under the First and Fifth Amendments. In *Rust*, the Supreme Court upheld the regulations against these attacks. 500 U.S. at 183-203. The Court accepted as reasonable the Secretary's explanation that the "prior policy failed to implement properly the statute and that it was necessary to provide clear and operational guidance to grantees about how to preserve the distinction between Title X programs and abortion as a method of family planning," as well as that "the new regulations [were] more in keeping with the original intent of the statute, are justified by client experience under the prior policy, and [were] supported by a shift in attitude against the elimination of unborn children by abortion." *Id.* at 187 (quotation marks omitted).

In February 1993, the President suspended the 1988 regulations and directed HHS to propose new regulations. *See* The Title X "Gag Rule," Memorandum, 58 Fed. Reg. 7455 (Jan. 22, 1993). HHS then issued a proposed rule, *see* 58 Fed. Reg. 7464 (Feb. 5, 1993), which it finalized on July 3, 2000, *see* 65 Fed. Reg. 41,270 (July 3, 2000). The 2000 regulations removed the provisions of the 1988 regulations that (1) prohibited Title X projects from counseling or

CONSOLIDATED OPPOSITION
TO PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION
NO. 1:19-CV-3040-SAB

7

U.S. DEPARTMENT OF JUSTICE
1100 L Street, N.W.
Washington, DC 20005
(202) 305-0878

1  referring project clients for abortion, (2) required grantees to separate their Title

2  X project physically from any abortion activities, and (3) implemented

3  compliance standards for Title X projects designed to eliminate the promotion or

4  encouragement of abortion as a method of family planning. *See id.* at 41,280.  The

5  regulations also affirmatively required grantees to provide counseling concerning

6  and referrals for abortion in certain situations.  *Id.* at 41,279.

7  **II.    THE FINAL RULE**

8      On June 1, 2018, HHS published a proposed rule soliciting comments on

9  proposed changes to the 2000 regulations.  *See* Proposed Rules, 83 Fed. Reg.

10  25,502 (June 1, 2018) (NPRM).  HHS explained that its proposed changes were

11  based on what HHS considers the best interpretation of Title X, and, in particular,

12  section 1008.  *Id.* at 25,505.  HHS further explained that the intent of the changes

13  was to "refocus the Title X program on its statutory mission—the provision of

14  voluntary, preventive family planning services specifically designed to enable

15  individuals to determine the number and spacing of their children[.]"  *Id.*

16      On March 4, 2019, after considering public comments, HHS published in

17  the Federal Register the Final Rule at issue.  *See* 84 Fed. Reg. 7714.  The Rule

18  adopted the proposals from the proposed rule with only modest changes.   As

19  discussed in detail below, the Rule for all intents and purposes restores the 1988

20  regulations that the Supreme Court upheld in *Rust*. *See infra* Part I.A.  If anything,

21  the Rule is more permissive than the 1988 regulations sustained in *Rust* in that it

22

allows (but does not require) nondirective counseling discussing abortion. *See* 84 Fed. Reg. at 7789.

HHS explained that the Rule provides much needed clarity regarding the Title X program's role as a family planning program that is statutorily forbidden from paying for abortion and from funding programs/projects where abortion is a method of family planning. *See* 84 Fed. Reg. at 7721. As HHS observed, the Rule is necessary because the 2000 regulations "fostered an environment of ambiguity surrounding appropriate Title X activities"—an assessment confirmed by many of the comments submitted in response to the proposed rule. *Id.* at 7721-7722. HHS explained that the Rule rectifies this ambiguity by making a clear delineation between Title X and non-Title X activities and provides grantees with clear direction on how to ensure that no Title X funds are expended where abortion is a method of family planning. *Id.* at 7722.

The Rule will take effect on May 3, 2019, but funding recipients have until July 2, 2019 to comply with the financial separation requirement, and until March 4, 2020 to comply with the physical separation requirement. 84 Fed. Reg. at 7714.

## III. THIS LITIGATION

On March 5, 2019, Washington filed its complaint asserting Administrative Procedure Act (APA) and constitutional claims. *See* Compl., ECF No. 1. The National Family Planning & Reproductive Health Association Plaintiffs (NFPRHA) filed two days, later asserting substantially similar claims. *See NFPRHA v. Azar*, No. 1:19-cv-03045-SAB, Compl., ECF No. 1. The Court

CONSOLIDATED OPPOSITION
TO PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION
NO. 1:19-CV-3040-SAB

9

U.S. DEPARTMENT OF JUSTICE
1100 L Street, N.W.
Washington, DC 20005
(202) 305-0878

consolidated the two cases on March 18.  *See* Order, ECF No. 8.  On March 22,

Plaintiffs in both cases moved for a preliminary injunction to block

implementation of the Rule.  *See* ECF No. 9 (Wash. Mem.); ECF No. 18

(NFPRHA Mem.).  Although their Complaints include various constitutional

claims, Plaintiffs do not advance these constitutional arguments in their motions

for preliminary injunctions, and the government therefore does not address them

here.  Pursuant to the Court's March 18 Order, the government now files this

consolidated opposition.

## **ARGUMENT**

A preliminary injunction is "an extraordinary and drastic remedy" that

should not be granted "unless the movant, *by a clear showing*, carries the burden of

persuasion." *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012).  "A plaintiff

seeking a preliminary injunction must establish that he is likely to succeed on the

merits, that he is likely to suffer irreparable harm in the absence of preliminary

relief, that the balance of equities tips in his favor, and that an injunction is in the

public interest." *Winter v. NRDC*, 555 U.S. 7, 20 (2008).  Plaintiffs fail to meet any

of these requirements.

## **I.  PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS**

Plaintiffs challenge a Rule that is materially indistinguishable from one the

Supreme Court has already upheld.  Most of Plaintiffs' arguments bear a striking

resemblance to those the Supreme Court rejected in *Rust*, and their remaining

claims are without merit.  Because Plaintiffs have no realistic likelihood of

CONSOLIDATED OPPOSITION
TO PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION
NO. 1:19-CV-3040-SAB

10

U.S. DEPARTMENT OF JUSTICE
1100 L Street, N.W.
Washington, DC  20005
(202) 305-0878

1    prevailing on the merits, their motions should be denied for that reason alone.

2    **A. Plaintiffs' Claims Are Indistinguishable From Those _Rust_ Rejected**

3

4    Plaintiffs' challenge to the Rule fails in significant part for a simple reason: The Supreme Court has already upheld HHS's materially indistinguishable—if anything, stricter—1988 regulations against APA challenges indistinguishable from the ones here. Section 1008 of the PHSA provides that "[n]one of the funds appropriated under [the Title X program] shall be used in programs where abortion is a method of family planning." 42 U.S.C. § 300a-6. In _Rust_, the Supreme Court held that this text authorized regulations that (1) barred counseling concerning the use of abortion and abortion referrals as a method of family planning within the Title X program, (2) broadly prohibited a Title X project from advocating abortion as a method of family planning, and (3) mandated financial and physical separation between Title X projects and prohibited abortion activities. 500 U.S. at 183-91.

The language of Title X and section 1008 has not changed since _Rust_. The regulatory provisions Plaintiffs principally challenge—which prohibit abortion referrals as a method of family planning and mandate the physical separation of Title X projects from abortion activities—are materially indistinguishable from those upheld in _Rust_. Indeed, Washington acknowledges that the Rule "reinstated the pre-_Rust_ status quo." Wash. Mem. at 8. Plaintiffs' objections to the Rule are

5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

11

CONSOLIDATED OPPOSITION
TO PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION
NO. 1:19-CV-3040-SAB

U.S. DEPARTMENT OF JUSTICE
1100 L Street, N.W.
Washington, DC 20005
(202) 305-0878

1    also for the most part indistinguishable from those the Supreme Court rejected in

2    *Rust*.

3        *The counseling, referral, and advocacy restrictions*:  The Rule prohibits

4    referrals for abortion as a method of family planning but allows nondirective

5    pregnancy counseling, including counseling concerning abortion, so long as "a

6    Title X project [does] not perform, promote, refer for, or support abortion as a

7    method of family planning, nor take any other affirmative action to assist a patient

8    to secure such an abortion."  84 Fed. Reg. at 7788-89 (to be codified at 42 C.F.R.

9    § 59.14(a)).  The 1988 regulations upheld in *Rust*, like the Rule here, prohibited

10   "referral for abortion as a method of family planning" in a Title X project.  53 Fed.

11   Reg. at 2945.  "[T]he broad directives provided by Congress in Title X in general

12   and § 1008 in particular," the Supreme Court explained, "plainly allows" this

13   "construction of the statute."  *Rust*, 500 U.S. at 184. The Rule's more modest

14   approach—prohibiting referrals but allowing nondirective counseling—is thus

15   even more defensible.

16       Plaintiffs do not explain what features of the restrictions on abortion

17   counseling, referral, and advocacy here distinguish this case from *Rust* in a way

18   that favors them.  Indeed, the aspects of the Rule that Plaintiffs attack here were

19   all features of the 1988 regulations *Rust* upheld:

20       a.    Plaintiffs complain that the Rule generally bars abortion referrals

21   within the Title X program.  *E.g.*, Wash. Mem. at 10; NFPRHA Mem. at 13-14.

22   So did the 1988 regulations.  *See Rust*, 500 U.S. at 184.

CONSOLIDATED OPPOSITION                    12
TO PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION
NO. 1:19-CV-3040-SAB

U.S. DEPARTMENT OF JUSTICE
1100 L Street, N.W.
Washington, DC  20005
(202) 305-0878

1     b.     Plaintiffs object that the Rule mandates referrals for prenatal care.

2     Wash. Mem. at 21; NFPRHA Mem. at 13.  Again, so did the 1988 regulations.

3     *See Rust*, 500 U.S. at 179 (noting that the regulations "clarif[ied] that pregnant

4     women must be referred to appropriate prenatal care services" (quoting 53 Fed.

5     Reg. at 2925)); *compare* 42 C.F.R. § 59.14(b)(1) (effective May 3, 2019)

6     (providing that "once a client served by a Title X project is medically verified as

7     pregnant, she shall be referred to a health care provider for medically necessary

8     prenatal health care"), *with* 53 Fed. Reg. at 2945 (providing that "once a client

9     served by a Title X project is diagnosed as pregnant, she must be referred for

10    appropriate prenatal and/or social services by furnishing a list of available

11    providers that promote the welfare of mother and unborn child").

12         c.     Plaintiffs protest that, under the Rule, providers may refuse to

13    provide information about abortion even if a Title X patient directly requests

14    abortion-related information, and providers must furnish information about

15    alternatives to abortion even if the provider believes that the patient does not want

16    this information.  Wash. Mem. at 21; NFPRHA Mem. at 14.  But the 1988

17    regulations "expressly prohibited [a Title X project] from referring a pregnant

18    woman to an abortion provider, even upon specific request." *Rust*, 500 U.S. at

19    180.  And they were even more stringent on counseling.  The 1988 regualtions

20    prohibited *any* "counseling concerning the use of abortion as a method of family

21    planning, *Rust*, 500 U.S. at 179 (quoting 42 C.F.R. § 59.8(a)(1) (1989)), whereas

22

CONSOLIDATED OPPOSITION                    13
TO PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION
NO. 1:19-CV-3040-SAB

U.S. DEPARTMENT OF JUSTICE
1100 L Street, N.W.
Washington, DC  20005
(202) 305-0878

1    the Final Rule allows providers to furnish "nondirective pregnancy counseling,

2    which may discuss abortion," 42 C.F.R. § 59.14(e)(5) (effective May 3, 2019).

3          d.     The Rule permits a provider to furnish a pregnant patient with a "list

4    of licensed, qualified, comprehensive primary health care providers (including

5    providers of prenatal care) . . . some (but not the majority) of which also provide

6    abortion as part of their comprehensive health care services." 84 Fed. Reg. at

7    7789 (to be codified at 42 C.F.R. § 59.14(c)(2)). NFPRHA objects that the Rule

8    requires including providers who do not provide abortion on the list, even if the

9    patient indicates she would like to seek an abortion. NFPRHA Mem. at 14. But

10   the same was true of the 1988 regulations. *See Rust*, 500 U.S. at 180 (list could

11   not "exclud[e] available providers who do not provide abortions"). NFPRHA also

12   attacks the no-majority specification but, again, the rule upheld in *Rust* prohibited

13   providers from "weighing the list of referrals in favor of health care providers

14   which perform abortions." *Id.*; *see also* 53 Fed. Reg. at 2945. And while

15   NFPRHA notes that the Rule bars including abortion providers who do not also

16   provide comprehensive primary health care, NFPRHA Mem. at 30-31, the 1988

17   regulations likewise prohibited "including on the list of referral providers health

18   care providers whose principal business is the provision of abortions," *Rust*, 500

19   U.S. at 180; *see also* 53 Fed. Reg. at 2945.

20          e.     Plaintiffs repeatedly—but incorrectly—assert that the Rule requires

21   them to conceal information from patients in a manner that violates ethical

22   principles. Wash. Mem. at 10; NFPRHA Mem. at 11, 40-41. Plaintiffs omit the

CONSOLIDATED OPPOSITION      14      U.S. DEPARTMENT OF JUSTICE
TO PLAINTIFFS' MOTIONS FOR               1100 L Street, N.W.
PRELIMINARY INJUNCTION                Washington, DC 20005
NO. 1:19-CV-3040-SAB                   (202) 305-0878

1    fact that, unlike the regulations sustained in *Rust*, the Rule permits providers to

2    offer "nondirective pregnancy counseling, *which may discuss abortion*, [provided

3    that] the counselor neither refers for, nor encourages, abortion."   42 C.F.R.

4    § 59.14(e)(5) (effective May 3, 2019) (emphasis added).   Plaintiffs largely ignore

5    this component of the Rule.   Virtually all of Plaintiffs' "concealment" allegations

6    concern the aspect of the Rule that prohibits providers supplying patients with a

7    list from identifying which providers on that list perform abortion.   But the 1988

8    rule did that and more, prohibiting counseling discussing abortion, and also

9    allowing a list of care providers but similarly prohibiting using such a list to

10   "steer[] clients to providers who offer abortion as a method of family planning."

11   42 C.F.R. § 59.8(a)(3) (1989).

12       Nor is the provision of such a list at all "misleading."   Wash. Mem. at 10;

13   NFPRHA Mem. at 11.   If a patient requests a list of abortion providers, the Title

14   X provider may simply inform the patient that "the project does not consider

15   abortion a method of family planning and, therefore, does not refer for abortion."

16   42 C.F.R. § 59.14(e)(5) (effective May 3, 2019).   Honestly informing a patient

17   about limitations imposed by law is not "misleading."   And once again, the

18   regulations upheld in *Rust* permitted a virtually identical response.   *See* 500 U.S.

19   at 180 (noting that a "permissible response" to a patient's request for an abortion

20   referral "is that 'the project does not consider abortion an appropriate method of

21   family planning and therefore does not counsel or refer for abortion'").

22       More fundamentally, any attempt to distinguish the counseling, referral,

1   and advocacy restrictions here from those in *Rust* cannot be reconciled with *Rust*'s

2   categorical reasoning.  *Rust* broadly held that section 1008 "plainly allows" a "ban

3   on [abortion] counseling, referral, and advocacy" within the Title X program, 500

4   U.S. at 184, and here, the Rule prohibits only referral and advocacy.  Even if

5   Plaintiffs could identify some differences in their favor between the prohibitions

6   here and those considered in *Rust*—and they hardly try to—*Rust* obviously would

7   encompass these restrictions.

8       *The program integrity requirements*:  The Rule's program integrity

9   requirements likewise are materially indistinguishable from the 1988 regulations.

10  The Rust Court held that these requirements—"mandating separate facilities,

11  personnel, and records"—were "not inconsistent with the plain language of Title

12  X" and "[c]ertainly . . . cannot be judged unreasonable."  500 U.S. at 187-88, 190.

13  The Court thus accepted HHS's view that "meeting the requirement of section

14  1008 mandates that Title X programs be organized so that they are physically and

15  financially separate from other activities which are prohibited from inclusion in a

16  Title X program," and that "[h]aving a program that is separate from such

17  activities is a necessary predicate to any determination that abortion is not being

18  included as a method of family planning in the Title X program."  *Id*. at 188

19  (quoting 53 Fed. Reg. at 2940).  Plaintiffs do not—and cannot—identify any

20  material differences between these requirements and those upheld in *Rust*:

21

22

CONSOLIDATED OPPOSITION                16
TO PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION
NO. 1:19-CV-3040-SAB

U.S. DEPARTMENT OF JUSTICE
1100 L Street, N.W.
Washington, DC  20005
(202) 305-0878

1     a.     Both mandate that "[a] Title X project must be organized so that it is

2 physically and financially separate . . . from activities which are prohibited under

3 section 1008";

4     b.     Both provide that a "project must have an objective integrity and

5 independence from prohibited activities";

6     c.     Both direct that "[m]ere bookkeeping separation of Title X funds

7 from other monies is not sufficient";

8     d.     Both set forth a list of four basically identical factors that the

9 Secretary will use to determine whether the requisite separation exists: (i) separate

10 accounting records (the Rule adds the requirement that such records be

11 "accurate"); (ii) facilities separation; (iii) separate personnel (the Rule adds

12 records and workstations to this requirement); and (iv) the extent to which

13 identification of the Title X project is present and abortion-related materials are

14 absent. *Compare* 42 C.F.R. § 59.15, *with* 53 Fed. Reg. at 2945.

15                       *       *       *

16     For all these reasons, neither group of Plaintiffs appears to contend that the

17 Rule reflects an impermissible interpretation of section 1008, and *Rust* squarely

18 forecloses any such claim.

19     **B.**     **Neither The Nondirective Provision Nor The ACA Silently Overrules *Rust***

20

21     *Rust*'s on-point statutory holding—and the remarkable overlap between

22 Plaintiffs' arguments and the ones *Rust* rejected—disposes of the claim that the

1   materially indistinguishable Rule is unlawful.  By necessity, Plaintiffs therefore

2   take a more creative approach, arguing that two subsequent provisions—(1) a

3   single line requiring that any pregnancy counseling provided in a Title X program

4   be "nondirective," in a rider Congress began adding to HHS appropriations acts

5   in 1996, and (2) section 1554 of the ACA, codified at 42 U.S.C. § 18114, which

6   mentions neither abortion nor abortion-related activities—silently supplant *Rust*.

7   *See* Wash. Mem. at 10; (claiming that the Rule violates "the Nondirective Mandate

8   and other post-*Rust* laws"); NFPRHA Mem. at 12 (arguing that "Congress's

9   Nondirective Mandate responded to the Supreme Court[] . . . in *Rust*").

10       This argument—that Congress silently overruled portions of *Rust* by

11  enacting two separate statutes and leaving the language of section 1008

12  unchanged—not only misconstrues the appropriations rider and section 1554, but

13  "runs foursquare into [the] presumption against implied repeals." *Nat'l Ass'n of

14  Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 664 (2007).  Even putting aside

15  this presumption, any argument that the two provisions supersede *Rust* is

16  implausible.  Neither the nondirective provision nor section 1554 mentions

17  abortion, section 1008, or *Rust*, and neither provision was accompanied by any

18  legislative history suggesting that Congress intended to overrule *Rust*.  Indeed,

19  when Congress *did* attempt to pass legislation that would have permitted abortion

20  referrals within the Title X program, that legislation was vetoed. *See infra* pp. 23-

21  24.  As explained further below, Plaintiffs' argument based on these two

22  provisions fails.

U.S. DEPARTMENT OF JUSTICE
1100 L Street, N.W.
Washington, DC  20005
(202) 305-0878

1        1.    <u>The Nondirective Provision Does Not Supplant *Rust*</u>

2        Since 1996, Congress has included a rider in its annual HHS appropriations

3    act that—in addition to stating that funds appropriated to Title X projects "shall

4    not be expended for abortions"—requires that "all pregnancy counseling shall be

5    nondirective." *E.g.*, HHS Appropriations Act 2019, Pub. L. No. 115-245, Div. B,

6    132 Stat. 2981, 3070-71 (2018).   Consistent with this requirement, the Rule

7    permits providers to provide "[n]ondirective pregnancy counseling," which "may

8    discuss abortion."    84 Fed. Reg. at 7789 (to be codified at 42 C.F.R.

9    § 59.14(b)(1)(i), (e)(5)).  The nondirective provision requires no more.

10       Plaintiffs nevertheless contend that the Rule violates the nondirective

11   provision because the Rule (1) requires that providers refer pregnant patients for

12   prenatal care, while (2) prohibiting referral for abortion as a method of family

13   planning.  *See* Wash. Mem. at 21; NFPRHA Mem. at 13-14.  Put differently,

14   Plaintiffs read the nondirective provision to *require* that Title X providers make

15   abortion referrals upon request and to bar HHS from mandating prenatal referrals.

16   *See id.*  But the nondirective provision says nothing about abortion referrals, much

17   less mandates HHS to bankroll only programs that provide them.  This is clear for

18   at least three reasons.

19       a.    For one, reading the nondirective provision to require abortion

20   referrals conflicts with the Supreme Court's authoritative interpretation of Title

21   X—*i.e.*, that Title X delegates authority to HHS to prohibit referrals for abortion

22   as a method of family planning and to allow for mandatory referrals of pregnant

1    patients for prenatal care.  *See Rust*, 500 U.S. at 184-87.  Plaintiffs' argument,

2    then, must be that the nondirective provision implicitly repealed section 1008 and

3    *Rust*.  *See* NFPRHA Mem. at 12.  But repeals by implication "are not favored and

4    will not be presumed unless the intention of the legislature to repeal is clear and

5    manifest." *Nat'l Ass'n of Home Builders*, 551 U.S. at 662 (quotations omitted).

6         The same is true with respect to judicial interpretations of statutory

7    provisions, such as the one in *Rust*:  "A clear, authoritative judicial holding on the

8    meaning of a particular provision should not be cast in doubt and subjected to

9    challenge whenever a related though not utterly inconsistent provision is adopted

10   in the same statute or even in an affiliated statute." *TC Heartland LLC v. Kraft*

11   *Foods Grp. Brands LLC*, 137 S. Ct. 1514, 1520 (2017) (quoting ANTONIN SCALIA

12   & BRIAN A. GARNER, READING LAW 331 (2012)); *see also, e.g.*, *Forest Grove Sch.*

13   *Dist. v. T.A.*, 557 U.S. 230, 240 (2009) (requiring "a clear expression" of

14   congressional intent to "abrogate" Supreme Court's interpretation of a statute).

15   Even when an "earlier ambiguous provision has already been construed by the

16   jurisdiction's high court to have a meaning that does not fit as well with a later

17   statute as another meaning," any "[l]egislative revision of law clearly established

18   by judicial opinion ought to be by express language or by unavoidably implied

19   contradiction." SCALIA & GARNER at 331.  Put differently, it makes no difference

20   that section 1008 contains an *implicit* rather than *explicit* delegation of authority

21   to HHS to prohibit referrals for abortion as a method of family planning and to

22   permit mandatory referrals of pregnant patients for prenatal care.   Given the

1  Supreme Court's interpretation of section 1008 in *Rust*, if Congress intended to

2  abrogate that interpretation, common sense suggests that it would have made its

3  intent clear.

4      Here, Plaintiffs' argument that Congress silently supplanted the Supreme

5  Court's decision in *Rust* and repealed part of Title X in an appropriations rider is

6  particularly weak because the doctrine "disfavoring repeals by implication . . .

7  applies with even *greater* force when the claimed repeal rests solely on an

8  Appropriations Act." *Hill*, 437 U.S. at 190. Because appropriations acts have

9  "the limited and specific purpose of providing funds for authorized programs,"

10  *id.*, there is a "very strong presumption that they do not" substantively change

11  existing law, *Calloway*, 216 F.3d at 9.

12      Plaintiffs cannot overcome that "very strong presumption" here because the

13  nondirective mandate expresses no clear indication that Congress was overriding

14  the Supreme Court's interpretation of Title X in *Rust*. The provision neither

15  mentions *Rust* nor alters the Title X statute, and Plaintiffs point to nothing in the

16  legislative record evincing such an intent. Nor is there any conflict between the

17  Rule and the appropriations rider. The latter provision addresses only

18  "counseling," which is different than the actual *referral* of a patient for medical

19  care. It does not use the word "referral" or dictate terms upon which a Title X

20  provider must make (or refrain from making) referrals for medical care outside of

21  the Title X program. Congress and HHS have long recognized that counseling a

22  patient and referring a patient for particular services are different. *See, e.g., supra*

CONSOLIDATED OPPOSITION
TO PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION
NO. 1:19-CV-3040-SAB

21

U.S. DEPARTMENT OF JUSTICE
1100 L Street, N.W.
Washington, DC 20005
(202) 305-0878

1    p. 6 (discussing 1981 guidance); *supra* pp. 7-8, (discussing 1993 guidance); *infra*

2    pp. 23-24 (discussing failed 1992 legislation and nondirective mandate).

3          There is thus no conflict—much less an irreconcilable one—between Title

4    X, as interpreted by HHS and the Supreme Court, and the nondirective provision.

5    Instead, the Rule adopts a position that appropriately harmonizes the two

6    statutes—prohibiting abortion referrals—consistent with the interpretation of

7    Title X upheld in *Rust*—while requiring that any pregnancy counseling (including

8    counseling on abortion), to the extent it is offered, be nondirective.  *See* 84 Fed.

9    Reg. at 7730.  The Court thus can give effect to the appropriations act, which does

10   not govern referral activities, without encroaching upon section 1008 or the

11   Supreme Court's interpretation in *Rust*.  Here, Congress included no definition of

12   the term "nondirective counseling" in its appropriations rider, much less any

13   indication that it intended to adopt a particular HHS interpretation of that

14   language.

15         Moreover, HHS's regulatory guidance prior to and since the nondirective

16   provision was first enacted draws a distinction between counseling and referrals.

17   The 1993 guidance (in place when Congress first enacted the nondirective

18   mandate) makes clear that the definition of counseling does not, standing alone,

19   include referrals.  To the contrary, it requires, in distinct phrases, that Title X

20   projects (1) provide nondirective counseling, and (2) refer patients for abortion

21   upon request.  *See* 58 Fed. Reg. 7464, 7464 (Feb. 5, 1993) (requiring providers

22   "provide nondirective counseling . . . *and* to refer her for abortion, if that is the

CONSOLIDATED OPPOSITION                    22         U.S. DEPARTMENT OF JUSTICE
TO PLAINTIFFS' MOTIONS FOR                            1100 L Street, N.W.
PRELIMINARY INJUNCTION                               Washington, DC  20005
NO. 1:19-CV-3040-SAB                                 (202) 305-0878

1 option she selects") (emphasis added). The 2000 rule also repeatedly uses the

2 terms "counseling" and "referral" separately. 65 Fed. Reg. at 41,272-75, 41,279.

3 Congress, in its appropriations rider, chose only to include the former term, while

4 excluding reference to the latter.

5         b. Even putting aside the strong presumption against implied repeals

6 and silent legislative abrogations of Supreme Court statutory interpretations (and

7 the even stronger presumption against implied repeals in appropriations bills),

8 Plaintiffs' attempt to equate "counseling" and "referrals" fails. "Counseling" does

9 not, in its common usage, necessarily include within its definition the act of

10 "referral." While the former is defined in purely verbal terms, *i.e.*, the "furnishing

11 of advice or guidance," Black's Law Dictionary (10th ed. 2014), the latter entails

12 the further, active step of "sending or directing to another for information, service,

13 consideration, or decision," *id*. And, again, counseling and referrals are treated

14 separately in the 1988 regulations, *Rust*, the 2000 regulations, and most notably,

15 Congress's *failed* attempt to overturn *Rust* with the Family Planning Amendment

16 Act of 1992, discussed in the next paragraph.

17         c. If there were any doubt that the non-directive provision did not

18 impliedly repeal section 1008 and *Rust*—and that "counseling" does not mean

19 "referrals" within the context of the Title X program—the immediate aftermath of

20 *Rust* should erase it. In an explicit attempt to overturn that decision, Congress set

21 out to "reverse[] the regulations issued in 1988 and upheld by the Supreme Court

22 in 1991 to restrict the provision of information on abortion to Title-Ten patients."

CONSOLIDATED OPPOSITION 23
TO PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION
NO. 1:19-CV-3040-SAB

U.S. DEPARTMENT OF JUSTICE
1100 L Street, N.W.
Washington, DC 20005
(202) 305-0878

H.R. Rep. No. 102-204, at 1 (Sept. 13, 1991), accompanying H.R. 3090. Both houses of Congress passed a bill, the "Family Planning Amendments Act of 1992," that would have amended Title X to explicitly condition Title X funding upon a project's agreement to "provide to individuals information regarding pregnancy management options" upon request. *See* S. 323, 102nd Cong. (1991). The bill defined "pregnancy management options" to mean "nondirective counseling *and referrals* regarding (A) prenatal care and delivery; (B) infant care, foster care, and adoption; and (C) *termination of pregnancy*." *Id*. (emphases added).

That bill was vetoed, *see* Message From the President, S. Doc. No. 102-28, 102nd Cong. (1992), and when Congress returned in 1996 to enact the nondirective provision, which *did* become law, it used entirely *different* language. The nondirective provision addresses counseling, but says nothing about referral. It says nothing about *Rust*. And it does not even require counseling, but merely provides that *if* pregnancy counseling occurs, it must be nondirective. "Few principles of statutory construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other language." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 442–43 (1987) (citation omitted). And this history confirms that the term "counseling" refers only to counseling, not also to referrals, and that the rider in no way intends to or actually supersedes *Rust* (much less by *requiring* abortion referrals in Title X).

CONSOLIDATED OPPOSITION
TO PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION
NO. 1:19-CV-3040-SAB

24

U.S. DEPARTMENT OF JUSTICE
1100 L Street, N.W.
Washington, DC 20005
(202) 305-0878

1    Plaintiffs' remaining arguments as to the nondirective provision are

2    meritless:

3         •    Plaintiffs claim that the Rule violates the nondirective provision by

4    requiring that Title X providers refer their pregnant patients for prenatal care (just

5    as the 1988 regulations did). *See* Wash. Mem. at 21; NFPRHA Mem. at 13. But

6    again, the nondirective provision addresses counseling alone and says nothing

7    about referrals. And because "[t]he Title X program is designed not for prenatal

8    care, but to encourage family planning," *Rust*, 500 U.S. at 193, such referrals are

9    necessary because pregnancy is a diagnosed medical condition that implicates the

10   need for early prenatal care, *see* 84 Fed. Reg. at 7734; *see also id.* at 7759 ("such

11   care is medically necessary to maintain or improve the health of both the mother

12   and the unborn baby"). Indeed, outside this litigation, Washington agrees that

13   "prenatal care is an important way to improve maternal and infant health

14   outcomes" and insists that the state is "promoting early & continuous prenatal

15   care" by having its own "family planning contractors refer women to prenatal care

16   providers."[1]

17

18

---

19        [1] *See* Washington State Department of Health, "2018 Washington State

20   Health Assessment," at 159-62, available at https://www.doh.wa.gov/Portals/1/

21   Documents/1000/2018SHA_FullReport.pdf.

22

1  •  Plaintiffs relatedly insist that the Rule defies the nondirective

2  provision by allowing Title X providers to give patients information about

3  maintaining their health during pregnancy.  *See* Wash. Mem. at 21-22; NFPRHA

4  Mem. at 14.  In other words, Plaintiffs maintain that Congress banned Title X

5  providers from providing pregnant women with knowledge about how to stay

6  healthy during her pregnancy.  That is implausible, to put it mildly.  Not even the

7  2000 rules—which Plaintiffs wish to revert to—prohibit giving prenatal care

8  information, even where no abortion counseling occurs.  65 Fed. Reg. at 41,279

9  (42 C.F.R. § 59.5(a)(5)).  Instead, those rules (like the 1988 rules) distinguish

10  between the terms "referral," "information," and "nondirective counseling."  *Id.*

11  •  Plaintiffs likewise object that the Rule does not require providers to

12  offer abortion counseling.  *See* Wash. Mem. at 21-22; NFPRHA Mem. at 14.  But

13  *Rust* upheld regulations that *prohibited any* counseling for abortion, *see* 500 U.S.

14  at 174-75, and, as discussed above, Congress did not silently supplant Supreme

15  Court precedent through the appropriations rider.   Again, the nondirective

16  provision requires only that "all pregnancy counseling shall be nondirective," 132

17  Stat. 3070-71, not that all Title X providers shall always provide pregnancy

18  counseling, much less that all Title X providers shall always provide pregnancy

19  counseling on a particular option (abortion).  Indeed, when Congress wants to

20  ensure that nondirective pregnancy counseling (when offered) includes discussion

21  of a specific option, it knows how to do so.  *See* 42 U.S.C. § 254c-6(1) (requiring

22  the Secretary to fund the training of, *inter alia*, Title X clinic staff "in providing

1   adoption information and referrals to pregnant women on an equal basis with all

2   other courses of action included in nondirective counseling to pregnant women");

3   *see also* 84 Fed. Reg. at 7730 (discussing this legislation).  Congress included no

4   such language with respect to abortion in the nondirective provision.  And in all

5   events, Plaintiffs lack standing to object that *other* entities might provide prenatal

6   information but not abortion counseling, when Plaintiffs themselves apparently

7   have no intention to do so.

8       •     NFPRHA also contends that the counseling authorized by the Rule

9   is directive because it requires providers to give patients a list of "comprehensive

10  primary health care providers (including providers of prenatal care)," even if the

11  patient only seeks abortion information or an abortion referral.  NFPRHA Mem.

12  at 14.  But NFPRHA does not explain how providing such a comprehensive list

13  "directs" a patient to take any particular course.  Presenting multiple options to a

14  patient is the paradigm of nondirective counseling.  As HHS explained, its

15  approach "is designed to assist the patient in making a free and informed

16  decision," presenting each option in a "factual, objective, and unbiased manner."

17  84 Fed. Reg. at 7747.  That a patient might *later* obtain an abortion *outside* the

18  auspices of Title X is no basis for withholding information *within* the Title X

19  project—nor does it support the atextual claim that a neutral presentation of

20  multiple options is "directive."

21      In short, Congress prohibited HHS from using Title X to fund pregnancy

22  counseling unless it is nondirective, and the Rule faithfully implements that

1   prohibition by specifying that projects can provide pregnancy counseling,

2   including about abortion, but only if it is nondirective. Plaintiffs are not likely to

3   succeed on the merits of this claim.

4              2.    Section 1554 of the ACA Does Not Supplant *Rust*

5       Plaintiffs' claim based on section 1554 of the ACA fares no better. *See*

6   Wash. Mem. at 22-25; NFPRHA Mem. at 16-18, 28-29. That provision states

7   that, "[n]otwithstanding any other provision of [the Affordable Care] Act, the

8   Secretary of Health and Human Services shall not promulgate any regulation that"

9       (1) creates any unreasonable barriers to the ability of individuals to
        obtain appropriate medical care;
10

11      (2) impedes timely access to health care services;

12      (3) interferes with communications regarding a full range of
        treatment options between the patient and the provider;

13      (4) restricts the ability of health care providers to provide full
        disclosure of all relevant information to patients making health care
14      decisions;

15      (5) violates the principles of informed consent and the ethical
        standards of health care professionals; or
16

17      (6) limits the availability of health care treatment for the full duration
        of a patient's medical needs.

18  42 U.S.C. § 18114.

19      To start, Plaintiffs have waived any challenge based on section 1554. A

20  plaintiff "must first utilize the opportunity for comment [on an agency regulation]

21  before it may raise issues" in federal court, or else arguments are "waived."

22  *Nutraceutical Corp. v. Von Eschenbach*, 459 F.3d 1033, 1041 n.9 (10th Cir. 2006)

1   (citation omitted) (collecting cases). "Th[is] rule applies with no less force to a

2   statutory interpretation claim not brought to an agency's attention," because

3   "respect for agencies' proper role in the *Chevron* framework requires that the court

4   be particularly careful to ensure that challenges to an agency's interpretation of its

5   governing statute are first raised in the administrative forum." *Nuclear Energy*

6   *Inst., Inc. v. EPA*, 373 F.3d 1251, 1298 (D.C. Cir. 2004); *see also Univ. Health*

7   *Servs., Inc. v. Thompson*, 363 F.3d 1013, 1019 (9th Cir. 2004). Here, Plaintiffs

8   challenge the product of notice-and-comment rulemaking, but never allege that

9   they (or anyone else) raised any purported inconsistency between the Rule and

10  section 1554 during the rulemaking process, and the government is aware of no

11  such objection.

12         Waiver aside, this argument is meritless. It is extraordinary to now claim,

13  for example, that the Rule "violate[s] the explicit limits that Congress placed on

14  HHS's rulemaking authority in Section 1554," NFPRHA Mem. at 16, when *none*

15  of the Plaintiffs (or, as best as the government can tell, anyone else) noticed any

16  supposed conflict between the Rule and section 1554 during the notice-and-

17  comment process. And before turning to specifics, consider the fundamental

18  implausibility of Plaintiffs' argument. It is a basic principle that Congress "does

19  not alter the fundamental details of a regulatory scheme in vague terms or ancillary

20  provisions—it does not, one might say, hide elephants in mouseholes." *Whitman*

21  *v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). Plaintiffs contend, however,

22  that Congress (1) abrogated a Supreme Court decision on an *extremely*

1  controversial subject; (2) *after* it had tried and failed to do so expressly; (3) in a

2  provision that does not mention abortion, pregnancy, Title X, section 1008, or

3  *Rust*; (4) without generating any meaningful legislative history; and (5) in a

4  manner that was so subtle in effecting this transformational change that not even

5  Plaintiffs thought to invoke it in their comments opposing the Rule.  That is, to

6  put it mildly, an unlikely proposition.

7      Turning to specifics, Plaintiffs cannot seriously contend that section 1554

8  silently repealed section 1008 as interpreted in *Rust*.  Section 1554 does not refer

9  to abortion or even pregnancy; it does not refer to section 1008; and it does not

10  refer to *Rust*.  And as far as the government is aware, section 1554 was not the

11  subject of any meaningful legislative history, and Plaintiffs provide none.

12      Nor are section 1554 and section 1008 in "irreconcilable conflict."  As

13  discussed further below, section 1554—which is not codified in, or an amendment

14  to, the PHSA and which applies only "[n]otwithstanding [the Affordable Care]

15  Act"—does not even apply to section 1008 (which is not part of the ACA).

16  Beyond that, section 1554 can quite comfortably be read as simply not speaking

17  to the issue of *funding* of abortion as a method of family planning within the Title

18  X program.  Indeed, since section 1554 does not refer to either funding of abortion

19  or Title X, it neither "covers the whole subject of [section 1008]" nor "is clearly

20  intended as a substitute."  *Branch v. Smith*, 538 U.S. 254, 273 (2003) (citation

21  omitted).

22

CONSOLIDATED OPPOSITION                    30
TO PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION
NO. 1:19-CV-3040-SAB

U.S. DEPARTMENT OF JUSTICE
1100 L Street, N.W.
Washington, DC  20005
(202) 305-0878

1    Plaintiffs' argument also conflicts with section 1554's text and multiple

2    interpretive principles. Start with the text. All six subjects of section 1554's sub-

3    sections—unreasonable barriers to appropriate medical care, impediments to

4    timely access to health care services, interference with medical communications,

5    restrictions on disclosure of relevant information, violation of ethical standards

6    and principles of informed consent, and limitations on the availability of health

7    care treatment—involve the *denial* of information or services to patients. The

8    Rule, however, denies nothing. It is merely a limit on what the government

9    chooses to fund. As *Rust* explained, when the government places restrictions on

10   the permissible use of Title X funds, it "is not *denying* a benefit to anyone, but is

11   instead simply insisting that public funds be spent for the purposes for which they

12   were authorized." 500 U.S. at 196 (emphasis added). "By requiring that the Title

13   X grantee engage in abortion-related activity separately from activity receiving

14   federal funding, Congress has . . . merely refused to fund such activities out of the

15   public fisc, and the Secretary has simply required a certain degree of separation

16   from the Title X project in order to ensure the integrity of the federally funded

17   program." *Id.* at 198.

18       In any event, section 1554 expressly applies "[n]otwithstanding any other

19   provision *of this Act*," 42 U.S.C. § 18114 (emphasis added)—that is, the ACA.

20   *See* Pub. L. No. 111-148 (Mar. 23, 2010). Section 1008 of Title X of the PHSA,

21   however, is not part of the ACA. Nor, for that matter, are Sections 1001 and 1006

22   of Title X of the PHSA, which give the Secretary authority to award grants and

1    issue Title X regulations.  Had Congress intended section 1554 to extend beyond

2    the ACA, it could have simply specified that section 1554 applies

3    "[n]otwithstanding any other provision of law."  Indeed, such language is

4    frequently used in American law in general, and in the ACA specifically; 21 times,

5    by the government's count.  *See, e.g.*, 42 U.S.C. § 18032(d)(3)(D)(i).  By its own

6    terms, section 1554 does not apply to Title X of the PHSA or its implementing

7    regulations.

8          That reading also comports with common sense.  Section 1554's sub-

9    sections are quite open-ended.  Nothing in the statute specifies, for example, what

10   constitutes an "unreasonable barrier[]," "appropriate medical care," "all relevant

11   information," or "the ethical standards of health care professionals."  42 U.S.C.

12   § 18114.  And as noted above, there is—as best as the government can tell—

13   nothing in the ACA's legislative history that sheds light on this provision.  Under

14   these circumstances, it is a substantial question whether section 1554 claims are

15   reviewable under the APA at all.  *See Citizens to Pres. Overton Park, Inc. v. Volpe*,

16   401 U.S. 402, 410 (1971) (APA bars judicial review of agency decision where,

17   among other circumstances, "statutes are drawn in such broad terms that in any

18   given case there is no law to apply") (citation omitted).  Even within the ACA,

19   HHS routinely issues regulations placing criteria and limits on what the

20   government will fund, and on what will be covered in ACA programs.  Under

21   Plaintiffs' standardless interpretation of section 1554, it is far from clear that the

22   Government could ever impose any limit on any parameter of a health program—

1  even if the program's own statute requires it—and how a court could possibly

2  evaluate such challenges by accepting the section's majestic generalities.  Indeed,

3  the government is unaware of any instance when a court invalidated a regulation

4  under section 1554, and Plaintiffs have identified none.  In any event, even if

5  section 1554 claims are reviewable, it is inconceivable to imagine that Congress

6  intended to subject the entire U.S. Code to these general and wholly undefined

7  concepts—and that it did so without leaving any meaningful legislative history.

8      Other principles point in the same direction.  In addition to the presumption

9  against hiding elephants in mouseholes, "it is a commonplace of statutory

10  construction that the specific governs the general," *Morales v. Trans World*

11  *Airlines, Inc.*, 504 U.S. 374, 384 (1992).  That is particularly true where Congress

12  has enacted a "comprehensive scheme and has deliberately targeted specific

13  problems with specific solutions." *RadLAX Gateway Hotel, LLC v. Amalgamated*

14  *Bank*, 566 U.S. 639, 645 (2012) (citation omitted).  "The general/specific canon

15  is perhaps most frequently applied to statutes in which a general permission or

16  prohibition is contradicted by a specific prohibition or permission." *Id.*  Under

17  such circumstances, "[t]o eliminate the contradiction, the specific provision is

18  construed as an exception to the general one." *Id.*  Thus, even if section 1554

19  applied to regulations implementing section 1008 (it does not), even if sections

20  1554 and 1008 were in conflict (they are not), and even if Plaintiffs had preserved

21  this challenge (they have not), section 1008 as interpreted in *Rust* would prevail

22  over section 1554.  Section 1554 is at best a general prohibition of certain types

of regulations (very broadly described). Section 1008, however, is a much more specific prohibition. It applies to funding of abortion as a method of family planning within the Title X program. And in *Rust*, the Supreme Court held that section 1008 authorized HHS to adopt regulations materially indistinguishable from the ones challenged here. Section 1554, by contrast, does not speak to abortion or, for that matter, to Title X at all. Plaintiffs are unlikely to succeed on the merits of this claim.

### C.  *Rust* Forecloses Plaintiffs' Title X Claims

Plaintiffs' contention that the Rule violates the requirements in Title X that receipt of services or information funded by Title X services remain "voluntary" is likewise meritless. Wash. Mem. at 26 (citing 42 U.S.C. §§ 300, 300a-5); NFPRHA Mem. at 15-16 (same). Both of the Title X provisions Plaintiffs cite predate *Rust*, neither mentions abortion, and *Rust* rejected this argument. *Rust* acknowledged the general Title X voluntariness principle, 500 U.S. at 178, yet held that the physical separation requirements, as well as the counseling, referral, and advocacy restrictions, reflected a permissible interpretation of the PHSA.

*Rust* aside, Title X services are required to be "voluntary" in the sense that accepting family planning services under the program "shall not be a prerequisite to eligibility for or receipt of any other service or assistance from, or to participation in, any other program of the entity or individual that provided such service or information." 42 U.S.C. § 300a-5. The Rule specifically abides by this requirement in 42 C.F.R § 59.5(a)(2), which is unchanged from the 2000

CONSOLIDATED OPPOSITION
TO PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION
NO. 1:19-CV-3040-SAB

34

U.S. DEPARTMENT OF JUSTICE
1100 L Street, N.W.
Washington, DC  20005
(202) 305-0878

1    regulations.  The Title X voluntariness principle thus has nothing to do with the

2    issues in this case.

3         Similarly, Washington also argues that the Rule is invalid because it is

4    contrary to Title X's "central purpose"—in Washington's view, "to equalize

5    access to comprehensive, evidence-based, voluntary family planning services."

6    Wash. Mem. at 25.  But Title X's central purpose has not changed since the

7    Supreme Court affirmed materially indistinguishable regulations in *Rust* and

8    rejected a materially indistinguishable argument.  *See* 500 U.S. at 185 n.3

9    (rejecting the challengers' argument based on statements in the legislative history

10   "stressing the importance of supplying both family planning information and a

11   full range of family planning information and of developing a comprehensive and

12   coordinated program").

13        **D.    The Final Rule Is Not Arbitrary and Capricious**

14        Much of what remains of Plaintiffs' case amounts to garden variety

15   arbitrary-and-capricious claims.  These arguments face a high hurdle.  Agency

16   action must be upheld in the face of such attacks so long as the agency "examine[s]

17   the relevant data and articulate[s] a satisfactory explanation for its action[,]

18   including a rational connection between the facts found and the choice made."

19   *Motor Vehicle Mfrs. Ass'n, Inc. v. State Farm Auto. Ins. Co.*, 463 U.S. 29, 43

20   (1983) (citation omitted).  Under this deferential standard of review, "a court is

21   not to substitute its judgment for that of the agency . . . and should uphold a

22   decision of less than ideal clarity if the agency's path may be reasonably

U.S. DEPARTMENT OF JUSTICE
1100 L Street, N.W.
Washington, DC  20005
(202) 305-0878

1  discerned." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513-14 (2009)

2  (citations omitted); *see also Alaska Oil & Gas Ass'n v. Jewell*, 815 F.3d 544, 554

3  (9th Cir. 2016) ("arbitrary and capricious" standard establishes a "high threshold"

4  for setting aside agency action, which is "presumed valid and is upheld if a

5  reasonable basis exists for the decision"). The Final Rule—the major components

6  of which have already been upheld by the Supreme Court—easily satisfies this

7  highly deferential review.

8          1.      Under *Rust*, it is Not Arbitrary and Capricious to Set
                   Conditions on Title X Funds that Require Physical Separation
9                  and Restrict Activities that Promote Abortion as a Method of
                   Family Planning
10

11         HHS had a simple and compelling basis for promulgating the Final Rule:

12  to ensure compliance with federal law, and in particular section 1008's command

13  that "none of the funds appropriated" for Title X "be used in programs where

14  abortion is a method of family planning." *See* 83 Fed. Reg. at 25,505. HHS reads

15  this statute, as it did in 1988, to establish "a broad prohibition on funding, directly

16  or indirectly, activities that treat abortion as a method of family planning." 84

17  Fed. Reg. at 7723; *see also* 53 Fed. Reg. at 2922 (explaining that section 1008

18  "creates a wall of separation between Title X programs and abortion as a method

19  of family planning"). Based on that interpretation, HHS determined that the

20  intervening 2000 regulations are inconsistent with section 1008 to the extent that

21  they "require referral for abortion as a method of family planning, allow the use

22  of funds for building infrastructure that could be used for abortion services, and

CONSOLIDATED OPPOSITION                    36
TO PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION
NO. 1:19-CV-3040-SAB

U.S. DEPARTMENT OF JUSTICE
1100 L Street, N.W.
Washington, DC 20005
(202) 305-0878

1    do not require clear physical separation between Title X activities and abortion-
2    related services." 84 Fed. Reg. at 7723. HHS thus determined that the Final Rule
3    is necessary to rectify the problems with the 2000 regulations and to properly
4    implement section 1008.

5        The Supreme Court has already approved of this reasoning. In particular,
6    it determined that: (1) Title X authorizes HHS to prohibit abortion "counseling,
7    referral, and advocacy within the Title X project," *Rust*, 500 U.S. at 184; (2) Title
8    X authorizes HHS to require physical separation of Title X and non-Title X
9    projects, *id*. at 188-90; and (3) HHS's interest in ensuring compliance with its
10   interpretation of section 1008 justified separation and counseling-and-referral
11   requirements materially indistinguishable from those in the Rule, *id*. at 184-91.

12       The Supreme Court's rejection of the arbitrary and capricious challenges in
13   *Rust* is controlling here. In response to comments contending that HHS had not
14   "provided sufficient reasons or evidence to justify the physical and financial
15   separation requirements," the agency explained that the Supreme Court has
16   already upheld the separation requirements "as a legitimate interpretation of the
17   Congressional mandate in section 1008." 84 Fed. Reg. at 7764. Similarly, HHS
18   noted that the Court in *Rust* already considered and endorsed the same restrictions
19   on abortion referrals adopted in the Final Rule. *See id.* at 7746; *see also Rust*, 500
20   U.S. at 193. That by itself was sufficient justification. The policy and legal
21   judgment embodied in the Rule is no less permissible or reasonable than it was in
22   1988.

2. <u>HHS Adequately Justified the Program Integrity, Counseling, and Referral Provisions</u>

Even if *Rust* were not dispositive here, HHS also detailed the problems of the 2000 regulations and adequately explained the need to impose anew the separation, counseling, and referral provisions.

*Program Integrity Requirements*:  HHS observed that allowing Title X projects to operate in shared spaces with non-Title X activities increases the risk that Title X and other funds will be commingled, that Title X funds will be used for prohibited purposes, and that the public will be deprived of the clear statutorily required assurance that taxpayer dollars are not being used to fund projects where abortion is a method of family planning.  84 Fed. Reg. at 7764-65.  HHS observed that these concerns are particularly acute because Title X projects use flexible grants that give considerable "latitude and versatility to grantees on how funds are used."  83 Fed. Reg. at 25,508.  This flexibility raises the specter of projects using Title X funds to build infrastructure used to support abortion, which HHS chronicled.  *See* 84 Fed. Reg. at 7773 (citing report that Title X funds are used to address "staff-related issues," for "operational investments," and towards "infrastructure and general operations").  In particular, HHS noted that various comments expressing support for the 2000 regulations themselves showed that, as a matter of economic reality, those requirements had the effect of indirectly supporting abortion-related activities.  *Id.* at 7766 (comments arguing that separation requirements would "increase the cost for doing business" confirms the

CONSOLIDATED OPPOSITION
TO PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION
NO. 1:19-CV-3040-SAB

U.S. DEPARTMENT OF JUSTICE
1100 L Street, N.W.
Washington, DC  20005
(202) 305-0878

1   need for the Rule because if "the collocation of a Title X clinic with an abortion

2   clinic permits the abortion clinic to achieve economies of scale, [Title X funds]

3   would be supporting abortion as a method of family planning"). In this context,

4   HHS determined that even using the "strictest accounting and charging of

5   expenses, a shared facility greatly increases the risk of confusion and the

6   likelihood that a violation of the Title X prohibition will occur." *Id*. at 7764; *cf.*

7   *Marina Mercy Hosp. v. Harris*, 633 F.2d 1301, 1304 (9th Cir. 1980) ("[I]n a

8   program as complex and ripe with potential abuse as Medicare, the Secretary has

9   broad discretion to control excessive costs by adopting general prophylactic

10  rules.").

11      Moreover, while HHS was not required to submit empirical evidence, it

12  cited a study showing that abortions are increasingly being performed at "sites

13  that focus primarily on contraceptive and family planning services," *i.e.*, precisely

14  the type of sites that receive Title X funds. *See* 84 Fed. Reg. at 7765. HHS also

15  pointed to examples of overbilling in the Medicaid program as demonstrating a

16  need for clarity with respect to permissible and impermissible activities. As HHS

17  explained, when abortions are performed at Title X facilities that are not clearly

18  separated, it confuses the public about whether federal funds are being used for

19  services that Title X prohibits—as evidenced by the fact that many commenters

20  apparently assumed that abortion was a permissible method of family planning

21  within the Title X program, *see* 84 Fed. Reg. at 7729-30—and increases the

22  likelihood that funds will be used for improper purposes. The more abortions that

are performed at the type of nonspecialized clinics that often house Title X services, the higher both risks. *See id*. at 7765 ("The performance of abortions at nonspecialized clinics that also may provide Title X services increases the risk and potential both for confusion and for the co-mingling or misuse of Title X funds."). Indeed, Plaintiffs' assertions that the Rule may force abortion clinics to lose Title X funding only justifies the Secretary's concerns. *Compare* Adams Decl. ¶ 45 (asserting that the Rule could cause a subrecipient, Eskenazi Health System, "to exit the Title X program"), *with id.* ¶ 45 (Eskenazi Health System "provides abortions").

*Counseling and Referral Restrictions*: HHS explained at length how the 2000 regulations were in tension with a number of federal conscience protection statutes and, with respect to referral for abortion at least, with section 1008 itself. 84 Fed. Reg. at 7746. As to abortion referrals, HHS explained that "[t]he primary focus of Title X remains on preconception family planning methods and services," and that "[i]n implementing section 1008 . . . the Department has a history of establishing prohibitions on abortion referral, even if at other times it has allowed or required such referrals." *Id.* HHS acknowledged that the 2000 regulations "requir[ed] information, counseling and referrals for abortion as a method of family planning in certain cases," but stated that it "has now reconsidered this issue and believes the approach taken in this final rule is a better interpretation of section 1008." *Id.* In reaching this conclusion, HHS reasoned—consistent with *Rust*—that "it is not necessary for women's health that the federal government use

CONSOLIDATED OPPOSITION
TO PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION
NO. 1:19-CV-3040-SAB

40

U.S. DEPARTMENT OF JUSTICE
1100 L Street, N.W.
Washington, DC 20005
(202) 305-0878

1     the Title X program to fund abortion referrals, directive abortion counseling, or

2     give to women who seek abortion the names of abortion providers" because such

3     information is available from other sources. 84 Fed. Reg. at 7746. HHS further

4     explained that, consistent with the conscience statutes, it would not *require*

5     grantees to engage in nondirective pregnancy counseling. It noted that the

6     nondirective provision "did not explicitly require pregnancy counseling, nor [did

7     it] prohibit such counseling from discussing abortion if the counseling is

8     nondirective." *Id.* at 7745.

9            3.     Plaintiffs' Contrary Arguments Lack Merit

10        Because the Supreme Court in *Rust* held that the major components of the

11    Rule flowed directly from HHS's permissible construction of section 1008

12    (which, as discussed above, has not changed since *Rust*), any challenge to those

13    restrictions is necessarily limited. *See Arent v. Shalala*, 70 F.3d 610, 616 n.6 (D.C.

14    Cir. 1995) (citing *Rust* as an example of a situation in which "what is 'permissible'

15    under *Chevron* is also reasonable under *State Farm*"). Plaintiffs nevertheless offer

16    up a welter of arguments for why the Rule is arbitrary and capricious. None is

17    persuasive.

18        a.     Plaintiffs fault HHS for supposedly failing to offer up new evidence

19    to support the Rule. Wash. Mem. at 15; NFPRHA Mem. at 23. But as discussed

20    above, HHS described in detail why its concerns were more than theoretical. In

21    any event, the APA "imposes no general obligation on agencies to produce

22

CONSOLIDATED OPPOSITION      41
TO PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION
NO. 1:19-CV-3040-SAB

U.S. DEPARTMENT OF JUSTICE
1100 L Street, N.W.
Washington, DC 20005
(202) 305-0878

1    empirical evidence." *Stilwell v. Office of Thrift Supervision*, 569 F.3d 514, 519

2    (D.C. Cir. 2009) (Kavanaugh, J.).

3         b.    Plaintiffs also contend that HHS failed to account for supposed

4    reliance interests engendered by the prior policy. Wash. Mem. at 33, 36, 37 n.108

5    (citing *Encino Motorcars*, 136 S. Ct. 2117, and *Fox*, 556 U.S. 502); NFPRHA

6    Mem. at 38-39. As a threshold matter, the fact that many people "rely" on a

7    particular program does not mean that every policy affecting that program

8    "engender[s]" the type of "serious reliance interests" that the Supreme Court had

9    in mind in *Fox. See Encino Motorcars*, 136 S. Ct. at 2126. In any event, Plaintiffs

10   have no legally cognizable reliance interests in the continued receipt of Title X

11   grants under the conditions they prefer. In contrast to the agency action at issue

12   in *Encino Motorcars*, which concerned private parties' substantive statutory

13   rights, *id.* at 2126-27, the challenged regulations here concern discretionary

14   funding decisions. Title X grants are generally available for only one year, 42

15   C.F.R. § 59.8(b), and HHS regulations provide that "[n]either the approval of any

16   application nor the award of any grant commits or obligates the United States in

17   any way to make any additional, supplemental, continuation, or other award with

18   respect to any approved application or portion of an approved application," *id.*

19   § 59.8(c). A discretionary funding program cannot create legally cognizable

20   reliance interests—and certainly not beyond the stated duration (generally one

21   year) of a Title X grant. *Cf. Janus v. Am. Fed'n of State, Cty., & Mun. Emps.,*

22   *Council 31*, 138 S. Ct. 2448, 2484 (2018) (discounting asserted reliance interests

CONSOLIDATED OPPOSITION                42
TO PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION
NO. 1:19-CV-3040-SAB

U.S. DEPARTMENT OF JUSTICE
1100 L Street, N.W.
Washington, DC 20005
(202) 305-0878

1    because the relevant "contract provisions . . . will expire on their own in two years'

2    time").

3        c.    Invoking the Supreme Court's decision in *Fox*, Plaintiffs suggest

4    more broadly that HHS failed to provide "good reason" for the change in policy

5    in the Rule.   NFPRHA Mem. at 22-24; *see* Wash. Mem. at 28-29.   But *Fox*

6    squarely rejected the notion that a "heightened standard" should apply where an

7    agency changes policy, 556 U.S. at 514, and held that "it suffices that the new

8    policy is permissible under the statute, that there are good reasons for it, and that

9    the agency *believes* it to be better, which the conscious change of course

10   adequately indicates," *id*. at 515.   HHS plainly satisfied that requirement.

11       *Fox* went on to explain that a "more detailed justification" is required only

12   when a new policy "rests upon factual findings that contradict those which

13   underlay its prior policy; or when its prior policy has engendered serious reliance

14   interests that must be taken into account." 556 U.S. at 515.   Neither circumstance

15   is present here.   As explained, the Rule does not upend any legally cognizable

16   reliance interests.   It is also based on HHS's renewed interpretation of section

17   1008 and, with respect to the program integrity requirements, the need for

18   prophylactic measures to address the risk and the perception that taxpayer dollars

19   will be used to fund will be used to fund abortion—not "factual findings that

20   contradict those which underlay [the] prior policy."   That policy and legal

21   judgment—a judgment blessed by the Supreme Court—is legitimate even if it

22   differs from the judgment of Plaintiffs and some prior administrations. *See Nat'l*

1 *Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005)

2 ("[T]he agency . . . must consider varying interpretations and the wisdom of its

3 policy on a continuing basis, for example, in response to changed factual

4 circumstances, or a change in administrations." (internal citation omitted)).

5     d.    Plaintiffs claim that the Rule undermines the provider-patient

6 relationship and requires them to violate ethical standards. Wash. Mem. at 29-32;

7 NFPRHA Mem. at 19-20. But HHS considered and responded to this precise

8 issue:

> In general, medical ethics obligations require the medical
> professional to share full and accurate information with the patient,
> in response to her specific medical condition and circumstance.
> Under the terms of this final rule, a physician or APP may provide
> nondirective pregnancy counseling to pregnant Title X clients on the
> patient's pregnancy options, including abortion. . . . Within the
> limits of the Title X statute and this final rule, the physician or APP
> is required to refer for medical emergencies and for conditions for
> which non-Title X care is medically necessary for the health and
> safety of the mother or child.

14 84 Fed. Reg. at 7724.

15     This analysis was not only logical but also consistent with multiple

16 Supreme Court decisions and other legal authorities. As HHS observed, (i) *Rust*

17 upheld similar requirements and HHS "does not believe the Court in *Rust* upheld

18 a rule that required the violation of medical ethics, regulations concerning the

19 practice of medicine, or malpractice liability standards"; (ii) "Federal and State

20 conscience laws, in place since the early 1970s, have protected the ability of health

21 care personnel to not assist or refer for abortions in the context of HHS funded or

CONSOLIDATED OPPOSITION      44
TO PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION
NO. 1:19-CV-3040-SAB

U.S. DEPARTMENT OF JUSTICE
1100 L Street, N.W.
Washington, DC 20005
(202) 305-0878

1 administered programs (or, under State law, more generally)"; (iii) "in *Roe v.*
2 *Wade*, 410 U.S. 113 (1973), the Court favorably quoted [a declaration that n]either
3 physician, hospital, nor hospital personnel shall be required to perform any act
4 violative of personally held moral principles" (quotation marks omitted); and (iv)
5 in *National Institute of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361
6 (2018), "the Supreme Court upheld conscience objections to making certain
7 statements, despite objections from professional medical organizations that
8 similarly asserted medical ethics standards." 84 Fed. Reg. at 7748.

9 HHS thus plainly did not ignore the concerns that Plaintiffs raise; it
10 considered them and simply adopted a different view—that the Rule's
11 requirements, properly understood, are consistent with medical ethics. And again,
12 *Rust* upheld a nearly identical version of the counseling and referral restrictions
13 that had the same implications. 500 U.S. at 199. In fact, Justice Blackmun argued
14 in dissent in *Rust* that "the ethical responsibilities of the medical professional
15 demand" that Title X patients be "provide[d] with the full range of information
16 and options regarding their health and reproductive freedom," including "the
17 abortion option." *Id.* at 213-14. His view did not prevail.

18 e. Plaintiffs contend that the counseling and referral provisions are
19 arbitrary and capricious because they are supposedly inconsistent with guidelines
20 issued by HHS, along with the Centers for Disease Control, in 2014. Wash. Mem.
21 at 32-34; NFPRHA Mem. at 10-11, 19-20. But this is just a rehash of Plaintiffs'
22 challenge to HHS's departure from its prior policy governing abortion counseling

CONSOLIDATED OPPOSITION
TO PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION
NO. 1:19-CV-3040-SAB

45

U.S. DEPARTMENT OF JUSTICE
1100 L Street, N.W.
Washington, DC 20005
(202) 305-0878

1    and referrals.  As explained above, HHS was entitled to depart from its previous

2    policy and adopt the position, blessed by the Supreme Court in *Rust*, that section

3    1008 prohibits abortion referral as a method of family planning and does not

4    require the provision of abortion counseling.  *See* 84 Fed. Reg. at 7716-7717.  Just

5    as HHS could permissibly depart from the 2000 regulations, it could adopt a

6    position different from the one espoused in the 2014 guidance based on the

7    reasoned justification discussed above.

8           f.      Plaintiffs also accuse HHS of failing to consider the importance of

9    "medical ethics and patient-focused care," which Plaintiffs claim will lead to an

10   exodus of providers from the Title X program.  Wash. Mem. at 29-32, 39-40;

11   NFPRHA Mem. at 43-44.  There are a number of problems with this claim.  As

12   previously noted, the Supreme Court has already upheld HHS's interpretation of

13   section 1008, and HHS has adequately explained that it does not share Plaintiffs'

14   views concerning professional and medical ethics.  In any event, HHS considered

15   the effect the Rule would have on Title X patients and concluded that the Rule

16   would "contribute to more clients being served, gaps in service being closed, and

17   improved client care."  84 Fed. Reg. at 7723.  The agency further explained that

18   it "expects that honoring statutory protections of conscience in Title X may

19   increase the number of providers in the program," *id.* at 7780, and it pointed to

20   data showing that a substantial number of medical professionals would limit the

21   scope of their practice if conscience protections were not put in place, *id.* at 7781

22

n.139. After analyzing this issue in detail, HHS concluded that the counseling-and-referral provisions "will result in more Title X applicants." *Id.* at 7781.

More fundamentally, the very nature of the time-limited and discretionary Title X grant process presupposes that there will be turnover and replacement among grantees. There is thus no basis for rejecting the agency's conclusion on this point, or for substituting the preferences of a subset of current grantees for the Secretary's well-reasoned view. Indeed, in highlighting these departure threats, Plaintiffs essentially request that this Court constrain the authority of HHS beyond the limits imposed by Congress, by giving certain grantees veto power over otherwise legally permissible and reasoned policy judgments. That tactic did not work in *Rust*, and it should not work here either. *Cf.* Planned Parenthood Amicus Brief at 14 n.45, *Rust* (No. 89-1391), 1990 WL 10012649 ("Since many providers will not accept Title X funds under the unethical restrictions imposed by the regulations, they will be forced to close or drastically curtail services, depriving poor women of their sole source of family planning services.").

g.  Washington also accuses HHS of failing to consider that the Rule "will force out the subrecipients and clinics comprising the vast majority of Washington's Title X network," because of the Rule's allegedly "unworkable and unnecessary physical separation requirements" and counseling and referral restrictions. Wash. Mem. at 34-38. NFPRHA similarly claims that the Rule "will make it effectively impossible for many . . . providers to stay in the Title X program," NFPRHA Mem. at 24, and will lead to "provider departures . . . at the

CONSOLIDATED OPPOSITION                    47
TO PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION
NO. 1:19-CV-3040-SAB

U.S. DEPARTMENT OF JUSTICE
1100 L Street, N.W.
Washington, DC 20005
(202) 305-0878

1    grantee, subrecipient, and individual clinical level," *id.* at 38.  HHS, however,

2    considered both of these points.  As to the prospect of providers leaving, HHS

3    acknowledged that "such calculations would be purely speculative, and, thus, very

4    difficult to forecast or quantify," but ultimately concluded that it "does not

5    anticipate that there will be a decrease in the overall number of facilities offering

6    services, since it anticipates other, new entities will apply for funds, or seek to

7    participate as subrecipients, as a result of the final rule."  84 Fed. Reg. at 7781.

8    And with respect to coordination, HHS explained that "[i]t is not uncommon for

9    people to have different health care providers for different health care needs" and

10   elaborated that "[i]f services and abortion services are separate, it is no more

11   difficult for Title X providers to maintain two electronic records, one for Title X

12   services and another for abortion services, than to keep abortion services and other

13   services separate within the same [electronic medical records (EHR)] system." *Id.*

14   at 7767.  HHS went on to explain that, because of the "growing interoperability

15   of EHRs and other health IT, it is a simpler matter for one provider to share a

16   patient's EHR with another provider," meaning that "any risk associated with

17   mishandling or missing patient data should be minimized." *Id.*  This analysis was

18   not arbitrary and capricious.

19         h.    NFPRHA further claims that HHS failed to consider the financial

20   costs that the Rule would impose on providers.  NFPRHA Mem. at 25-28.  Yet,

21   the principle "that a court is not to substitute its judgment for that of the agency"

22   is "especially true when the agency is called upon to weigh the costs and benefits

CONSOLIDATED OPPOSITION          48
TO PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION
NO. 1:19-CV-3040-SAB

U.S. DEPARTMENT OF JUSTICE
1100 L Street, N.W.
Washington, DC  20005
(202) 305-0878

1    of alternative policies." *Consumer Elecs. Ass'n v. FCC*, 347 F.2d 291, 303 (D.C.

2    Cir. 2003).  In promulgating the Rule, HHS reasonably relied on the available data

3    and considered concerns identical to those that NFPHRA raises here.  *See* 84 Fed.

4    Reg. at 7781 (pointing to data from the Congressional Research Service, and

5    explaining that commenters "contend that the department underestimated the costs

6    related to the new physical separation requirements, but themselves did not

7    provide sufficient data to estimate these effects across the Title X program").

8    NFPRHA's flyspecking of HHS's analysis gets it nowhere.

9         i.    NFPRHA objects to the inclusion of the instruction in the Rule that

10   Title X providers "[s]hould offer either comprehensive primary health services

11   onsite or have a robust referral linkage with primary health care providers who are

12   in close physical proximity."  NFPRHA Mem. at 29-31 (quoting 42 C.F.R.

13   § 59.5(a)(12)).   According to NFPRHA, because Title X providers already

14   establish referral relationships with primary care providers for their patients, the

15   new subsection "merely confuses and creates an obstacle to Title X family

16   planning clinics." NFPRHA Mem. at 30.  To the extent that NFPRHA's concern

17   is confusion, applicants can always seek clarity from HHS.  *See* 84 Fed. Reg. at

18   7766 ("The Department welcomes regular interaction with grantees and

19   subrecipients, should they have questions.  Project officers are available to help

20   grantees successfully implement the Title X program in compliance with both the

21   statute and the regulation.").  It was also substantively reasonable for HHS to

22   encourage access to primary health care services.   As HHS explained, by

1    encouraging Title X projects to offer either comprehensive primary health care

2    services onsite or have a robust referral linkage with primary health care providers

3    who are in close proximity to the Title X site, the Rule supports other health care

4    goals without limiting access to care. *See* 84 Fed. Reg. at 7725.

5         NFPRHA's concern that the Rule will lead to a lack of care in some areas,

6    *see* NFPRHA Mem. at 29-30, is also unfounded.  Section 59.5(a)(1) does not

7    impose an absolute requirement that a project offer either comprehensive primary

8    health services onsite or have linkages to primary health providers in close

9    proximity. *See* 42 C.F.R. § 59.5(a)(12).  It instead reflects Congress's expectation

10   that "'Family Planning Services under Title X generally are most effectively

11   provided in a general health setting.'"  84 Fed. Reg. at 7749 (quoting S. Rep. No.

12   63, 94 Cong., 1st Sess. 65-66 (1975), *reprinted in* 1975 U.S.C.C.A.N. 469, 528).

13   HHS also accounts for the geographic distribution of awards when making grant

14   decisions.  *See* Announcement of the Availability of Funds for Title X Family

15   Planning Services Grants, Notice at 49-50 (explaining that HHS considers "[t]he

16   extent to which the project provides geographic distribution of services").[2]

17        j.    NFPRHA also suggests that the Rule will degrade care because it

18   removes the requirement that a Title X project provide "medically approved"

19   family planning methods and allows entities to offer only a single method or a

20   _____

     [2]    https://www.hhs.gov/opa/sites/default/files/FY2019-FOA-FP-services-

21   amended.pdf.

22

U.S. DEPARTMENT OF JUSTICE
1100 L Street, N.W.
Washington, DC  20005
(202) 305-0878

limited number of family planning methods.  NFPRHA Mem. at 32-34.  But HHS addressed these concerns by explaining that, even if individual service sites might offer a limited number of family planning methods, each Title X project, as a whole, must "provide[] a broad range of family planning methods and services, including contraception and natural family planning."  84 Fed. Reg. at 7732; *see also* 42 C.F.R. § 59.5(a)(1) (effective May 3, 2019) (each "project" must "provide a broad range of family planning methods (including contraceptives, natural family planning, and other fertility awareness based methods)").

And with regard to the removal of the "medically" approved requirement in particular, NFPRHA's complaint is with Congress, not HHS:  "When Congress specified what family planning methods and services Title X projects must provide, Congress directed that the methods and services be 'acceptable and effective'; it did not specify that they be 'medically approved.'"  84 Fed. Reg. at 7732 (quoting 42 U.S.C. § 300(a)).  HHS addressed this issue directly, *see id*. at 7732, 7740-41, and explained that the "medically approved" language had not proved workable, *see id*. at 7732 (explaining practical difficulty of enforcing the "medically approved" requirement).  This response was an adequate justification for returning to the text of the statute, which requires that any family planning services be "acceptable and effective," and which HHS rationally concluded would "sufficiently ensure[]" that Title X clients receive appropriate services.  *Id*.  NFPHRA also is in no position to object that *other* providers might offer family planning methods and services that NFPHRA would not itself offer.  The Rule

CONSOLIDATED OPPOSITION
TO PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION
NO. 1:19-CV-3040-SAB

51

U.S. DEPARTMENT OF JUSTICE
1100 L Street, N.W.
Washington, DC  20005
(202) 305-0878

leaves NFPHRA free to decide which methods and services to offer so long as its project grantees meet the statutory and regulatory requirements—primarily, that each project offer a broad range of methods including natural family planning (and, as the Rule specifies, contraception).

k.     Finally, NFPRHA claims that the Rule is arbitrary and capricious because it imposes "new, convoluted criteria" regarding how HHS awards Title X grants. NPPRHA Mem. at 34-35. NFPRHA's complaint appears to be that the Rule requires Title X grant applicants to demonstrate their "affirmative compliance" with the other, substantive requirements of the Rule. *See* 42 C.F.R. § 59.7(b). As HHS explained, it implemented this additional requirement "to better direct Title X funds for family planning projects, to prevent misuse of funds, and to save taxpayer dollars by only sending qualified applications to the costly and time consuming competitive review committee." 84 Fed. Reg. at 7754.

NFPRHA cannot show how HHS's approach is anything but reasonable. Section 1006 of the Title X statute specifically provides that the Secretary may issue regulations setting forth criteria by which HHS will award Title X grants and contracts. 42 U.S.C. § 300a-4(a). HHS's criteria tracks the statute itself, listing and elaborating on the four non-exclusive criteria that Congress provided. 42 C.F.R. § 59.7(c)(1)-(4) (effective May 3, 2019). Both the statute and Rule specify that projects shall provide a broad range of family planning methods and services, and shall consider the relative needs of applicants, the capacity to make rapid and effective use of funds, the number of patients to be served, and local

U.S. DEPARTMENT OF JUSTICE
1100 L Street, N.W.
Washington, DC  20005
(202) 305-0878

1  need.  The Rule also provides that proposals must specify how to meet these and

2  other requirements of the regulations.  Title X's grant application process—before

3  and after this Rule—is a sophisticated one, with funding announcements and grant

4  applications running many pages long, and being subject to a detailed review and

5  scoring system.  None of that complexity is new in this Rule, and the preamble to

6  the Rule as well as longstanding agency practice makes it clear that HHS provides

7  applicants with ample guidance during the process.  The Title X statute fully

8  authorizes the Secretary to promulgate regulations setting forth grant application

9  criteria.  NFPHRA may prefer the previous regulations, but nothing in the APA

10  renders the criteria HHS chose arbitrary or capricious.

11  l.  NFPRHA also takes issue with new review criteria regarding a

12  grantees' "ability to procure a broad range of diverse subrecipients."  NFPRHA

13  Mem. at 36 (quoting 84 Fed. Reg. at 7754).  But it is eminently reasonable for

14  HHS to ask grantees to show how they can expand the impact of federal funds,

15  consistent with Title X's mandate to provide "a broad range of acceptable and

16  effective family planning methods and services," 42 U.S.C. § 300(a), and to take

17  into account an applicant's capacity to make rapid and effective use of grants and

18  contracts, *id.* § 300(b).  NFPRHA's claim to the contrary is meritless.

19  **II.    PLAINTIFFS WILL SUFFER NO IRREPARABLE HARM**

20  Showing irreparable harm absent an injunction is "necessary" to obtain

21  such relief.  *Ctr. for Food Safety v. Vilsack*, 636 F.3d 1166, 1171 n.6 (9th Cir.

22  2011); *Winter*, 555 U.S. at 19.  A party "seeking preliminary relief [must]

CONSOLIDATED OPPOSITION                 53
TO PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION
NO. 1:19-CV-3040-SAB

U.S. DEPARTMENT OF JUSTICE
1100 L Street, N.W.
Washington, DC  20005
(202) 305-0878

1    demonstrate that irreparable injury is *likely* in the absence of an injunction."

2    *Winter*, 555 U.S. at 22.  Plaintiffs cannot carry that burden.

3    ### A.    Washington

4    Washington's primary claim of irreparable harm is that the Rule will

5    negatively impact the health of state residents.  *See* Wash. Mem. at 43-44.

6    Because these allegations "do not rise to the level of a concrete, particularized,

7    actual or imminent injury against the state itself, that is independent from alleged

8    harm to private parties," *Oregon v. Legal Servs. Corp.*, 552 F.3d 965, 972 (9th

9    Cir. 2009), they cannot establish that Washington even has standing, much less

10   that it has satisfied the demanding irreparable injury standard.  Although the

11   "doctrine of *parens patriae* allows a sovereign to bring suit on behalf of its

12   citizens" in certain circumstances, *Washington v. Chimei Innolux Corp.*, 659 F.3d

13   842, 847 (9th Cir. 2011), it is well-established that a state "'does not have standing

14   as *parens patriae* to bring an action against the Federal government,'" *Sierra*

15   *Forest Legacy v. Sherman*, 646 F.3d 1161, 1178 (9th Cir. 2011) (quoting *Alfred*

16   *L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 610 n.16

17   (1982)).

18   Washington also alleges irreparable harm to its proprietary interests,

19   namely that, in the event that the Rule leads to Title X providers leaving the

20   program and patients losing access to care, the effects will harm Washington's

21   "family planning network" and impact the state economically.  Wash. Mem. at

22   40-43.  Although Washington is a Title X grantee, it administers its statewide

1 program by overseeing a network of 16 subrecipients. *See id.* at 5. Washington's

2 alleged injury is, in fact, an alleged injury to its subrecipients (who are not before

3 the Court) rather than to the State itself. Even more, Washington's predictions

4 depend on a number of uncertain events: (1) Washington's subrecipients would

5 need to stop providing services, (2) quality of patient care would need to suffer as

6 a result, and (3) Washington would need to bear the costs of any increased

7 healthcare costs as a result. Washington has not shown that this attenuated chain

8 of events is likely to occur.

9     **B.**    **NFPRHA**

10     NFPRHA asserts that the Rule will (1) lead to a reduction in Title X

11 providers and services, (2) interfere with the provider-patient relationship, and (3)

12 harm patients and public health. None of these assertions establishes irreparable

13 harm.

14     1.    <u>Impact on Title X Services</u>

15     First, NFPRHA asserts that the Rule will lead some grantees and

16 subrecipients that currently provide Title X services to forgo federal funds rather

17 than comply with the Final Rule. NFPRHA Mem. at 41-42. But this argument

18 rests on the erroneous assumption that the Rule is unlawful; an entity's choice not

19 to comply with a legal funding condition plainly does not create an irreparable

20 injury. And while NFPRHA also suggests that the providers who choose to

21 remain in the Title X program will "expend scarce resources" to comply with the

22 Rule, NFPRHA Mem. at 42, "ordinary compliance costs are typically insufficient

CONSOLIDATED OPPOSITION       55         U.S. DEPARTMENT OF JUSTICE
TO PLAINTIFFS' MOTIONS FOR                    1100 L Street, N.W.
PRELIMINARY INJUNCTION                      Washington, DC 20005
NO. 1:19-CV-3040-SAB                       (202) 305-0878

1    to constitute irreparable harm," *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112,

2    115 (2d Cir. 2005) (collecting cases).  NFPRHA offers no reason why this case

3    should be treated any differently.  To the contrary, the "providers" it describes—

4    unlike regulated parties who must absorb significant costs to comply with federal

5    regulations—can simply forgo receiving taxpayer funds if it would be more costly

6    on balance to comply.  And if the costs of compliance are less than Title X

7    funding, the providers will come out ahead.  Either way, there is no irreparable

8    injury here.  *See United States v. City of Los Angeles*, 595 F.2d 1386, 1391 (9th

9    Cir. 1979) (federal agency actions "cannot be enjoined simply because those

10   actions may require recipients of congressional largesse to expend large amounts

11   of time and [monetary] resources").

12        2.    <u>Harm to Provider-Patient Relationship</u>

13        Next, NFPRHA claims that the Rule will put providers into a "Hobson's

14   Choice" between providing "substandard pregnancy counseling" and leaving the

15   Title X program."  But the Rule does no such thing.  *See* 84 Fed. Reg. at 7724

16   (explaining that the counseling and referral requirements are consistent with

17   medical ethics obligations).  To the extent providers believe that it is necessary to

18   make abortion referrals, they are free to do so.  They simply cannot, consistent

19   with the requirements of Section 1008, do so within a project funded by Title X

20   funds. *See Rust*, 500 U.S. at 203 ("[A] doctor's ability to provide, and a woman's

21   right to receive, information concerning abortion and abortion-related services

22   outside the context of the Title X project remains unfettered.").  And although

1    Plaintiffs suggest that the Rule will "harm their reputation[] and goodwill,"

2    NFPRHA Mem. at 41, they do not establish, with concrete examples of particular

3    patients of any named provider plaintiff, that such harm is imminently likely to

4    occur during the pendency of this litigation if an injunction is not entered.

5              3.    Harm to Patients and Public Health

6        Finally, NFPRHA argues that the Rule will "harm—irreparably—Title X

7    patients across the country."  NFPRHA Mem. at 43.  In making these allegations,

8    NFPRHA impermissibly "attempts to redirect the focus of the irreparable harm

9    inquiry to third parties," but "'[a] plaintiff seeking a preliminary injunction must

10   establish that *he is* likely to suffer irreparable harm in the absence of preliminary

11   relief.'"  *Exeltis USA Inc. v. First Databank, Inc.*, No. 17-cv-04810-HSG, 2017

12   WL 6539909, at *9 (N.D. Cal. Dec. 21, 2017) (quoting *Winter*, 555 U.S. at 20)

13   (ellipsis omitted).  NFPRHA has not done so here.

14       In any event, NFPRHA has not demonstrated that the public health harms

15   it describes are "of such *imminence* that there is a clear and present need for

16   equitable relief to prevent irreparable harm."  *Chaplaincy of Full Gospel Churches*

17   *v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).  But much like Washington's

18   alleged harms, NFPRHA's predictions will come to pass only if (1) a significant

19   number of subrecipient providers choose to leave the Title X program rather than

20   comply with the Final Rule; and (2) without such funding, such providers are no

21   longer able to provide health services, NFPRHA Mem. at 44; and (3) as a result,

22   "unintended pregnancy rates [will] rise and other public health consequences [are]

felt," *id*. at 44.  And this chain of hypotheticals in turn rests on the unstated assumption that new providers will not fill any gaps if current providers (such as Planned Parenthood) leave the program.  As discussed above, HHS concluded the opposite in the Rule, and that determination was not arbitrary and capricious.  *See also* 84 Fed. Reg. at 7756 (concluding that Rule will "expand[] the type and nature of the Title X providers . . . so as to fill gaps and expand family planning services").

## III.   THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST WEIGH IN FAVOR OF DENYING PLAINTIFFS' MOTIONS

On the other side of the ledger, the government will "suffer[] a form of irreparable injury" if it "is enjoined by a court from effectuating statutes enacted by representatives of its people."  *Maryland v. King*, 567 U.S. 1301 (2012) (Roberts, C.J., in chambers) (citation omitted).  That is particularly true here, as the government has a compelling interest in following longstanding federal law prohibiting the use of Title X funds for programs where abortion is a method of family planning.  *See* 42 U.S.C. § 300a-6.  Granting Plaintiffs their desired injunction would require HHS to disburse taxpayer dollars in violation of Title X and would thwart lawful regulations intended to avoid any risk that federal funds will be used—or perceived to be used—to subsidize abortion, an unquestionably irreparable injury to both the government and the public more generally.

The need to avoid that harm significantly outweighs any of Plaintiffs' asserted injuries.  At bottom, Plaintiffs simply desire to receive government

CONSOLIDATED OPPOSITION
TO PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION
NO. 1:19-CV-3040-SAB

58

U.S. DEPARTMENT OF JUSTICE
1100 L Street, N.W.
Washington, DC  20005
(202) 305-0878

subsidies under the terms and conditions they prefer. But "the government may 'make a value judgment favoring childbirth over abortion, and . . . implement that judgment by the allocation of public funds,'" by "subsidiz[ing] family planning services which will lead to conception and child birth, and declining to 'promote or encourage abortion.'" *Rust*, 500 U.S. at 192-93 (citation omitted). Accordingly, the balance of equities and public interest make preliminary injunctive relief inappropriate.

A preliminary injunction would particularly disserve the public interest given the nature of Plaintiffs' attacks against the Rule. *Rust* blessed highly similar regulations and, as discussed at length previously, Plaintiffs' argument that Congress silently abrogated *Rust* lacks merit, as discussed above. Necessarily then, most of Plaintiffs' arguments amount to various assertions that HHS failed to adequately consider particular issues and topics in a rulemaking consisting of over 500,000 comments. Those arguments are wrong, particularly since an agency "need not address every comment" but must only "respond in a reasoned manner to those that raise significant problems." *Reytblatt v. Nuclear Regulatory Comm'n*, 105 F.3d 715, 722 (D.C. Cir. 1997). Indeed, failing to respond to comments is not itself a sufficient basis for invalidating federal agency action. Rather, "[t]he failure to respond to comments is significant only insofar as it demonstrates that the agency's decision was not based on a consideration of the relevant factors." *Thompson v. Clark*, 741 F.2d 401, 409 (D.C. Cir. 1984). But even if the Court were later to accept some of these arguments, the

CONSOLIDATED OPPOSITION
TO PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION
NO. 1:19-CV-3040-SAB

59

U.S. DEPARTMENT OF JUSTICE
1100 L Street, N.W.
Washington, DC 20005
(202) 305-0878

likely remedy would be a remand without vacatur. *See Pollinator Stewardship Council v. EPA*, 806 F.3d 520, 532 (9th Cir. 2015) (vacatur less appropriate when agency "could adopt the same rule on remand" by "offer[ing] better reasoning" or "by complying with procedural rules"); *La. Fed. Land Bank Ass'n, FLCA v. Farm Credit Admin.*, 336 F.3d 1075, 1085 (D.C. Cir. 2003) (remanding rather than vacating based on the conclusion that it was "not unlikely" that the agency "'[would] be able to justify a future decision to retain the [r]ule'" (citation omitted)).  The Court should not issue a sweeping preliminarily injunction against the Rule's operation when Plaintiffs would, at most, be entitled to far more limited relief at final judgment.

## IV.  ANY INJUNCTIVE RELIEF SHOULD BE LIMITED

### A.  Any Injunctive Relief Should Be Limited To The Plaintiffs

At a minimum, any injunction should be no broader than necessary to provide Plaintiffs relief, and should therefore be limited to redressing the injuries of the parties before this Court.  As the Supreme Court recently confirmed, any "remedy" ordered by a federal court must "be limited to the inadequacy that produced the injury in fact that the plaintiff has established"; a court's "constitutionally prescribed role is to vindicate the individual rights of the people appearing before it"; and "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 138 S. Ct. 1916, 1921, 1933-34 (2018); *see Doe v. Shanahan*, 917 F.3d 694, 740 (D.C. Cir. 2019) (Williams, J., concurring in result) (recognizing the implications of *Gill* for nationwide

CONSOLIDATED OPPOSITION
TO PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION
NO. 1:19-CV-3040-SAB

60

U.S. DEPARTMENT OF JUSTICE
1100 L Street, N.W.
Washington, DC 20005
(202) 305-0878

1   injunctions).  Equitable principles likewise require that an injunction "be no more

2   burdensome to the defendant than necessary to provide complete relief to the

3   plaintiffs." *Madsen v. Women's Health Ctr., Inc.,* 512 U.S. 753, 765 (1994)

4   (citation omitted); *see also Trump v. Hawaii*, 138 S. Ct. 2392, 2429 (2018)

5   (Thomas, J., concurring) (noting that nationwide injunctions "are legally and

6   historically dubious").  These principles apply with even greater force to a

7   preliminary injunction, an equitable tool designed merely to "preserve the relative

8   positions of the parties until a trial on the merits can be held."  *Univ. of Tex. v.*

9   *Camenisch*, 451 U.S. 390, 395 (1981); *accord Zepeda v. INS*, 753 F.2d 719, 728

10  n.1 (9th Cir. 1983).

11      Here, Plaintiffs fail to show that a nationwide injunction is necessary to

12  redress their alleged injuries.  Indeed, leading up to the Supreme Court's decision

13  in *Rust*, every district court to enjoin the 1988 regulations limited that relief to the

14  parties before it.  *See W. Va. Ass'n of Cmty. Health Centers, Inc. v. Sullivan*, 737

15  F. Supp. 929, 956-57 (S.D.W. Va. 1990); *Planned Parenthood Fed'n of Am. v.*

16  *Bowen*, 687 F. Supp. 540, 544 (D. Colo. 1988); *Massachusetts v. Bowen*, 679 F.

17  Supp. 137, 148 (D. Mass. 1988).  Plaintiffs provide no tenable reason why the

18  Rule should be treated differently from how courts proceeded before.

19      To start, Plaintiffs' decision to bring APA claims does not necessitate a

20  nationwide remedy.  *See, e.g.*, *California v. Azar*, 911 F.3d 558, 582-84 (9th Cir.

21  2018) (vacating nationwide scope of injunction in facial challenge under the

22  APA); *Los Angeles Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 664-65 (9th

CONSOLIDATED OPPOSITION          61

1    Cir. 2011) (same).  A court "do[es] not lightly assume that Congress has intended

2    to depart from established principles" regarding equitable discretion, *Weinberger*

3    *v. Romero-Barcelo,* 456 U.S. 305, 313 (1982), and the APA's general instruction

4    that unlawful agency action "shall" be "set aside," 5 U.S.C. § 706(2), is

5    insufficient to mandate such a departure.  Indeed, the Supreme Court held that not

6    even a provision directing that an injunction "shall be granted" was sufficient to

7    displace traditional principles of equitable discretion, *Hecht Co. v. Bowles*, 321

8    U.S. 321, 328-30 (1944), and Congress is presumed to have been aware of that

9    holding when it enacted the APA two years later.  In fact, the APA confirms that,

10   absent a special review statute, "[t]he form of proceeding for judicial review" is

11   simply the traditional "form[s] of legal action, including actions for declaratory

12   judgments or writs of prohibitory or mandatory injunction," 5 U.S.C. § 703, and

13   that the statutory right of review does not affect "the power or duty of the court to

14   . . . deny relief on any . . . appropriate legal or equitable ground," *id.* § 702(1). The

15   Supreme Court therefore has confirmed that, even in an APA case, "equitable

16   defenses may be interposed." *Abbott Labs. v. Gardner*, 387 U.S. 136, 155 (1967).

17   Accordingly, the Court should construe the "set aside" language in Section 706(2)

18   as applying only to the named Plaintiffs, especially as no federal court had issued

19   a nationwide injunction before Congress's enactment of the APA in 1946, nor

20   would do so for more than fifteen years thereafter, *see Hawaii*, 138 S. Ct. at 2426

21   (Thomas, J., concurring).

22

1    Nor does the Rule's "nationwide" impact require a nationwide injunction.

2    NFPRHA Mem. 44.  The Supreme Court recently explained that under Article III,

3    the proper remedy in a constitutional vote-dilution challenge brought by an

4    individual voter entailed "revising only such districts as are necessary to reshape

5    the voter's district" rather than "restructuring all of the State's legislative

6    districts[,]" *notwithstanding* that the alleged gerrymandering was "statewide in

7    nature" rather than limited to each plaintiff's particular district. *Gill*, 138 S. Ct. at

8    1920, 1930-31.  Likewise, the Ninth Circuit recently vacated the nationwide scope

9    of an injunction against particular interim final rules, even though "the agencies'

10   own regulatory impact analysis" estimated that the rules would affect between

11   "31,700 and 120,000 women *nationwide*." *California*, 911 F.3d at 572 (emphasis

12   added).  These holdings confirm that it is the scope of the plaintiff's injury and

13   not the defendant's policy that governs the permissible breadth of an injunction

14   under Article III.

15        Likewise, that NFPRHA "represents Title X funding recipients in all states

16   and two territories" makes no difference.  NFPRHA Mem. at 44.  That Plaintiffs

17   are *geographically* dispersed is no basis for enjoining the Rule's application to

18   *non-parties*.  For example, one of the district courts that enjoined the 1988

19   regulations acknowledged that the plaintiffs before it included "national

20   organizations" that "represent[ed] nearly 75% of Title X recipients and 285

21   subgrantees across the country," but nevertheless limited its injunction to "the

22   plaintiffs in this action." *Massachusetts*, 679 F. Supp. at 148.  Likewise, the Ninth

1    Circuit recently vacated the nationwide scope of an injunction, even though the

2    plaintiffs were five states located in many federal judicial circuits. *California*,

3    911 F.3d at 568 (plaintiffs were "California, Delaware, Maryland, New York, and

4    Virginia").

5         Finally, the structure of the Title X program does not support entry of a

6    nationwide injunction. *See* Wash. Mem. at 45; NFPRHA Mem. at 43. Contrary

7    to Plaintiffs' suggestion, a nationwide injunction is not necessary to "ensure an

8    even playing field." Wash. Mem. at 45 (citing *City of L.A. v. Sessions*, 293 F.

9    Supp. 3d 1087, 1100-01 (C.D. Cal. 2018)); NFPRHA Mem. at 43 (same). Title X

10   funds are allocated on a state-by-state basis, so any effect of the Rule on funding

11   in other states would have no impact on Washington. *See* HHS, *Announcement*

12   *of Anticipated Availability of Funds for Family Planning Services Grants* 13-14

13   (Feb. 23, 2018).[3]

14        Nationwide relief would be particularly harmful here given that three other

15   district courts in California, Maine, and Oregon are currently considering similar

16   challenges. If the government prevails in all three other jurisdictions, a nationwide

17   injunction would render those victories meaningless as a practical matter. It

18   would also preclude appellate courts from testing Plaintiffs' factual assertions

19   against the Rule's operation in other jurisdictions. For example, in *Rust* itself, the

20   _____

21        [3]      https://www.hhs.gov/opa/sites/default/files/FY18-Title-X-Services-

22   FOA-Final-Signed.pdf.

1   claim that the separation requirements in the 1988 regulations would "be applied

2   in an arbitrary manner" was refuted by the fact that in the states where those

3   regulations "ha[d] been implemented," there had been "no issues of compliance."

4   Br. for Resp't at 45 n.51, *Rust* (No. 89-1391), 1990 WL 10012655 (U.S. Sept. 7,

5   1990); *see also California*, 911 F.3d at 583 ("The Supreme Court has repeatedly

6   emphasized that nationwide injunctions have detrimental consequences to the

7   development of law and deprive appellate courts of a wider range of

8   perspectives.").  In addition, other states—especially those that have taken

9   measures to ensure that their own funds are not used to subsidize family planning

10   through abortion—have welcomed the Rule.  *See* ECF No. 43-1 (amicus curiae

11   brief of fourteen states in support of the Rule); *see also, e.g.*, *Planned Parenthood*

12   *of Greater Ohio v. Hodges*, 917 F.3d 908, 910 (6th Cir. 2019) (en banc)

13   (upholding Ohio law prohibiting state health department from funding

14   organizations that "[p]erform nontherapeutic abortions").  There is no reason why

15   Plaintiffs' views on abortion funding should govern the rest of the country.  *See*

16   *California*, 911 F.3d at 583 ("The detrimental consequences of a nationwide

17   injunction are not limited to their effects on judicial decisionmaking.  There are

18   also the equities of non-parties who are deprived the right to litigate in other

19   forums.").

20

21

22

1    **B.    Any Injunctive Relief Should Be Limited To Particular Provisions**

2    Similarly, should the Court decide to enjoin any portion of the Rule, the

3    Court should allow the remainder to go into effect.  In determining whether

4    severance is appropriate, courts look to both the agency's intent and whether the

5    regulation can function sensibly without the excised provision(s).  *MD/DC/DE*

6    *Broads. Ass'n v. FCC*, 236 F.3d 13, 22 (D.C. Cir.  2001).

7    Here, HHS's intent is clear:  the Rule provides that "[t]o the extent a court

8    may enjoin any part of the rule, the Department intends that other provisions or

9    parts of provisions should remain in effect."  84 Fed. Reg. at 7725.  Nor is there

10    any functional reason why the entire Rule must fall if the Court agrees with

11    Plaintiffs' attacks on particular provisions.  The program integrity requirements

12    can function without the referral requirements (and vice versa).  And there is

13    certainly no logical basis for enjoining the entire Rule if the Court agrees with

14    some of Plaintiffs' various challenges to more ancillary provisions (*e.g.*, the

15    "medically approved" requirement).  None of these provisions should be enjoined,

16    but there is no compelling justification for extending any injunctive relief beyond

17    any particular offending provision(s).

18    Finally, Washington argues in passing that if the Court does not enjoin the

19    Rule, it should stay its effective date pursuant to 5 U.S.C. § 705. *See* Wash. Mem.

20    at 45. As Washington correctly notes, courts considering requests for such relief

21    apply the same test as when considering a request for a preliminary injunction.

22

CONSOLIDATED OPPOSITION
TO PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION
NO. 1:19-CV-3040-SAB

66

U.S. DEPARTMENT OF JUSTICE
1100 L Street, N.W.
Washington, DC  20005
(202) 305-0878

1  Plaintiffs have not satisfied that standard. And even if they had, as discussed in

2  this section, nationwide relief would not be appropriate.

3  ## **CONCLUSION**

4  Accordingly, Plaintiffs' motions for preliminary injunction should be

5  denied.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

CONSOLIDATED OPPOSITION
TO PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION
NO. 1:19-CV-3040-SAB

67

U.S. DEPARTMENT OF JUSTICE
1100 L Street, N.W.
Washington, DC 20005
(202) 305-0878

# DECLARATION OF SERVICE

I hereby declare that on this day I caused the foregoing document to be electronically filed with the Clerk of the Court using the Court's CM/ECF System which will send notification of such filing to the attorneys for all parties.

DATED this 12th day of April, 2019, at Washington, D.C.

*/s/ Bradley P. Humphreys*
BRADLEY P. HUMPHREYS
D.C. Bar No. 988057

CONSOLIDATED OPPOSITION
TO PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION
NO. 1:19-CV-3040-SAB

68

U.S. DEPARTMENT OF JUSTICE
1100 L Street, N.W.
Washington, DC 20005
(202) 305-0878