FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Apr 25, 2019

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>    Plaintiff,<br><br>    v.<br><br>ALEX M. AZAR II, in his official capacity as Secretary of the United States Department of Health and Human Services; and UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES,<br><br>    Defendants. | No. 1:19-cv-03040-SAB<br><br><br><br><br><br><br><br>**ORDER GRANTING PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION** |
| NATIONAL FAMILY PLANNING & REPRODUCTIVE HEALTH ASSOCIATION, FEMINIST WOMEN'S HEALTH CENTER, DEBORAH OYER, M.D. and TERESA GALL, F.N.P.,<br><br>    Plaintiffs,<br><br>    v.<br><br>ALEX M. AZAR II, in his official capacity as Secretary of the United States | |

**ORDER GRANTING PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION ~ 1**

| | |
|---|---|
| Department of Health and Human Services; and UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, DIANE FOLEY, M.D., in her official capacity as Deputy Assistance Secretary for Population Affairs, and OFFICE OF POPULATION AFFAIRS,<br><br>    Defendants. | |

Before the Court are Plaintiffs' Motions for Preliminary Injunction, ECF Nos. 9 and 18. A hearing on the motions was held on April 25, 2019. The State of Washington was represented by Jeffrey Sprung, Kristin Beneski and Paul Crisalli. Plaintiffs National Family Planning and Reproductive Health Association, *et al.*, (NFPRHA) were represented by Ruth Harlow, Fiona Kaye, Brigitte Amiri, Elizabeth Deutsch, and Joseph Shaeffer. Defendants were represented by Bradley Humphreys. The Court also received *amicus* briefs from American Academy of Pediatrics, *et al*.; Institute of Policy Integrity; State of Ohio, *et al*., and Susan B. Anthony List. This Order memorializes the Court's oral ruling.

## Introduction

Plaintiffs seek to set aside the Office of Population Affairs (OPA), Department of Health and Human Services ("Department") March 4, 2019 Final Rule that revises the regulations that govern Title X family planning programs. 84 Fed. Reg. 77141-01, 2019 WL 1002719 (Mar. 4, 2019). The new regulations were proposed to "clarify grantee responsibilities under Title X, to remove the requirement for nondirective abortion counseling and referral, to prohibit referral for abortion, and to clarify compliance obligations under state and local laws . . . to clarify access to family planning services where an employer exercises a

**ORDER GRANTING PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION ~ 2**

religious and moral objection . . . and to require physical and financial separation to ensure clarity regarding the purpose of Title X and compliance with the statutory program integrity provisions, and to encourage family participation in family planning decisions, as required by Federal law." *Id.*

Plaintiffs contend the Final Rule is in excess of the agency's statutory authority, is arbitrary and capricious, violates the Administrative Procedures Act, violates Title X requirements, violates congressional Non-directive Mandates, violates Section 1554 of the Patient Protection and Affordable Care Act ("ACA"), and is otherwise unconstitutional.

Plaintiffs assert the Final Rule is not designed to further the purposes of Title X, which is to equalize access to comprehensive, evidence-based, voluntary family planning. Rather it is designed to exclude and eliminate health care providers who provide abortion care and referral—which by extension will impede patients' access to abortion—even when Title X funds are not used to provide abortion care, counseling or referral.

Plaintiffs also believe the Final Rule appears to be designed to limit patients' access to modern, effective, medically approved contraception and family planning health care. Plaintiffs argue the Final Rule was designed by the Department to direct Title X funds to providers who emphasize ineffective and inefficient family planning.

Finally, Plaintiffs believe the Final Rule is politically motivated and not based on facts. Instead, it intentionally ignores comprehensive, ethical, and evidence-based health care, and impermissibly interferes with the patient-doctor relationship.

Defendants assert the Final Rule adopted by the Secretary is consistent with the Administrative Procedures Act, consistent with Title X, the Non-directive

**ORDER GRANTING PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION ~ 3**

Mandates, and Section 1554 of the ACA[1], and is otherwise constitutional.

Defendants believe the Final Rule is indistinguishable from regulations adopted over 30 years ago, which were held to be valid by the United States Supreme Court in *Rust v. Sullivan*, 500 U.S. 173 (1991). Finally, Defendants argue Plaintiffs have not shown, at this early stage in the litigation, that the Final Rule violates Section 1008 of Title X—in fact, Plaintiffs cannot make that showing—primarily because of *Rust*.

At issue in this hearing are Plaintiffs' Motions for Preliminary Injunction. The Final Rule is scheduled to take effect on May 3, 2019. Plaintiffs seek to preserve the status quo pending a final determination on the merits.

## Motion Standard

"A preliminary injunction is a matter of equitable discretion and is 'an extraordinary remedy that may only be awarded upon a clear showing that a plaintiff is entitled to such relief.'" *California v. Azar*, 911 F.3d 558, 575 (9th Cir. 2018) (quoting *Winter v. NRDC*, 555 U.S. 7, 22 (2008)). "A party can obtain a preliminary injunction by showing that (1) it is 'likely to succeed on the merits,' (2) it is 'likely to suffer irreparable harm in the absence of preliminary relief,' (3) 'the balance of equities tips in [its] favor,' and (4) 'an injunction is in the public interest.'" *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017) (alteration in original) (quoting *Winter*, 555 U.S. at 20). The Ninth Circuit uses a "sliding scale" approach in which the elements are "balanced so that a stronger

---

[1] Defendants also argue Plaintiffs have waived their argument that the Final Rule violates Section 1554 of the ACA by failing to refer to Section 1554 in their comments prior to the Final Rule being published. It is doubtful that an APA claim asserting that an agency exceeded the scope of its authority to act can be waived. Moreover, it appears that during the rule making process the agency was apprised of the substance of the violation.

**ORDER GRANTING PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION ~ 4**

showing of one element may offset a weaker showing of another." *Hernandez v. Sessions*, 872 F.3d 976, 990 (9th Cir. 2017) (quotation omitted). When the government is a party, the last two factors merge. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). This means that when the government is a party, the court considers the balance of equities and the public interest together. *Azar*, 911 F.3d at 575. "[B]alancing the equities is not an exact science." *Id.* (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 609 (1952) (Frankfurter, J., concurring) ("Balancing the equities . . . is lawyers' jargon for choosing between conflicting public interests")).

Likelihood of success on the merits is the most important factor; if a movant fails to meet this threshold inquiry, the court need not consider the other factors. *Disney*, 869 F.3d at 856 (citation omitted). A plaintiff seeking preliminary relief must "demonstrate that irreparable injury is likely in the absence of an injunction." *Winter*, 555 U.S. at 22. The analysis focuses on irreparability, "irrespective of the magnitude of the injury." *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 725 (9th Cir. 1999). Economic harm is not normally considered irreparable. *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980).

"'[I]njunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs' before the Court." *L.A. Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 664 (9th Cir. 2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). This is particularly true where there is no class certification. *See Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1501 (9th Cir. 1996) ("[I]njunctive relief generally should be limited to apply only to named plaintiffs where there is no class certification."); *Meinhold v. U.S. Dep't of Defense*, 34 F.3d 1469, 1480 (9th Cir.1994) (district court erred in enjoining the defendant from improperly applying a regulation to all military personnel (*citing Califano*, 442 U.S. at 702)).

**ORDER GRANTING PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION ~ 5**

That being said, there is no bar against nationwide relief in the district courts or courts of appeal, even if the case was not certified as a class action, if such broad relief is necessary to give prevailing parties the relief to which they are entitled. *Bresgal v. Brock*, 843 F.2d 1163, 1170–71 (9th Cir. 1987).

## Federal Administrative Agency Rule-Making

Federal administrative agencies are required to engage in "reasoned decisionmarking." *Michigan v. E.P.A.*, __ U.S. __, 135 S.Ct. 2699 (2015). "Not only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational." *Id.* (quoting *Allentown Mack Sales & Service, Inc. v. NLRB*, 522 U.S. 359, 374 (1998)).

## Administrative Procedures Act

The Administrative Procedure Act "sets forth the full extent of judicial authority to review executive agency action for procedural correctness." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009). Under the arbitrary and capricious standard contained in the APA, a reviewing court may not set aside an agency rule that is rational, based on consideration of the relevant factors and within the scope of the authority delegated to the agency by the statute. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983). "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency. Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.* at 43. (quotation omitted). An agency rule is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference

**ORDER GRANTING PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION ~ 6**

in view or the product of agency expertise." *Id.*

An agency must consider and respond to significant comments received during the period for public comment. *Perez v. Mortgage Bankers Ass'n*, __ U.S.__, 135 S.Ct. 1199, 1203 (2015). The public interest is served by compliance with the APA. *Azar*, 911 F.3d at 581. "The APA creates a statutory scheme for informal or notice-and-comment rulemaking reflecting a judgment by Congress that the public interest is served by a careful and open review of proposed administrative rules and regulations." *Alcaraz v. Block*, 746 F.2d 593, 610 (9th Cir. 1984) (internal quotation marks and citation omitted). "It does not matter that notice and comment could have changed the substantive result; the public interest is served from proper process itself." *Azar*, 911 F.3d at 581.

## History of Title X

*"No American woman should be denied access to family planning assistance because of her economic condition."*[2]

In 1970, Congress created the Title X program[3] to address low-income individuals' lack of equal access to the same family planning services, including modern, effective medical contraceptive methods such as "the Pill," available to those with greater economic resources. NFPRHA, *et al*. Complaint, 1:19-cv-3045-SAB, ECF No. 1, ¶4. Title X monetary grants support family planning projects that offer a broad range of acceptable and effective family planning methods and services to patients on a voluntary basis, 42 U.S.C. § 300(a), creating a nationwide of Title X health care providers. *Id.* at ¶5. Title X gives those with incomes below or near the federal poverty level free or low-cost access to clinical professional,

---

[2] President Nixon, *Special Message to the Congress on Problems of Population Growth* (July 18, 1969).

[3] Title X became law as part of the "Family Planning Services and Population Research Act of 1970." Pub. L. No. 91-572, 84 Stat. 1504 (1970).

**ORDER GRANTING PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION ~ 7**

contraceptive methods and devices, and testing and counseling services related to reproductive health, including pregnancy testing and counseling. *Id.* Over almost five decades, Title X funding has built and sustained a national network of family planning health centers that delivers high-quality care. *Id.* at ¶41. It has enabled millions of low-income patients to prevent unintended pregnancies and protect their reproductive health. *Id.* Approximately 90 federal grants, totaling approximately $260 million, for Title X projects now fund more than 1000 provider organizations across all the states and in the U.S. territories, with more than 3800 health centers offering Title X care. *Id.* at ¶6, ¶52. In 2017, the Title X program served more than four million patients. *Id.*

Washington's Department of Health ("DOH") Family Planning Program is the sole grantee of Title X funds in Washington State. Decl. of Cynthia Harris, ECF No. 11 at ¶14. It provides leadership and oversight to its Family Planning Network of 16 subrecipients offering Title X services at 85 service sites. *Id.* at ¶4. The Family Planning Program collaborates with other programs in the DOH, other state agencies, subrecipient network organizations, and other family planning, primary health care, and social service organizations to ensure that Title X services are available statewide on issues related to women's health, adolescent health, family planning, sexually transmitted infection (STI) and Human Immunodeficiency Virus (HIV) prevention and treatment, intimate partner violence, and unintended pregnancy. *Id*.

NFPRHA represents more than 850 health care organizations in all 50 states, the District of Columbia and the U.S. territories, as well as individual professional members with ties to family planning care. ECF No. 19 at ¶5. NFPRHA currently has more than 65 Title X grantee members and almost 700 Title X subrecipient members. These NFPRHA member organizations operate or fund a network of more than 3,500 health centers that provide family planning services to more than 3.7 million Title X patients each year. *Id.* at ¶7.

**ORDER GRANTING PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION ~ 8**

The scope of the care provided by Title X programs is summarized in OPA's current Program Requirements:

> All Title X-funded projects are required to offer a broad range of acceptable and effective medically (U.S. Food and Drug Administration (FDA)) approved contraceptive methods and related services on a voluntary and confidential basis. Title X services include the delivery of related preventive health services, including patient education and counseling; cervical and breast cancer screening; sexually transmitted disease (STD) and human immunodeficiency virus (HIV) prevention education, testing and referral; and pregnancy diagnosis and counseling.

POA, *Program Requirements for Title X Funded Family Planning Projects,* at 5 (Apr. 2014), https://www.hhs.gov/opa.sites/default/files/Title-X-2014-Program Requirements.pdf ("Program Requirements"). Title X projects also provide basis infertility services, such as testing and counseling. 1:19-cv-3045-SAB, ECF No. 1, at ¶43.

The Title X statute has always provided that "[n]one of the funds appropriated under this subchapter shall be used in programs where abortion is a method of family planning." 42 U.S.C. § 300a-6 ("Section 1008"). The statute authorizes the Secretary to promulgate regulations governing the program. 42 U.S.C. § 300a-4.

The Secretary adopted regulations in 1971 and they remained in effect until 1988 when the Secretary adopted final regulations that drastically altered the landscape in which Title X grantees operated. To summarize, the 1988 regulations:

- Prohibited Title X projects from counseling or referring clients for abortion as a method of family planning;
- Required grantees to separate their Title X project—physically and financially—from prohibited abortion-related activities
- Established compliance standards for family planning projects
- Prohibited certain actions that promote, encourage, or advocate

**ORDER GRANTING PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION ~ 9**

abortion as method of family planning, such as using project funds for lobbying for abortion, developing and disseminating materials advocating abortion, or taking legal action to make abortion available as a method of family planning.

Those regulations were challenged in federal courts and ultimately upheld by the United States Supreme Court. *See Rust v. Sullivan*, 500 U.S. 173 (1991)[4]. The 1988 rules were never fully implemented due to ongoing litigation and bipartisan concern over its invasion of the medical provider-patient relation. State of Washington, Complaint, ECF No. 1 at ¶30.

In 1993, President Clinton suspended the 1988 Regulations by way of a Presidential memorandum to the Department:

> Title X of the Public Health Services Act [this subchapter] provides Federal funding for family planning clinics to provide services for low-income patients. The Act specifies that Title X funds may not be used for the performance of abortions, but places no restrictions on the ability of clinics that receive Title X funds to provide abortion counseling and referrals or to perform abortions using non-Title X funds. During the first 18 years of the program, medical professionals at Title X clinics provided complete, uncensored information, including nondirective abortion counseling. In February 1988, the Department of Health and Human Services adopted regulations, which have become known as the "Gag Rule," prohibiting Title X recipients from providing their patients with information, counseling

---

[4] In *Rust*, the United States Supreme Court held that (1) the regulations were based on permissible construction of the statute prohibiting the use of Title X funds in programs in which abortion is a method of family planning; (2) the regulations do not violate First Amendment free speech rights of Title X fund recipients, their staffs or their patients by impermissibly imposing viewpoint-discriminatory conditions on government subsidies; and (3) regulations do not violate a woman's Fifth Amendment right to choose whether to terminate a pregnancy and do not impermissibly infringe on doctor-patient relationship. 500 U.S. at 184-203.

**ORDER GRANTING PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION ~ 10**

or referrals concerning abortion. Subsequent attempts by the Bush Administration to modify the Gag Rule and ensuing litigation have created confusion and uncertainty about the current legal status of the regulations.

The Gag Rule endangers women's lives and health by preventing them from receiving complete and accurate medical information and interferes with the doctor-patient relationship by prohibiting information that medical professionals are otherwise ethically and legally required to provide to their patients. Furthermore, the Gag Rule contravenes the clear intent of a majority of the members of both the United States Senate and House of Representatives, which twice passed legislation to block the Gag Rule's enforcement but failed to override Presidential vetoes.

For these reasons, you have informed me that you will suspend the Gag Rule pending the promulgation of new regulations in accordance with the "notice and comment" procedures of the Administrative Procedure Act [5 U.S.C.A. §§ 551 et seq., 701 et seq.].

"The Title X Gag Rule," Memorandum for the Secretary of Health and Human Services, 1993 WL 366490 (Jan. 22, 1993).

New regulations were finalized in 2000, 65 Fed. Reg. 41270 (Jul. 3, 2000), *codified at* 42 C.F.R. Pt. 59, and these regulations remain in effect unless and until the new Final Rule is implemented.

**Congressional Intent / The Department's Program Requirements**

Plaintiffs argue that laws passed by Congress since *Rust* limit the Department's discretion in implementing Title X regulations. These laws include Section 1554 of the ACA and congressional Non-directive Mandates contained in appropriation bills. They also rely on the Department's own program requirements to support their arguments.

**1.    § 1554 of the ACA**

Section 1554 of the ACA states:

Notwithstanding any other provision of this Act, the Secretary of Health and Human Services shall not promulgate any regulation that--

**ORDER GRANTING PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION ~ 11**

> (1) creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care;
> (2) impedes timely access to health care services;
> (3) interferes with communications regarding a full range of treatment options between the patient and the provider;
> (4) restricts the ability of health care providers to provide full disclosure of all relevant information to patients making health care decisions;
> (5) violates the principles of informed consent and the ethical standards of health care professionals; or
> (6) limits the availability of health care treatment for the full duration of a patient's medical needs.

42 U.S.C. § 18114.

### 2. Appropriations Mandate

With the Non-directive Mandate, Congress has explicitly required every year since 1996 that "all pregnancy counseling [in Title X projects] shall be nondirective." NFPRHA, *et al*. Complaint, 1:19-cv-3045-SAB, ECF No. 1, at ¶78. Non-directive counseling provides the patient with all options relating to her pregnancy, including abortion. *Id.* at ¶76. Congress has been providing Non-directive Mandates in its appropriations bills for the past 24 years.

### 3. Department of Health and Human Services Program Requirements / Quality Family Planning

Title X grantees are required to follow the Quality Family Planning (QFP) guidelines, issued by the Centers for Disease Control and Prevention and OPA. State of Washington, Complaint, ECF No. 1, at ¶45. This document reflects evidence-based best practices for providing quality family planning services in the United States.[5] It requires that options counseling should be provided to pregnant

---

[5] "Providing Quality Family Planning Services: Recommendations of CDC and the U.S. Office of Population Affairs," Morbidity and Mortality Weekly Report Vol. 62, No. 4 (April 25, 2014), *available at* https:www.cdc.gov/mmwr/pdf/rr/rr6304.pdf (last accessed April 24, 2019) (the QFP).

**ORDER GRANTING PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION ~ 12**

patients as recommended by the American College of Obstetricians and Gynecologists and others, including that patients with unwanted pregnancy should be "fully informed in a balanced manner about all options, including raising the child herself, placing the child for adoption, and abortion." *Id.* at ¶46.

The Department's Program Requirements require Title X projects to provide nondirective pregnancy counseling. *Id*. at ¶44.

## Federal Conscience Laws

In the Executive Summary of the Final Rule, the Department indicates that one of the purposes of revising the Title X regulations was to eliminate provisions which are inconsistent with the health care conscience statutory provisions. 84 Fed. Reg. 7714, 7716. These provisions include the Church Amendment, the Coats-Snowe Amendment and the Weldon Amendment. *Id.*

### 1. The Church Amendment

"The Church Amendments, among other things, prohibit certain HHS grantees from discriminating in the employment of, or the extension of staff privileges to, any health care professional because they refused, because of their religious beliefs or moral convictions, to perform or assist in the performance of any lawful sterilization or abortion procedures. The Church Amendments also prohibit individuals from being required to perform or assist in the performance of any health service program or research activity funded in whole or in part under a program administered by the Secretary contrary to their religious beliefs or moral convictions. *See* 42 U.S.C. 300a-7." 84 Fed. Reg. at 7716, n.7.

### 2. 1996 Coats-Snowe Amendment

"The Coats-Snowe Amendment bars the federal government and any State or local government that receives federal financial assistance from discriminating against a health care entity, as that term is defined in the Amendment, who refuses, among other things, to provide referrals for induced abortions. *See* 42 U.S.C. 238n(a)." 84 Fed. Reg. at 7716, n.8.

**ORDER GRANTING PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION ~ 13**

### 3. 2005 Weldon Amendment

"The Weldon Amendment was added to the annual 2005 health spending bill and has been included in subsequent appropriations bills." 84 Fed. Reg. at 7716, n. 9. "The Weldon Amendment bars the use of appropriated funds on a federal agency or programs, or to a State or local government, if such agency, program, or government subjects any institutional or individual health care entity to discrimination on the basis that the health care entity does not, among other things, refer for abortions." *Id.*

## Analysis

As set forth above, the Ninth Circuit uses a sliding scale approach in determining whether it is appropriate to grant a preliminary injunction. Although Plaintiffs have met their burden of showing that all four factors tip in their favor, the irreparable harm and balance of equities factors tip so strongly in Plaintiffs' favor that a strong showing of likelihood on the merits was not necessary.

### 1. Likelihood of Success on the Merits

Plaintiffs have presented reasonable arguments that indicate they are likely to succeed on the merits, thus meeting the threshold inquiry. In so finding, the Court has not concluded that Plaintiffs will definitely prevail on the merits, nor has it concluded that they are more likely going to prevail. The preliminary injunction standard requires neither of these conclusions. *See Azar*, 911 F.3d at 582 ("The purpose of such interim equitable relief is not to conclusively determine the rights of the parties but to balance the equities as the litigation moves forward.") (quoting *Trump v. Int'l Refugee Assistance Proj.*, __ U.S. __, 137 S.Ct. 2080, 2087 (2017)). Rather, it requires a determination that Plaintiff has made a colorable claim—a claim that has merit and a likely chance of success.

First, Plaintiffs have presented initial facts and argument that the separation requirement in the Final Rule forces clinics that provide abortion services to maintain separate facilities and finances for Title X programs will more likely than

not increase their expenses unnecessarily and unreasonably.

Second, Plaintiffs have presented initial facts and argument that the Final Rule gag requirement would be inconsistent with ethical, comprehensive, and evidence-based health care.

Third, Plaintiffs have presented initial facts and argument that the Final Rule violates Title X regulations, the Non-directive Mandates and Section 1554 of the Affordable Care Act and is also arbitrary and capricious.

Specifically, Plaintiffs have demonstrated the Final Rule likely violates the central purpose of Title X, which is to equalize access to comprehensive, evidence-based, and voluntary family planning. They have presented facts and argument that the Final Rule violates the Non-directive Mandate because it requires all pregnant patients to receive referrals for pre-natal care, regardless of whether the patient wants to continue the pregnancy, and regardless of the best medical advice and treatment that might be recommended for that patient.

They have also presented facts and argument that the Final Rule likely violates Section 1554 of the ACA because the Final Rule creates unreasonable barriers for patients to obtain appropriate medical care; impedes timely access to health care services; interferes with communications regarding a full range of treatment options between the patient and the heath care provider, restricts the ability of health care providers to provide full disclosure of all relevant information to patients making health care decisions, and violates the principles of informed consent and the ethical standards of health care professions.

Fourth, Plaintiffs, with the help from *Amicus* parties, have presented facts and argument that the Final Rule is arbitrary and capricious because it reverses long-standing positions of the Department without proper consideration of sound medical opinions and the economic and non-economic consequences.

Finally, Plaintiffs have presented facts and argument that the Department failed to consider important factors, acted counter to and in disregard of the

**ORDER GRANTING PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION ~ 15**

evidence in the administrative record and offered no reasoned analysis based on the record. Rather, it seems the Department has relied on the record made 30 years ago, but not the record made in 2018-19.

### 2. Irreparable Harm

Plaintiffs have demonstrated they are likely to suffer irreparable harm in the absence of a preliminary injunction by presenting facts and argument that the Final Rule may or likely will: (1) seriously disrupt or destroy the existing network of Title X providers in both the State of Washington and throughout the entire nation—this network has been carefully knit together over the past 45 years and there is no evidence presented by the Department that Title X is being violated or ignored by this network of providers; (2) impose additional and unnecessary costs on the State of Washington and other states; (3) harm the health of the patients who rely on the existing Title X providers; and (4) drive many Title X providers from the system either because of the increased costs imposed by the new separation requirements or because they cannot or will not comply with the allegedly unprofessional gag rule requirements.

Washington State has shown that it is not legally or logistically feasible for Washington to continue accepting any Title X funding subject to the Final Rule. At the minimum, Washington stands to lose more than $28 million in savings from the loss of federal dollars. It has demonstrated the harmful consequences of the Final Rule will uniquely impact rural and uninsured patients. If the Final Rule is implemented, over half of Washington counties would be unserved by a Title X-funded family planning provider. Students at Washington colleges and universities will be especially hurt by the Final Rule. DOH reports it does not have the funding that would be required to comply with the Final Rule, nor would it be able to comply with the May 3, 2019 deadline.

NFPRHA currently has more than 65 Title X grantee members and almost 700 Title X sub-recipient members. These NFPRHA member organizations

**ORDER GRANTING PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION ~ 16**

operate or fund a network of more than 3,500 health centers that provide family planning services to more than 3.7 million Title X patients each year. NFPRHA has shown that upon its effective date, the Final Rule will cause all current NFPRHA members grantees, sub-recipients, and their individual Title X clinicians to face a Hobson's Choice that harms patients as well as the providers. Faced with this difficult choice, many NFPRHA members will leave the network once the Final Rule becomes effective, thereby leaving low-income individuals without Title X providers.

It is worth noting that Plaintiffs have submitted substantial evidence of harm, including declarations from Karl Eastlund, President and CEO of Planned Parenthood of Greater Washington and North Idaho, ECF No. 10; Cynthia Harris, program manager for the Family Planning Program, Washington DOH, ECF No. 11; Anuj Khattar, M.D., primary care physician and reproductive health provider, ECF No. 12; Dr. Judy Kimelman, practitioner at Seattle Obstetrics & Gynecology Group, ECF No. 13; Bob Marsalli, CEO of the Washington Association for Community Health, ECF No. 14; David Schumacher, Director of the Office of Financial Management, State of Washington, ECF No. 15; Dr. Judy Zerzan-Thul, Chief Medical Officer for the Washington State Health Care Authority, ECF No. 16; Clare M. Coleman, President and CEO of the National Family Planning & Reproductive Health Association, ECF No. 19; Dr. Kathryn Kost, Acting Vice President of Domestic Research at the Guttmacher Institute, ECF No. 20; Connie Cantrell, Executive Director of the Feminist Women's Health Center, ECF No. 21; Kristin A. Adams, Ph.D, President and CEO of the Indiana Family Health Council, ECF No. 22; J. Elisabeth Kruse, M.S., C.N.M., A.R.N.P, Lead Clinician for Sexual and Reproductive Health and Family Planning at the Public Health Department for Seattle and King County, Washington, ECF No. 23; Tessa Madden, M.D., M.P.H., Director of the Family Planning Division, Department of Obstetrics and Gynecology, Washington University School of Medicine, ECF No. 24; Heather

**ORDER GRANTING PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION ~ 17**

Maisen, Manager of the Family Planning Program in the Public Health Department for Seattle and King County, Washington, ECF No. 25; and Sarah Prager, M.D., Title X Director of the Feminist Women's Health Center, ECF No. 26.

Yet, the Government's response in this case is dismissive, speculative, and not based on any evidence presented in the record before this Court.

### 3. Balance of Equities/Public Interest

The balance of equities and the public interest strongly favors a preliminary injunction, which tips the scale sharply in favor of Plaintiffs.

There is no public interest in the perpetration of unlawful agency action. Preserving the status quo will not harm the Government and delaying the effective date of the Final Rule will cost it nothing. There is no hurry for the Final Rule to become effective and the effective date of May 3, 2019 is arbitrary and unnecessary.

On the other hand, there is substantial equity and public interest in continuing the existing structure and network of health care providers, which carefully balances the Title X, the congressional Non-directive Mandates, and Section 1554 of the Affordable Care Act, while the legality of the new Final Rule is reviewed and decided by the Court.

Accordingly, **IT IS HEREBY ORDERED**:

1. The State of Washington's Motion for Preliminary Injunction, ECF No. 9, is **GRANTED**.

2. National Family Planning & Reproductive Health Center, *et al.*'s Motion for Preliminary Injunction, ECF No. 18, is **GRANTED**.

3. Defendants and their officers, agents, servants, employees, and attorneys, and any person in active concert or participation with them, are **ENJOINED** from implementing or enforcing the Final Rule entitled *Compliance with Statutory Program Integrity Requirements*, 84 Fed. Reg. 7714-01 (March 4,

2019), in any manner or in any respect, and shall preserve the status quo pursuant to regulations under 42 C.F.R., Pt. 59 in effect as of the date of April 24, 2019, until further order of the Court.

4. No bond shall be required pursuant to Fed. R. Civ. P. 65(c).

**IT IS SO ORDERED**. The Clerk of Court is directed to enter this Order and forward copies to counsel.

**DATED** this 25th day of April 2019.



Stanley A. Bastian
United States District Judge

**ORDER GRANTING PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION ~ 19**