George M. Ahrend, #25160
Ahrend Law Firm PLLC
100 E. Broadway Ave.
Moses Lake, WA 98837
(509) 764-9000
(509) 464-6290 Facsimile
Email gahrend@ahrendlaw.com
Designated Local Attorney

Adam S. Hochschild, admitted *pro hac vice*
Thomas More Society
309 W. Washington St., Ste. 1250
Chicago, IL 60606
(312) 782-1680
(312) 782-1887 Facsimile
Email adam@hochschildlaw.com

Hon. Stanley A. Bastian

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, et al.,<br><br>Plaintiff,<br><br>vs.<br><br>ALEX M. AZAR, II, et al.,<br><br>Defendants. | No. 19-CV-03040-SAB (Consolidated with 19-CV-03045-SAB)<br><br>BRIEF OF AMICUS CURIAE SUSAN B. ANTHONY LIST IN SUPPORT OF DEFENDANTS<br><br>February 27, 2020<br>10:00 a.m.<br>Courtroom 755 |

## STATEMENT OF INTEREST OF AMICUS

Amicus Curiae Susan B. Anthony List ("SBA" or "SBA List") is a "pro-life advocacy organization," *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2339 (2014) (internal quotation marks omitted), dedicated to reducing and ultimately eliminating abortion by electing national leaders and advocating for laws that save lives, with a special calling to promote pro-life women leaders.

SBA List is deeply involved in the process of persuading fellow citizens of the rightness of its cause and effecting change through political processes. SBA List combines politics with policy, investing heavily in voter education to ensure that pro-life Americans know where their lawmakers stand on protecting the unborn, and in issue advocacy, advancing pro-life laws through direct lobbying and grassroots campaigns.

In particular, SBA List strongly supports private and public programs that assist women in avoiding abortion and protecting their own health and the health of their children. Fortified by its membership roster of 700,000 Americans, SBA List advocates policies that ensure that tax dollars are neither used to pay for abortions nor supplied to programs that provide or promote abortion as a method of family planning.

## INTRODUCTION

The United States Department of Health and Human Services ("HHS") has acted prudently and properly in issuing its Final Rule revising the regulations governing the Title X family planning program. *See* 84 Fed. Reg. 7714 (May 3, 2019) (the "Final Rule"). The purpose of the Final Rule—i.e., to "ensure compliance with, and enhance implementation of, the statutory requirement that none of the funds appropriated for Title X may be used in programs where abortion is a method of family planning," *id.* at 7715—is consonant with federal law and Supreme Court precedent. And the Rule's provisions are amply justified by both historical facts and health care providers' own arguments and admissions.

BRIEF OF AMICUS CURIAE SUSAN B. ANTHONY LIST - Page 2 of 10

# ARGUMENT

**I. Federal law has long prohibited the use of taxpayer funds to provide abortions and protected healthcare providers that do not refer for abortions.**

Since 1970, Section 1008 of Title X to the Public Health Service Act has clearly stated that "[n]one of the funds appropriated under this title shall be used in programs where abortion is a method of family planning." 42 U.S.C. § 300a-6. This provision has not been altered since its adoption, though implementing regulations and enforcement efforts have varied. *See* 84 Fed. Reg. at 7720-21.

Since Title X's adoption, moreover, the Government has also enacted other provisions that give effect to the state's legitimate preference for childbirth over abortion. Most directly, since 1976, the Hyde Amendment has barred the use of taxpayer funds to fund abortions through the Medicaid program. *See* Pub. L. No. 94-439, 90 Stat 1418 (1976).

At the same time, Congress has protected health care providers that do not refer for or provide abortions. Since 1996, with the adoption of the Coats-Snowe amendment, the law has protected from discrimination health care facilities and providers who decline to train or be trained in the performance of induced abortions. 42 U.S.C. § 238n. Since 2005, appropriations made through the Department of Health Human Services have been subject to the Weldon Amendment, which prohibits allocations of federal funds to agencies, programs and governments that discriminate against health care entities who refuse to facilitate or provide abortions. *See* Consolidated Appropriations Act of 2012, Pub.L. No. 112–74, div. F, tit. V, § 507(d)(1), 125 Stat. 786, 1111 (2011).

These well-established provisions of federal law reflect a legitimate and laudable public policy favoring childbirth over abortion by disfavoring the use of federal funds or privileges to facilitate or provide abortion. The Final Rule seeking to give effect to Title X's prohibition on the use of public funds to promote

BRIEF OF AMICUS CURIAE SUSAN B. ANTHONY LIST - Page 3 of 10

abortion as a method of family planning is of a piece with all of these legitimate exercises of federal power.

## II. Well-established legal precedent supports the right of government to favor childbirth over abortion.

Considering these legislative measures and other questions, the United States Supreme Court has consistently found that all governments have a legitimate interest in protecting human life beginning in utero and in favoring childbirth over abortion, including by their use of public funds and facilities.

"The government may use its voice and its regulatory authority to show its profound respect for the life within the woman." *Gonzales v. Carhart*, 550 U.S. 124, 157 (2007). *See also, e.g., Roe v. Wade*, 410 U.S. 113, 162 (1973) ("[T]he State…has legitimate interests in protecting…the potentiality of human life…."); *Planned Parenthood v. Casey*, 505 U.S. 833, 846 (1992) (recognizing the State's "regulatory interest," "from the inception of pregnancy," "in protecting the life of the fetus"). "[T]he Constitution does not forbid a State or city, pursuant to democratic processes, from expressing a preference for normal childbirth . . . ." *Webster v. Reprod. Health Servs.*, 492 U.S. 490, 511 (1989) (quoting *Poelker v. Doe*, 432 U.S. 519, 521 (1977)).

Upholding the Hyde Amendment prohibiting Medicaid funds to pay for abortions, *Harris v. McRae* found that "incentives that make childbirth a more attractive alternative than abortion for persons eligible for Medicaid . . . bear a direct relationship to the legitimate congressional interest in protecting potential life." *Harris v. McRae*, 448 U.S. 297, 325 (1980). The Court specifically approved the funding limitation's "encourag[ing] alternative[s]" to abortion by means of "unequal subsidization of abortion and other medical services." *Id.* at 315.

Consistent with these holdings and principles governing the judicial deference properly accorded to administrative actions, the United States Supreme Court—in precisely the administrative context presented in this case—affirmed the

BRIEF OF AMICUS CURIAE SUSAN B. ANTHONY LIST - Page 4 of 10

legitimate prerogative of the Secretary of Health and Human Services to adopt revised interpretations of the abortion-based restrictions on Title X funds that more firmly effect the intent of the statute and the state's policy favoring childbirth over abortion. *See Rust v. Sullivan*, 500 U.S. 173, 184 (1991) ("substantial deference" must be accorded to the "Secretary's construction of the statute," which represented a shift toward stricter enforcement of the abortion-funding prohibitions). The Court specifically approved the Secretary's justifications for its new interpretation, which included a "shift in attitude against the 'elimination of unborn children by abortion,'" as well as responding to non-compliance with earlier interpretations and better implementing the "original intent" of the statute. *Id.* at 187. Considering the constitutionality of new regulations requiring strict separation between Title X funds and abortion counseling, the Court reaffirmed the principles from *Webster* and *McRae* that the State has a legitimate interest in favoring childbirth over abortion and may commit its funds unequally to further that policy. *Id.* at 201.

The often-recognized State interest in life in utero, as well as the State's firmly established right to commit its funds in order to favor childbirth over abortion, and the Secretary's discretion in interpreting Title X's abortion restrictions all reinforce HHS's decision to adopt the Final Rule to ensure federal funds do not go to organizations that facilitate or provide abortions.

**III.    HHS's concerns that Title X recipients are improperly using federal funds to subsidize abortion are well-founded.**

HHS has historical grounds to be concerned about the possibility that abortion providers might misuse taxpayer funds. If that history were not enough, public comments on the proposed rule and arguments made in this lawsuit reinforce concerns that, wittingly or unwittingly, there has been widespread violation of Section 1008's prohibition on using Title X funds to subsidize programs in which abortion is a method of family planning.

BRIEF OF AMICUS CURIAE SUSAN B. ANTHONY LIST - Page 5 of 10

### A. Abortion providers have a documented history of fraudulent use of taxpayer funds.

Plaintiffs argue that the Final Rule is insufficiently justified. Wash. MSJ, Dkt. 118, at 45 (characterizing HHS's motivation of ensuring statutory compliance by avoiding "commingling" as "based on pure speculation"); NFPRHA MSJ, Dkt. 121, at 61-65 (disputing HHS's evaluation of "purported benefits and asserted needs"). Plaintiffs claim that there is no record of misuse of Title X funds under the 2000 regulations. Wash. MSJ, Dkt. 118, at 45; NFPRHA MSJ, Dkt. 121, at 63. However, Plaintiffs do not and cannot deny that abortion providers have a history of misusing taxpayer funds. The instances of abuse are widespread, well-documented, and involve many millions of dollars. *See* Catherine Glenn Foster, Charlotte Lozier Institute & Alliance Defending Freedom, *Profit. No Matter What, 2017 Report on Publicly Available Audits of Planned Parenthood Affiliates and State Family Planning Programs*, https://s27589.pcdn.co/wp-content/uploads/2017/01/plannedparenthood-profit-no-matter-what.pdf ("Abuse of Funds Report"); Foster, Charlotte Lozier Institute & Alliance Defending Freedom, *Planned Parenthood: Profit. No Matter What*, https://lozierinstitute.org/profit-no-matter-what/ (summarizing and linking to Abuse of Funds Report; cited in the Final Rule, 84 Fed. Reg. at 7725 n.33).

In one lawsuit, a major abortion provider paid at least $4.3 million dollars to settle claims of abuse of federal funds—and that case related to only certain claims in Texas. Abuse of Funds Report at 8, 28. While audits and investigations to date have been limited, due largely to successful political efforts by abortion providers,[1]

---

[1] For example, in 2002, as in other years, Planned Parenthood "spent millions of dollars to elect politicians who support abortion and who defend and shield Planned Parenthood from any serious audit or investigation or other congressional oversight." Abuse of Funds Report at 46 n.5.

BRIEF OF AMICUS CURIAE SUSAN B. ANTHONY LIST - Page 6 of 10

they have nevertheless uncovered instances of federal-funds abuse of at least $12.8 million. *Id.* at 4, 8, 46 n.5. Former employees of abortion providers and others allege abuse of many more millions of dollars. *Id.* at 4-5, 8, 28-31.

Any assertion that abortion providers' well-documented abuse of taxpayer funds designated for Medicaid or other federal programs doesn't also support increased accountability in the Title X context is meritless. As HHS notes, although abortion providers' documented abuses of other federal program funds do not definitively prove the existence of similar abuses of Title X, they do help illustrate the need for appropriate accountability. 84 Fed. Reg. at 7725.

In fact, as HHS also notes, it is even easier to abuse Title X funds than it is to abuse certain other forms of public funding (e.g., Medicaid funds), because Title X funds are disbursed as grants *before* services are rendered. *See* 84 Fed. Reg. at 7773 ("Title X funds go to centers up front as grants, rather than after the fact as reimbursement for services centers have provided to individual enrollees."). That "increas[es] the possibility of intentional or unintentional misuse of funds," making "[a]ppropriate accountability standards . . . particularly appropriate in the case of grant programs such as Title X." *Id.* at 7725.

Concerns about abuse of Title X funds are particularly warranted where abortion providers who receive Title X funds have demonstrably abused federal funds in the past. Where abortion providers have abused one type of federal funds, it is more than reasonable—and certainly not arbitrary and capricious—to seek accountability for those same entities with respect to other types of federal funds that are even easier to abuse.

> **B. Abortion providers' own arguments reinforce concerns that they have been misusing Title X funds to subsidize their abortion businesses.**

On top of the evidence of abortion providers' past misuse of public funds, the Final Rule's critics have conceded the propriety of the rule in their own arguments and admissions. For example, Washington claims that separating Title

BRIEF OF AMICUS CURIAE SUSAN B. ANTHONY LIST - Page 7 of 10

X programs from "all of [the State Department of Health's] other work . . . that touch[es] on abortion" would be "impossibly burdensome, disruptive, and costly." Wash. MSJ, Dkt. 118, at 30; *see also* NFPRHA MSJ, Dkt. 121, at 58 (predicting that "major costs will push providers from the Title X network and discourage other providers from joining it").. Those arguments echo comments received by HHS from family planning providers claiming that it would be too costly for them to impose a genuine physical separation between their Title X-funded services and their abortion-related services. *See* 84 Fed. Reg. at 7766.

What Plaintiffs present as an argument in favor of the status quo is in fact an indictment of it. Title X states plainly that "[n]one of the funds appropriated under this subchapter shall be used in programs where abortion is a method of family planning." 42 U.S.C. § 300a-6. In other words, Title X funds were never supposed to have been used to subsidize or facilitate any program that treats abortion as a method of family planning. The Rule therefore imposes no "sudden burdens." *Contra* Wash. MSJ, Dkt. 118, at 28. On the contrary, if providers cannot logistically or financially sustain abortion-supportive activities separately from the provision of Title X-eligible health care, then their programs are in violation of the plain terms of Title X. Title X recipients who have long been violating the plain terms of Title X have no "reliance interest" in continuing to do so. *Contra* Washington Br., Dkt. 118, at 28.

Title X-eligible services will not be rendered costlier by the Final Rule. To the extent that the Final Rule will jeopardize or increase the cost of non-Title X-eligible services (e.g., abortion), it should go without saying that the Federal Government is under no obligation to underwrite any such activities. And more than that, where the "activities" in question are referral for and provision of abortion as a method of family planning, such underwriting is statutorily prohibited. *See* 42 U.S.C. § 300a-6. Thus, the fact that the Final Rule would make it more burdensome for Title X-funded programs to provide abortion services only

BRIEF OF AMICUS CURIAE SUSAN B. ANTHONY LIST - Page 8 of 10

proves that the Rule is warranted and well-justified.  *See* 84 Fed. Reg. at 7766 ("Commenters' insistence that requiring physical and financial separation would increase the cost for doing business only confirms the need for such separation.").

## CONCLUSION

Plaintiffs in these consolidated actions come into federal court to insist on the prerogative of abortion providers to continue commingling their abortion businesses with their provision of Title X-eligible health care services, despite the fact that such commingling is plainly prohibited by federal law.  The past misconduct of abortion providers, combined with their own admissions, provide ample proof that the Final Rule is neither arbitrary nor capricious, and that it is in fact a much-needed response to widespread violation of federal law.

DATE: 01/23/2020                     Respectfully submitted,

                                             By: s/George M. Ahrend
                                                   George M. Ahrend
                                                   Adam S. Hochschild, *pro hac vice*

                                                *Attorneys for Amicus Curiae*
                                                  *Susan B. Anthony List*

CERTIFICATE OF SERVICE

I hereby certify that on January 23, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System, which in turn automatically generated a Notice of Electronic Filing (NEF) to all parties in the case who are registered users of the CM/ECF system.

I hereby certify that I have mailed by United States Postal Service the document to the following non-CM/ECF participants:

None.

s/George M. Ahrend<br>
George M. Ahrend, WSBA #25160<br>
Ahrend Law Firm PLLC<br>
100 E. Broadway Ave.<br>
Moses Lake, WA 98837<br>
(509) 764-9000<br>
(509) 464-6290 Facsimile<br>
Email gahrend@ahrendlaw.com

BRIEF OF AMICUS CURIAE SUSAN B. ANTHONY LIST - Page 10 of 10